_____



**SO ORDERED,**

**Judge Selene D. Maddox**

**United States Bankruptcy Judge**

**The Order of the Court is set forth below. The case docket reflects the date entered.**
_____

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF MISSISSIPPI

IN RE: UNITED FURNITURE INDUSTRIES, INC.          CASE NO. 22-13422-SDM

DEBTOR                                            CHAPTER 11

## MEMORANDUM OPINION AND ORDER GRANTING UNITED FURNITURE INDUSTRIES, INC.'S MOTION TO CONVERT CASE TO CHAPTER 11, DENYING AS MOOT WELLS FARGO BANK, NATIONAL ASSOCIATION'S EMERGENCY MOTION FOR APPOINTMENT OF AN INTERIM TRUSTEE, AND ORDERING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

This bankruptcy case came before the Court on two matters: (1) the *Emergency Motion of Wells Fargo Bank, National Association, for Appointment of an Interim Trustee and Certain Related Relief* (the "Motion to Appoint an Interim Trustee")(Dkt. #6) filed by Wells Fargo, National Association ("Wells Fargo"); and (2) the *Motion of United Furniture Industries, Inc. to Convert Debtor's Case to Chapter 11* (the "Motion to Convert")(Dkt. #42) filed by United Furniture Industries, Inc. ("UFI"). Several responses, replies, joinders, and oppositions were filed by various interested parties which included the following:

(1) *Renasant Bank's Response to Emergency Motion of Wells Fargo Bank, National Association, for Appointment of an Interim Trustee and Certain Related Relief* filed by Renasant Bank ("Renasant")(Dkt. #28);

(2) A *Joinder in Emergency Motion of Wells Fargo Bank, National Association for Appointment of an Interim Trustee and Certain Related Relief*, filed by Frances Denise Alomari ("Alomari")(Dkt. #30):

(3) A *Reply of Wells Fargo Bank, National Association, to Renasant Bank's Response to Emergency Motion for Appointment of an Interim Trustee and Certain Related Relief*, filed by Wells Fargo (Dkt. #38);

(4) An *Opposition of Alleged Debtor to the Emergency Motion of Wells Fargo Bank, National Association, for the Appointment of an Interim Trustee and Certain Related Relief*, filed by UFI (Dkt. #41);

(5) A *General Response to Motion of United Furniture Industries, Inc. to Convert Debtor's Case to Chapter 11*, filed by Alomari (Dkt. #68); and

(6) *Wells Fargo Bank, National Association's (A) Reply to Alleged Debtor's Opposition to Emergency Motion for Appointment of an Interim Trustee and Certain Related Relief; (B) Opposition to Motion to Convert Debtor's Case to Chapter 11; and (C) Cross-Motion Directing the Appointment of a Chapter 11 Trustee Pursuant to §§ 1104(a)(1) or 1104(a)(2)*, filed by Wells Fargo (Dkt. #69).

The Court held a hearing on the Motion to Appoint an Interim Trustee and the Motion to Convert on January 13, 2023, during which the Court instructed the parties to present arguments

and evidence on the Motion to Convert first.[1] Following closing arguments on the Motion to Convert, the Court announced that it would be taking the matter under advisement, issuing a bench ruling via telephonic hearing on January 18, 2023, and continuing the Motion to Appoint an Interim Trustee to a later date. The Court conducted a telephonic status hearing at which the Court issued its ruling (1) granting UFI's Motion to Convert; (2) denying the Motion to Appoint an Interim Trustee as moot; and (3) ordering the appointment of a Chapter 11 trustee. This Memorandum Opinion and Order memorializes, incorporates, and supplements the Court's bench ruling made on January 18, 2023 by reference and includes findings of fact and conclusions of law. Based on the law and facts as detailed below, the Court finds that the Motion to Convert should be granted and that this bankruptcy case should be converted from an involuntary Chapter 7 case to a voluntary case in Chapter 11. Further, because this bankruptcy case is converted to Chapter 11, the Motion to Appoint an Interim Trustee is denied as moot. Finally, the Court orders the United States Trustee (the "UST") to appoint a Chapter 11 trustee in this case as expeditiously as possible.

## I. JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a) and the Standing Order of Reference signed by Chief District Judge L.T. Senter and dated August 6, 1984. This is a "core proceeding" under 28 U.S.C. §§ 157(b)(2)(A) (matters concerning the administration of the estate) and 157(b)(2)(O) (other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims).

---

[1] The Court entertained the Motion to Convert prior to the Motion to Appoint an Interim Trustee because, if the bankruptcy case were converted to a case under Chapter 11, the Motion to Appoint an Interim Trustee would be moot.

## II. FACTS[2] AND PROCEDURAL HISTORY

UFI, an Ohio corporation formed in 2000, operated as a manufacturer of budget-friendly sofas and recliners for various retailers and operated facilities in multiple locations, including its corporate headquarters in Verona, Mississippi. On November 21, 2021, UFI abruptly closed, ceased all operations, and terminated approximately 2,700 employees. After learning about the abrupt closure of UFI, Wells Fargo, UFI's senior secured lender, "stepped in" and attempted to preserve its collateral and protect UFI's assets. Wells Fargo retained Focus Management Group ("Focus"), a consulting firm specializing in turnaround, restructuring, and other advisory work to secure UFI's properties and begin liquidating Well Fargo's collateral. Wells Fargo and Focus then hired security for UFI's properties and secured insurance on UFI's inventory.

On November 23, 2022, Todd Evans ("Evans"), UFI's Chief Executive Officer ("CEO") and Lynda Barr ("Barr"), UFI's Chief Financial Officer ("CFO"), tendered their resignations to UFI's board of directors, David Belford ("Belford") and Jason Gabauer ("Gabauer") (collectively, "the Original Board"). Following these resignations, UFI appointed Kimberly Harper ("Harper") as CFO on December 1, 2022. That same day, Harper selected Mark Melickian ("Melickian") of Sugar Felsenthal Grais & Helsinger LLP ("Sugar Felsenthal") to serve as UFI's general counsel. Harper additionally re-employed former UFI employees between December 4 and December 5, 2022, to assist with accounting, human resources and payroll issues, IT administration, and network administration and support. On December 9, 2022, UFI engaged Oxford Restructuring

---

[2] The facts enumerated in this Opinion and Order were derived from the parties' pleadings, arguments, and evidence presented on the Motion to Convert. Even though the Court did not entertain the merits of the Motion to Appoint an Interim Trustee and denied it as moot, the facts as pled in the parties' pleadings related to the Motion to Appoint an Interim Trustee were considered and relevant to the Court's decision to allow UFI's conversion and to order the appointment of a Chapter 11 trustee.

Advisors ("Oxford") for assistance with a potential bankruptcy filing, and on December 21, 2022, UFI engaged Hahn Loeser & Parks LLP as bankruptcy co-counsel to work with Melickian. On December 23, 2022, the Original Board appointed Alpesh Amin ("Amin") as Chief Restructuring Officer ("CRO") and engaged Amin's consulting firm, Riveron Management Services, LLC ("Riveron") to provide additional support in connection with a potential bankruptcy filing.

Before UFI could file its own voluntary bankruptcy case, Wells Fargo, Security Associates of Mississippi/Alabama, LLC ("Security Associates"), and V&B International, Inc. ("V&B") (collectively, the "Petitioning Creditors") filed an involuntary Chapter 7 petition (the "Involuntary Petition") on December 30, 2022. The Petitioning Creditors alleged through the Involuntary Petition that UFI had not been paying its debts as they became due. The following day, Wells Fargo filed its Motion to Appoint an Interim Trustee. On January 3, 2023, the involuntary summons was issued on UFI, and on January 4, 2023, the summons was executed (*Certificate of Service of Executed Summons*, Dkt. #22). Shortly before the hearing on January 6, 2023, UFI filed its Response to the Motion to Appoint an Interim Trustee and its Motion to Convert. Due to these additional filings by UFI, the Court continued the Motion to Appoint an Interim Trustee to January 13, 2023. Likewise, the Court entered its *Order Setting Expedited Hearing on Motion to Convert* (Dkt. #48), which scheduled the hearing on the Motion to Convert for the same date and time.

*UFI's Motion to Convert*

In its Motion to Convert, UFI argued that § 706(a) of the Bankruptcy Code grants it the "absolute right" to convert a case from Chapter 7 to Chapter 11 if the case had not previously been converted and the Debtor would be eligible to be a debtor under Chapter 11. To support this argument, UFI cited to the legislative history of § 706(a), specifically to the House Committee Report on the provision. Further, UFI argued that the "only instances" where conversion was

denied involved circumstances amounting to bad faith, abuse of process, imposition on the court's jurisdiction, or other gross inequity.

*Wells Fargo's Omnibus Pleading and Alomari's Response*

With respect to UFI's Motion to Convert, Wells Fargo challenged UFI's assertion that it has a one-time, "absolute right" to convert its case from one in Chapter 7 to a case in Chapter 11 under § 706(a), citing to *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365 (2007) in support. Wells Fargo argued that under *Marrama*, if a debtor engages in bad faith conduct, a Court may deny a request for conversion from Chapter 7 to Chapter 11. Wells Fargo also argued that UFI (and majority equity holder, Belford), engaged in prepetition bad faith conduct by abruptly shuttering operations, terminating employees, and abandoning its properties. In addition, Wells Fargo argued that UFI's inactions following its closure, but prior to Harper's appointment as CFO on December 1, 2022, demonstrated UFI's failure to preserve and secure estate assets and work with its many creditors, employees, and other interested parties.

Wells Fargo avers that, even after the retention of Harper as CFO and Amin as CRO, Wells Fargo and Focus were "required to continue efforts to secure and preserve UFI's assets" and other ancillary issues, including, but not limited to: (1) maintaining security at UFI sites; (2) maintaining insurance on UFI's inventory; (3) dealing with third-party requests to recover property held by UFI; (4) identifying equipment owned by third parties and unloading third-party trailers for return to their owners; and (5) collecting accounts receivable. According to Wells Fargo, because any Chapter 11 case would involve a plan of liquidation, reorganization would be futile, and UFI failed to provide any justification for why the estate should bear the additional costs of a Chapter 11 bankruptcy case. Finally, with respect to UFI's alleged bad faith conduct, Wells Fargo argued that any Chapter 11 process to liquidate UFI's assets would be overseen by management appointed by

the Original Board, specifically Belford, who, according to Wells Fargo, has a family trust holding security interests in UFI's real estate. Wells Fargo contended that any sale process could potentially benefit UFI's real estate secured creditors and Belford.

In addition to its opposition to the Motion to Convert, Wells Fargo requested that, if the Court determined conversion to Chapter 11 to be appropriate in this case, the Court should only do so conditioned on the appointment of a Chapter 11 trustee under § 1104(a). Wells Fargo claimed that "cause" existed to appoint a Chapter 11 trustee under § 1104(a)(1) for several reasons, including: (1) UFI's "lack of integrity" in shutting down its business with no prior notice to Wells Fargo and UFI's employees and its gross mismanagement in doing the same; (2) UFI's "ongoing incompetence" in preserving UFI's assets and addressing other ancillary issues; (3) conflicts of interest, specifically between UFI and Belford; and (4) the potential for UFI's lack of credibility among creditors due to UFI's failure to address creditor claims at any time after the abrupt closure of UFI's facilities and business operations.

Further, Wells Fargo argued that a trustee should be appointed under § 1104(a)(2) because such an appointment would be in the best interests of the creditors and the bankruptcy estate. Rather than presenting a plan to take over security at UFI's facilities or insure collateral, Wells Fargo argued that UFI is solely focused on proposing to run a real estate sale process that would benefit Belford and real estate creditors. The conflict of loyalties, Wells Fargo argued, would result in the loss of confidence of creditors and, to protect the assets of the estate and the creditors, an independent trustee should be appointed to appropriately control and dispose of valuable assets while ensuring that the interests of creditors would be protected.

Concerning Alomari's position, she argued that while there was no proof of evidence at this stage of outright fraud committed by UFI, the abrupt shutdown of operations was not justified,

could have been avoided, and led to a chaotic atmosphere with UFI's employees, vendors, creditors, and other parties. Alomari also argued that it would not be in her best interest (or in the interest of other employees similarly situated) to fight over whether UFI has the right to convert. Nevertheless, Alomari argued for the immediate appointment of a Chapter 11 trustee to oversee an orderly liquidation because of the lack of faith in UFI to oversee a sale process. Further, Alomari argued that an independent Chapter 11 trustee would be better positioned to examine prepetition actions or inactions on the part of UFI and its management and employees without any conflicts of interest.

*The Hearing on January 13, 2023*

UFI, Wells Fargo, and Alomari presented arguments to the Court at the hearing on January 13, 2023. Four witnesses were called: (1) Alpesh Amin; (2) Lynda Barr; (3) Marc Grossman; and (4) Michael Grau. To begin, UFI argued that the Court should convert the involuntary Chapter 7 bankruptcy case to a case under Chapter 11 because of its eligibility to be a debtor under Chapter 11, and if Wells Fargo believed that the case should be reconverted to Chapter 7, or if Wells Fargo believed that a Chapter 11 trustee is necessary, it could file the appropriate motions later. Tr. Oral Arg. at 10 (Dkt. #83). While not mentioned in her pleadings, Alomari raised concerns of over-professionalism and the costs associated with retaining such professionals if their employment was approved by the Court. Tr. Oral Arg. at 12-13. In fact, Alomari stated that, because this bankruptcy case is a simple liquidation, other brokers could be retained on a commission basis as opposed to hiring professionals charging hourly rates. Tr. Oral Arg. at 13 (Dkt. #83). Alomari's greatest concern in converting the case to Chapter 11 was the overall cost. Tr. Oral Arg. at 13 (Dkt. #83).

Wells Fargo opened by outlining the actions taken by UFI between November 21, 2022, and the Involuntary Petition date, including the abrupt closure of its facilities and its termination

of all employees. Tr. Oral Arg. at 14 (Dkt. #83). In addition to the arguments made in its pleadings,

Wells Fargo claimed that only an independent fiduciary—whether that be a Chapter 7 trustee or a

Chapter 11 trustee—would be able to adequately marshal, protect, and liquidate UFI's assets and

creditors. Tr. Oral Arg. at 15 (Dkt. #83). Wells Fargo addressed UFI's assertion that it would be

receiving a loan in the amount of approximately $10 million to run a real estate sale process

resulting in $50 million in unencumbered value[3] and argued that UFI provided no support for this

alleged $10 million in funding. Tr. Oral Arg. at 21-22 (Dkt. #83). In fact, Wells Fargo argued that

any plan presented would be overseen by management installed and paid for post-abandonment

by UFI's majority equity shareholder, Belford. Tr. Oral Arg. at 22 (Dkt. #83).

*Amin's Testimony*

Amin testified that, before his retention as CRO at UFI on December 23, 2022, he

previously worked with several consulting firms during his 21-year career and primarily served as

an interim manager to companies, boards, and stakeholders experiencing some form of distress or

transformation. Tr. Oral Arg. at 32 (Dkt. #83). As CRO, Amin testified that he became the "senior-

most ranking officer" of UFI and its business. Tr. Oral Arg. at 38 (Dkt. #83).

Amin also testified about Stage Capital, a "family office investment fund" owned and

controlled by Belford. Tr. Oral Arg. at 37 (Dkt. #83). Amin stated that Stage Capital had a majority

ownership interest in UFI, and to his knowledge, in addition to Belford and Gabauer's roles as

members of the Original Board, UFI needed an "independent board" in furtherance of a

---

[3] UFI made this assertion in its *Opposition of Alleged Debtor to the Emergency Motion of Wells Fargo Bank, National Association, for the Appointment of an Interim Trustee and Certain Related Relief* (Dkt. #41). As previously mentioned, the Court will not address arguments made in pleadings on the Motion to Appoint an Interim Trustee. However, UFI's assertion that it will be receiving approximately $10 million to fund a real estate sale that will garner approximately $50 million in unencumbered value was relevant in this Court's decision to convert this bankruptcy case and order the appointment of a trustee.

"demonstration of independence." Tr. Oral Arg. at 37-38 (Dkt. #83).  Amin testified that he

oversaw the appointment of two individuals from Oxford—John Pidcock ("Pidcock") and Andrew

Simon ("Simon")—as proposed independent board members (collectively, the "New Board"), and

that at the time of the resignation of the Original Board members, Pidcock and Simon would act

as the sole New Board members of UFI. Tr. Oral Arg. at 39 (Dkt. #83). Amin maintained that,

since his appointment as CRO on or about December 23, 2022, he was not taking direction from

Belford or any other member of Stage Capital. Tr. Oral Arg. at 40 (Dkt. #83). In fact, despite being

the individual that appointed the New Board, Amin testified that he "report[s] to the independent

directors." Tr. Oral Arg. at 60, 62 (Dkt. #83).

        In executing his duties as CRO, Amin stated that he worked to organize a team of

restructuring professionals, including: (1) an individual to work as a "facility and security person,"

(2) individuals to work in IT and infrastructure; (3) a team of core winddown and liquidation

personnel (consisting of a managing director, a senior director, and two directors); (4) a consulting

firm, B. Riley, that handles real estate matters and "healthy and distressed" business transformation

(which includes Michael Jerbich ("Jerbich"), who leads a real estate disposition services group

that includes two additional professionals); and (5) legal counsel from Sugar Felsenthal,

Melickian, Han Loeser, and local counsel from Mississippi. Tr. Oral Arg. at 40-42 (Dkt. #83).

Amin briefly discussed the commission rates of these professionals on his direct examination,

testifying that, while the real estate disposition team at B. Riley was working on a commission

basis, the other professionals' compensation was "commensurate with other firms in the industry"

and consistent with their standard rate structure. Tr. Oral Arg. at 43 (Dkt. #83).

        Amin further testified concerning his dealings with Wells Fargo and its group of

professionals. Amin stated that he had assisted Wells Fargo's outside counsel as well as Wells

Fargo's financial advising group, Focus, who was being led by Michael Grau ("Grau"). Tr. Oral

Arg. at 44-45 (Dkt. #83). Amin acknowledged that, upon shutdown of the company, Wells Fargo

stepped in and placed 24/7 security at all UFI facilities and funded (and continues to fund) certain

property carrying costs. Tr. Oral Arg. at 47, 51 (Dkt. #83). However, Amin testified that, at the

time of his appointment, UFI began to act regarding utility service payments, outreach from

landlords, and creditor inquiries. Tr. Oral Arg. at 47-49 (Dkt. #83). With regard to security, Amin

testified that he believed it was appropriate that UFI take over from Wells Fargo, and, in that vein,

began receiving quotes from security firms. Tr. Oral Arg. at 51 (Dkt. #83).

Much of Amin's cross examination related to UFI's New Board, the restructuring

professionals he assisted in appointing, UFI's equity shareholders or, more specifically, Stage

Capital, and certain budget items and insider loans that had been contemplated with respect to

debtor-in-possession financing. Amin confirmed that he appointed Pidcock and Simon to the New

Board and that he, acting as CRO, had the authority to relieve them of their respective positions if

necessary. Tr. Oral Arg. at 61-62 (Dkt. #83). But Amin later acknowledged that he failed to read

UFI's code of regulations, i.e., its bylaws, prior to appointing Pidcock and Simon to the New

Board. Tr. Oral Arg. at 62 (Dkt. #83). When asked whether equity, or Stage Capital, had the power

to dismiss the independent directors, Amin stated that it was his understanding that it cannot. Tr.

Oral Arg. at 65 (Dkt. #83).

Alomari questioned Amin regarding UFI's hired restructuring professionals and their

specific compensation rates. With respect to the winddown and liquidation team, he indicated that

his current hourly rate is $815.00 per hour, with the managing director earning $740.00 per hour,

the senior director earning $600.00 per hour, and both directors earning $535.00 per hour,

respectively. Tr. Oral Arg. at 55 (Dkt. #83). When asked about B. Riley's specific commission

rate, Amin stated that their commission rate was 3% of gross sale proceeds of any real estate disposition. Tr. Oral Arg. at 55 (Dkt. #83). Amin further clarified that B. Riley was working to assist UFI in finding a group to take over all property management services (including security and upkeep) and that, for this work, B. Riley was not charging UFI any fees. Tr. Oral Arg. at 56 (Dkt. #83).[4]

Concerning Stage Capital, Amin testified that, while Belford and Gabauer had resigned their positions on the Original Board, they had not relinquished equity security interests in UFI. Tr. Oral Arg. at 61 (Dkt. #83). Amin also received questions about the independent directors' and his team's compensation and, although initially testifying that "United Furniture Industries [was] paying" them, he clarified that he and his team were "being funded by insider loans" coming from Stage Capital. Tr. Oral Arg. at 63-64 (Dkt. #83). When asked about the amount of the insider loan from Stage Capital, Amin testified that he did not know. Tr. Oral Arg. at 64 (Dkt. #83). Amin further testified that he and his team were not operating under a budget regarding the insider loan. Tr. Oral Arg. at 75 (Dkt. #83).

Finally, Wells Fargo questioned Amin regarding a liquidating budget that he and his team prepared. He confirmed that the total debtor-in-possession forecast indicated necessary funding in the amount of $40,231,009, but that the budget did not include cash inflows and did not demonstrate asset proceeds offsetting the $40 million funding needed by UFI to continue "operations". Tr. Oral Arg. at 74 (Dkt. #83). Wells Fargo additionally questioned Amin about UFI's assertion that it has $10 million in funding to run a sale of the company's real estate

---

[4] Alomari also questioned Amin about the hourly rates of the lawyers and law firms that UFI retained. Despite acknowledging that UFI and its counsel agreed to their hourly rates upon retention, Amin did not know what their hourly rates were. Tr. Oral Arg. at 57 (Dkt. #83). With respect to Melickian, Amin testified that he would expect the average fair rate to be $800.00 per hour. Tr. Oral Arg. at 58 (Dkt. #83).

portfolio, and, upon being asked where the $10 million was coming from, Amin again stated that

Stage Capital would be the source of funding. Tr. Oral Arg. at 76, 81-82 (Dkt. #83); see also Wells

Fargo Ex. 3.[5]

*Other Relevant Testimony*

The Court heard testimony from Barr, UFI's former CFO who currently works as an

independent consultant for Focus. Barr had previously worked as the UFI's CEO from June 26,

2022 until her termination/resignation on November 21, 2022. Tr. Oral Arg. at 94 (Dkt. #83). Barr

discussed the events that occurred in the days prior to her termination on November 21 and stated

that, initially, Belford and Gabauer expressed an intent to fund approximately $6 million to allow

the company to continue to assess its refinancing. Tr. Oral Arg. at 95-97 (Dkt. #83). However,

after it became clear that Wells Fargo could not contribute $6 million to UFI (or engage in

combined financing) in a timely manner and without a secondary collateral position in the

inventory, Belford and Gabauer rescinded their offer. Tr. Oral Arg. at 95-97 (Dkt. #83). Barr stated

that by 11:45 p.m. on November 21, 2022, she received a resolution from the Original Board,

signed by Belford and Gabauer, instructing her and Evans to terminate all employees. Tr. Oral

Arg. at 99 (Dkt. #83). Barr also read onto the record a text message correspondence sent to all UFI

employees on November 21, 2022, at 11:43 p.m., stating that all employees were terminated,

effective immediately. Tr. Oral Arg. at 100 (Dkt. #83); Ex. 5.

Grossman, managing director of Wells Fargo, testified about the security that had been

placed at the various UFI sites. Grossman testified that Wells Fargo funded the payments for

---

[5] Wells Fargo questioned Amin about the contents of a "term sheet" titled "$10 Million
Secured Superpriority Debtor in Possession Credit Facility", which the Court admitted in evidence
as Exhibit 3. When asked about the blank "proposed lender" section of the agreement, Amin stated
that he understood the lender to be Stage Capital.

security and other asset protections in the amount of $1,500,000.00. Tr. Oral Arg. at 106-07 (Dkt. #83). Grossman additionally testified that, as of their respective appointments on December 1, 2022, and December 23, 2022, Grossman had not had any direct communications with Amin or Harper. Tr. Oral Arg. at 106-07 (Dkt. #83).

Last, Grau, a manager at Focus, testified as to his involvement in UFI's operations post-closure, prepetition, and postpetition. Grau testified that when Wells Fargo retained Focus, he and his team first went on site to UFI's properties in Tupelo, Mississippi and the Winston-Salem, North Carolina facility, where Grau found the facilities "completely abandoned," with no UFI employees present. Tr. Oral Arg. at 112-13 (Dkt. #83). According to Grau, Focus immediately began discussions with several security providers in both Mississippi and North Carolina to implement security measures at both facilities. Tr. Oral Arg. at 114 (Dkt. #83). Grau stated that UFI's closure created multiple issues, including ongoing attempts by third parties to gain access to facilities, repossession by equipment lessors and third parties of equipment and trailers, and the unannounced arrival of 25-30 former employees seeking to retrieve their belongings. Tr. Oral Arg. at 115-19 (Dkt. #83).

UFI addressed several points in their closing argument, including their retention of restructuring professionals, the financing UFI has available to run a successful Chapter 11 liquidation if this case was converted, the New Board, UFI's code of regulations, and bad faith. First, UFI argued that the evidence showed it took substantial steps between its "unexpected" closure and the filing of the Involuntary Petition in furtherance of an anticipated Chapter 11 filing, including putting professionals in place to guide UFI through its liquidation. Tr. Oral Arg. at 121 (Dkt. #83). With respect to the professionals' compensation, UFI argued that parties with objections to professional employment or rates would have the opportunity to object to any rates

or fees when the employment and fee applications are before the Court. Tr. Oral Arg. at 125. UFI

argued that it took additional steps to secure debtor-in-possession financing through a pending

agreement with Stage Capital. Tr. Oral Arg. at 121 (Dkt. #83). While feasibility "[was] not before

the court," UFI argued that its current financing in addition to anticipated net sales of its real estate

would be sufficient to run a successful Chapter 11 liquidation for the benefit of unsecured creditors.

Tr. Oral Arg. at 122 (Dkt. #83).

UFI also discussed "equity," or Belford, and the "bad, bad thing" that it did in November:

the abrupt and disorganized closure of UFI and the termination of all its employees. UFI stated

that the question before the Court was whether the decisions amount to bad faith and an abuse of

the bankruptcy process, not whether the actions were wise. Tr. Oral Arg. at 123 (Dkt. #83). UFI

argued the officers, professionals, and staff currently retained by UFI are independent and

competent, and that none of these individuals report to the individuals behind the November

shutdown. Tr. Oral Arg. at 123 (Dkt. #83). UFI briefly addressed UFI's code of regulations with

respect to shareholder authority to appoint directors, arguing that shareholders "will always have

the authority to appoint directors." Tr. Oral Arg. at 124 (Dkt. #83).

Alomari's closing argument attacked UFI's claim of management independence and the

potential over-professionalism in a Chapter 11. Alomari began by pointing out that though Amin

appointed the New Board conditioned upon Belford and Gabauer's resignation, the equity

shareholders continue to have their equity security interests in UFI and could, theoretically, "get

rid of Mr. Amin at any time." Tr. Oral Arg. at 126. Additionally, Alomari argued that UFI is subject

to the equity shareholder's proposed debtor-in-possession financing and that, though UFI is

independent on paper, the financing is still being directed by equity. Tr. Oral Arg. at 126 (Dkt.

#83). Alomari concluded by stating that she would welcome a committee or an independent trustee

to analyze claims and the actions taken prepetition because, in Alomari's words, "[UFI] is hopelessly conflicted." Tr. Oral Arg. at 128 (Dkt. #83).

Wells Fargo addressed UFI's right to conversion, bad faith, and UFI's control and funding as it relates to the equity shareholders and Belford. Wells Fargo argued that the circumstances the Court should consider are UFI's prepetition activity and decision-making, a lack of possibility of reorganization, and UFI's inability to meet current expenses. Tr. Oral Arg. at 129 (Dkt. #83). In that vein, Wells Fargo argued that UFI failed to controvert proof of these claims outside of the testimony of Amin—the CRO that could be replaced by the equity shareholders at any moment. Tr. Oral Arg. at 129-30 (Dkt. #83). With respect to these equity shareholders, Wells Fargo argued that they are entities controlled or owned by Belford, who is the same individual who reneged on his offer to give UFI $6 million in financing and terminated 2,700 of UFI's employees. Tr. Oral Arg. at 130 (Dkt. #83). With respect to the $10 million debtor-in-possession loan offered by Stage Capital for funding a real estate sale, Wells Fargo argued that the term sheet was "misleading" and that there was no evidence that the offer was "real or not." Tr. Oral Arg. at 130 (Dkt. #83). Wells Fargo also argued that UFI presented no testimony or evidence demonstrating that there is $50 million in equity that could be recovered upon a sale of its real estate. Tr. Oral Arg. at 130 (Dkt. #83).

## III. DISCUSSION

### A. UFI does not have an "absolute" right to convert.

The relevant portions of § 706 of the Bankruptcy Code state that a debtor may convert a Chapter 7 case if the case has not been previously converted under §§ 1112, 1208, or 1307, and the debtor qualifies as a debtor under another chapter. 11 U.S.C. § 706(a), (d). On February 21, 2007, the United States Supreme Court handed down its opinion in *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365 (2007), addressing the widely accepted contention that 11 U.S.C.

§ 706(a) creates an "absolute," one-time right of conversion from a bankruptcy case under Chapter 7 to a case under Chapter 11 or 13.[6] While the Supreme Court acknowledged language contained in both the House and Senate Committee Reports[7] on the provision indicating that such a right exists, the Supreme Court rejected this, noting that the Committee's reference to an "absolute right" was "more equivocal" than suggested. *Id*. at 372. Rather, the Supreme Court found that § 706(d) and the phrase "unless the debtor may be a debtor under such chapter" conditions a debtor's right to convert on its ability to "qualify" as a debtor in Chapter 13. *Id*.

To begin, although UFI alleged in its Motion to Convert that it had an absolute right to convert its bankruptcy case based the legislative history of § 706, as correctly pointed out by Wells Fargo, it does not. UFI cites pre-*Marrama* case law[8] to support that argument, which is not relevant considering the limiting language contained in § 706(d) as interpreted by the Supreme Court in *Marrama*. The Court need not belabor this point. Much of the arguments and evidence presented

---

[6] The Court previously addressed *Marrama* being the controlling law on conversion under § 706(a) in *In re Dennis and Brenda Wester*, Case No. 19-13140-SDM (Bankr. N.D. Miss. 2020).

[7] The Senate Report reads: "Subsection (a) of this section gives the debtor the one-time absolute right of conversion of a liquidation case to a reorganization or individual repayment plan case. If the case has already once been converted from chapter 11 or 13 to chapter 7, then the debtor does not have that right. The policy of the provision is that the debtor should always be given the opportunity to repay his debts, and a waiver of the right to convert a case is unenforceable." *Id*., citing S. Rep. No. 95-989, p. 94 (1978). The House Report contains nearly identical language. *Id*. UFI cited to this House Report in support of their Motion to Convert.

[8] As stated above, *Marrama* was decided on February 21, 2007. UFI cited the following cases ranging from years 1992 through 1996 in support of its position, which included the argument that even if a debtor had engaged in fraudulent conduct a debtor could be granted a one-time right to convert: *In re Thornton*, 203 B.R. 648, 649 (Bankr. S.D. Ohio 1996); *In re Calder*, 93 B.R. 739, 740 (Bankr. D. Utah 1988); *Finney v. Smith (In re Finney)*, 992 F.2d 43 (4th Cir. 1993); *Stegall v. Adams*, 1992 W.L. 698764 (N.D. Oklahoma); *Calder v. Job (In re Calder)*, 973 F.2d 862 (10th Cir. 1992); *In re Bowman*, 181 B.R. 836 (Bankr. D. Md. 1995); *In re Jennings*, 31 B.R. 378, 380 (Bankr. S.D. Ohio 1983); and *In re Porras*, 188 B.R. 375, 378 (Bankr. W.D. Tex. 1995).

at the hearing concerned alleged bad faith on the part of UFI prepetition, including additional statutory cause as a basis to convert or dismiss UFI's potential Chapter 11 bankruptcy case.

**B. Wells Fargo failed to meet its burden to show that UFI's prepetition activity amounted to bad faith or that UFI's postpetition activity established "cause."**

The Supreme Court in *Marrama* identified two reasons why a debtor may not qualify as a debtor: one arising under § 109(e),[9] and the other turning on the word "cause" as it is articulated in § 1307(c). *Id.* In focusing its discussion on § 1307(c) and "cause," the Supreme Court reasoned:

> [A] Chapter 13 proceeding may be either dismissed or converted to a Chapter 7 proceeding "for cause" and includes a nonexclusive list of 10 causes justifying that relief. [. . .] Bankruptcy courts nevertheless routinely treat dismissal for prepetition bad-faith conduct as implicitly authorized by the words "for cause." [. . .] In practical effect, a ruling that an individual's Chapter 13 case should be dismissed or converted to Chapter 7 because of prepetition bad-faith conduct, including fraudulent acts committed in an earlier Chapter 7 proceeding, is tantamount to a ruling that the individual does not qualify as a debtor under Chapter 13. That individual, in other words, is not a member of the class of "honest but unfortunate debtor[s]" that the bankruptcy laws were enacted to protect.

*Id.* at 373-74 (quoting *Grogan v. Garner*, 498 U.S. 279, 287 (1991)). In other words, the Supreme Court held that only the class of honest but unfortunate debtors possess the absolute right to convert their cases from Chapter 7 to Chapter 13. *Id.* at 374.

*Marrama* addresses a Chapter 7 debtor's conversion to Chapter 13; however, many courts have found *Marrama*'s analysis applicable where a Chapter 7 debtor requests to convert to a case in Chapter 11, reasoning that § 1112(b) serves the same purpose as § 1307(c). *In re Hunter*, 597 B.R. 287, 292 (Bankr. M.D.N.C. 2019); *In re Broad Creek Edgewater, LP*, 371 B.R. 752, 758 (Bankr. D.S.C. 2007)("This Court reads *Marrama* as standing for the proposition that a court should address a motion to convert under § 706(a) as it would address an initial petition filed under

---

[9] Section 109 defines who may or may not be a debtor under Title 11 depending on the chapter. For example, § 109(e) provides aggregate debt limits that may prohibit an individual from qualifying as a debtor under chapter 13.

Chapter 13 (or Chapter 11) in its determination of whether the case should be dismissed or converted.").[10] Therefore, a Chapter 7 debtor seeking to convert to Chapter 11 must be eligible to be a debtor under that chapter and not subject to conversion or dismissal for cause under § 1112(b), including but not limited to bad faith. *In re Hunter*, 597 B.R. at 292.

While the Bankruptcy Code does not define "cause," § 1112(b)(4) provides examples of "cause" that would support dismissal or conversion. "Cause" may be shown if there is substantial or continuing loss to the estate and the absence of a reasonable likelihood of rehabilitation, gross mismanagement of the estate, failure to maintain insurance that poses a risk to the estate or the public, or unauthorized use of cash collateral that is substantially harmful to a creditor. 11 U.S.C. § 1112(b)(4). In addition to the statutory examples of "cause," it is well established in the Fifth Circuit that a Chapter 11 bankruptcy case is subject to dismissal or conversion for cause under § 1112(b) for lack of good faith. *In re Delta AG Grp., LLC*, 596 B.R. 186, 194 (Bankr. W.D. La. 2019) (citing *Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.),* 779 F.2d 1068, 1072 (5th Cir. 1986) (stating that the "lack of good faith in proceedings based on . . . § 1112(b) have been predicated on certain recurring but non-exclusive patterns . . . .")).

In the Fifth Circuit, a "cause" determination requires a consideration of the totality of circumstances. *Matter of T–H New Orleans L.P.,* 116 F.3d 790 (5th Cir. 1997) (finding the

---

[10] Despite courts employing the Supreme Court's analysis in *Marrama* concerning attempted conversion to Chapter 11, the Court is aware that § 1307(c) and § 1112(b) contain slightly different language. Before the 2005 amendments to the Bankruptcy Code, § 1112 contained the language "may convert," which now appears in § 1307(c). The 2005 amendments to the Bankruptcy Code replaced the language "may convert" in § 1112 with "shall convert." Thus, the text alteration "diminishes the discretion the bankruptcy courts have in conversions to Chapter 11". *Broad Creek Edgewater*, 371 B.R. at 759. If cause for dismissal or conversion to Chapter 7 is present, the court's discretion not to convert or dismiss is limited to instances where the court makes specific findings that unusual circumstances establish conversion or dismissal is not in the best interests of creditors and the estate, or if an objecting party in interest establishes that the facts of a specific case fall within the confines of § 1112(b)(2). *Id.*

requirement of good faith must be viewed in the light of the totality of the circumstances concerning establishment of a Chapter 11 plan).[11] Further, courts since *Marrama* agree that the burden is initially on the Debtor to make a *prima facie* showing under § 706 for conversion (i.e., showing no prior conversion of the case, that a debtor is eligible for relief under § 109, and that conversion is to achieve a purpose permitted under chapter 11). *Hunter,* 597 B.R. at 292 (citing, among other cases, *Broad Creek Edgewater*, 371 B.R. at 757). The burden then shifts to the objecting party to show by a preponderance of the evidence that the debtor is not eligible to convert its case. *Id.*

The Court first must address two obvious points. First, there is no dispute (and no evidence was presented) that UFI is ineligible for relief under § 109 of the Bankruptcy Code as a Chapter 11 debtor.  Second, the involuntary petition in this bankruptcy case was filed on December 30, 2022. There is no dispute that the involuntary Chapter 7 bankruptcy case has not been previously converted. Having addressed those issues, the Court must now turn to whether UFI's actions or inactions, both prepetition and postpetition, disqualify it from being a debtor under Chapter 11 of the Bankruptcy Code.

Based on the parties' arguments and evidence produced through testimony and several documents, UFI's business decision to shutter operations, however devastating to thousands of employees, does not rise to the level of bad faith. In addition, UFI's inability, post-closure, to take the appropriate steps to secure its real and personal property leaves the Court at a loss for words—

---

[11] The Supreme Court in *Marrama* also stated the following as it relates to a lack of good faith in the context of conversion: "We have no occasion here to articulate with precision what conduct qualifies as "bad faith" sufficient to permit a bankruptcy judge to dismiss a Chapter 13 case or to deny conversion from Chapter 7. It suffices to emphasize that the debtor's conduct must, in fact, be atypical. Limiting dismissal or denial of conversion to extraordinary cases . . . ." *Marrama*, 549 U.S. at 374-75, n.11.

almost. UFI and its management made serious errors in business judgment and displayed clear financial incompetence, but Wells Fargo failed to show how those actions or inactions are fraudulent.[12] Importantly, most courts that have considered the issue of bad faith in the context of conversion have found bad faith under circumstances wholly distinct from those presented to this Court. *See e.g., In re Sammut*, 486 B.R. 404, 408 (Bankr. E.D. Michigan 2012) (denying motion to convert on grounds of bad faith following the court's entry of judgment denying the debtor a discharge under §§ 727(a)(4)(A) and (a)(5), during which the court determined that the debtor "knowingly and fraudulently, in connection with the case, made a false oath or account."); *and In re Hunter*, 597 B.R. 287, 298-99 (denying motion to convert based on the debtor's failure to disclose conveyances to family members and certain assets in the debtor's schedules). To put it simply, the Court does not equate UFI's conduct with that of debtors committing fraudulent acts.

Even more, while UFI made considerable error in judgment relating to the failure to timely secure or preserve its real and personal property for weeks after shuttering operations, UFI attempted to remedy these issues by the retention of professionals to assist with asset preservation and cooperate with creditors and other parties. Specifically, UFI employed Harper as CEO on December 1, 2022 (only a week post-closure) and Melickian as general counsel. UFI also re-employed former employees several days later to assist with a variety of internal issues, and then on December 9, 2022, employed a group of advisors to assist in filing for bankruptcy relief. The totality of the circumstances show that UFI's exercised flawed business judgment prepetition, but no evidence presented to the Court suggests its actions or inactions constitute bad faith, or an abuse

---

[12] The Court considered Barr's testimony regarding Belford's refusal to provide additional capital to UFI for continued operation. Whether owners or shareholders of a company inject capital to continue operations is a business judgment decision. The Court also points out it considered the fact that UFI at least attempted to secure financing from Wells Fargo pre-closure.

of the bankruptcy process so extreme to qualify as "extraordinary" as the Supreme Court indicated in *Marrama*.

The Court's inquiry as to conversion, however, is not complete. In addition to Wells Fargo's bad faith arguments, Wells Fargo also claims that other cause exists to deny conversion under § 1112(b)(4). Specifically, Wells Fargo claims cause exists to convert or dismiss a Chapter 11 bankruptcy case under § 1112(b)(4)(A) due to UFI's actions or inactions causing a substantial or continuing loss to or diminution of the estate and/or resulting in the absence of a reasonable likelihood of rehabilitation. "Cause" may be shown under this provision if the loss is either substantial *or* continuing (not both) and by showing the debtor suffered or continues to experience a negative cash flow or declining asset values *following the order for relief. In re Delta AG Grp., LLC*, 596 B.R. 186, 195 (Bankr. W.D. La. 2019) (emphasis added).

As the Court stated in its bench ruling, the Court may have found sufficient cause existed under § 1112(b) if the Court were to consider only prepetition activity. But the Court is analyzing conduct since the filing of the Involuntary Petition. Much of Wells Fargo's argument regarding diminution in value of property of the estate or the lack of ability of rehabilitation (or in the context of a liquidation case, a lack of cash flow from which to satisfy current obligations) speaks to facts as they were prior to the Debtor retaining professionals and prior to the commencement of this involuntary bankruptcy case. Based on testimony provided by Amin, the Debtor has, at least, funded some property costs, assisted in at least half a dozen payments for utilities, and continues to work with Wells Fargo and its professionals to preserve certain properties. In addition, although

not entirely clear to the Court, the Debtor has some process in place to handle inquiries from both landlords and other Creditors.[13]

Wells Fargo also argued that there has been gross mismanagement of the estate under § 1112(b)(4)(B). Wells Fargo's case citations in its pleading, however, do not prove its point, i.e., that prepetition mismanagement is relevant to an inquiry under § 1112(b)(4)(B). To be more specific, the court in *Broad Creek Edgewater* (cited by this Court above) found gross mismanagement of the bankruptcy estate because the debtor there had no corporate governance postpetition. *Broad Creek Edgewater*, 371 B.R. at 759. In fact, one of the unsecured creditors was given control of the corporate debtor by a family member. *Id.* Unlike the status of the debtor's management postpetition in *Broad Creek Edgewater*, here, since the filing of the Involuntary Petition, there are no facts sufficient to prove outright gross mismanagement on the part of UFI (although the Court will discuss its concerns with current management in more detail below).

Finally, the Court will briefly address the status of insurance on UFI's assets. Under § 1112(b)(4)(C), "cause" exists to convert or dismiss if the debtor's failure to maintain insurance poses a "risk to the estate or to the public." 11 U.S.C. § 1112(b)(4)(C). From what the Court can surmise, there is insurance on UFI's properties currently. The Court, however, is not able to ascertain whether Wells Fargo is solely funding the premiums or if there is some contribution by UFI. Without adequate information to assess further, the Court can only conclude that, because the appropriate insurance is being maintained, the risks to the bankruptcy estate and public are mitigated. Again, Wells Fargo has not met its burden to show cause under § 1112(b)(4)(C). In

---

[13] The Court considered the fact that at least one Creditor recovered trailers with inventory at a UFI facility at some point prior to the filing of the Involuntary Petition, which was clearly a consequence of UFI's prepetition inaction to secure its properties. While unfortunate, again, this occurred prepetition and is not entirely relevant to the court's postpetition "cause" analysis.

summary, Wells Fargo has not met its burden by a preponderance of the evidence to show either prepetition bad faith or any of the enumerated causes under § 1112(b)(4) since the filing of the Involuntary Petition to convert or dismiss a Chapter 11 bankruptcy case.[14]

### C.  The appointment of Chapter 11 trustee under 11 U.S.C. § 1104(a)(2) is in the interests of the creditors, equity shareholders, and the bankruptcy estate.

Although the Court acknowledges that Wells Fargo has failed to meet its burden to show prepetition bad faith or "cause" under § 1112(b)(4), the Court finds that, given the evidence presented before it through testimony and documents, UFI should not be allowed to "drive its own car" as a debtor-in-possession in a Chapter 11 case. Rather, a Chapter 11 trustee should be appointed pursuant to § 1104(a)(2) of the Bankruptcy Code because such an appointment is in the interests of the creditors, equity shareholders, and the estate.

Section 1104(a)(2) provides:

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee –
. . .

(2) if such appointment is in the interests of creditors, any equity shareholders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

---

[14] The Court also is aware of the Supreme Court's recognition in *Marrama* that bankruptcy courts have the broad authority to take any action that is necessary or appropriate "to prevent an abuse of process" described in § 105(a) of the Bankruptcy Code. In other words, this Court could invoke that Bankruptcy Code provision as a basis to deny conversion in this bankruptcy case. The Court, however, does not find that conversion here would provide the debtor an opportunity to take action prejudicial to creditors or postpone an eventual conversion back to Chapter 7 or dismissal of the Chapter 11 bankruptcy case. Considering the Court's discretion to order the UST to appoint a Chapter 11 trustee as articulated below, the Court is satisfied that its decision to allow the conversion is correct.

11 U.S.C. § 1104(a)(2). While the Bankruptcy Code generally permits Chapter 11 debtors to remain in control of their assets and business operations in a Chapter 11 case, such a permission comes with certain fiduciary duties—such as the duty of care to protect assets, the duty of loyalty, and a duty of impartiality—that debtors-in-possession owe to the bankruptcy estate. *In re Ford Steel, LLC*, 629 B.R. 871, 889 (Bankr. S.D. Tex. 2021) (citing *In re Bowman*, 181 B.R. 836, 843 (Bankr. D. Md. 1995) and *In re Eurospark Indus., Inc.*, 424 B.R. 621, 627 (Bankr. E.D.N.Y. 2010)).

Even though courts enjoy wide discretion under § 1104(a)(2) to appoint a trustee, the Court recognizes that the appointment of a Chapter 11 trustee is an extraordinary remedy. *In re Basil Street Partners, LLC*, 477 B.R. 856, 867 (Bankr. M.D. Fla. 2012) (citing *In re William A. Smith Constr. Co., Inc.*, 77 B.R. 124, 126 (Bankr. N.D. Ohio 1987)); *In re Ford Steel*, 629 B.R. at 889. As such, under § 1104(a)(2), a court may utilize "its broad equity powers to engage in a cost-benefit analysis to determine whether the appointment of a trustee would be in the interests of creditors, equity security holders, and other interests of the estate," and the analysis "becomes one of whether the cost of appointing a trustee is outweighed by the benefits derived by the appointment." *In re Royal Alice Props., LLC*, 2020 WL 5357795 at *11 (Bankr. E.D. La. 2020) (quoting *In re Sharon Steel Corp.*, 86 B.R. 455, 457 (Bankr. W.D. Penn. 1988) (internal quotations omitted)). The standard under § 1104(a)(2) is a flexible one, and it allows the appointment of a trustee even when no "cause" exists to do so. *Id*. (citing *In re Ionosphere Clubs, Inc.*, 113 B.R. 164 at 426); *In re Euro-American Lodging Corp.*, 365 B.R. 421, 427 (Bankr. S.D.N.Y. 2007)("Although decisions have articulated certain factors to guide the court [. . . ] the standard is a flexible one.").

Courts consider several factors when determining whether to appoint a Chapter 11 trustee under § 1104(a)(2), including: (1) the trustworthiness of the debtor; (2) the debtor-in-possession's past and present performance and prospects for the debtor's rehabilitation; (3) the confidence—or lack thereof—of the business community and of creditors in present management; and (4) the benefits derived by the appointment of a trustee; balanced against the cost of appointment. *In re Ford Steel*, 629 B.R. at 890 (citing *In re Ionosphere Clubs, Inc.*, 113 B.R. at 168 (Bankr. S.D.N.Y. 1990); *In re Euro-American Lodging Corp.*, 365 B.R. at 427). Importantly, it is not necessary for the Court to find fault on the part of the debtor-in-possession before appointing a Chapter 11 trustee; rather, what the Court should consider are the practical realities, necessities of the case, and the totality of the circumstances in determining whether to appoint a trustee. *In re Ironside, LLC*, 2022 WL 509890, at *2 (Bankr. S.D. Tex. 2022).

A Chapter 11 trustee appointment at the time of conversion from an involuntary Chapter 7 case is not unusual. In fact, the court in *In re Basil Street Partners, LLC* did just that. 477 B.R. at 870. In *Basil Street Partners*, four petitioning creditors filed an involuntary petition under Chapter 7 against the alleged debtor. *Id*. at 858. Prior to the filing of the petition, the alleged debtor had been engaged in state court litigation with the lead petitioning creditor, Antaramian Properties, LLC ("APL"). *Id*. During the state court action, an individual was appointed as a "Receiver" of the alleged debtor's property, whose role prior to the bankruptcy included operating certain resort property on behalf of the alleged debtor and controlling its other assets. *Id*. at 859. The Receiver properly allocated the property's funds among its revenue-generating amenities, and the Receiver controlled the receipt and disbursement of funds flowing through the property. *Id*. Eighteen days before the trial on the involuntary petition, the alleged debtor filed a motion to convert the

involuntary Chapter 7 to a case under Chapter 11. *Id*. APL and its manager filed an emergency motion to appoint a Chapter 11 trustee in the event the court converted the case to Chapter 11. *Id*.

The *Basil Street Partners* court began its discussion by acknowledging *In Re Euro-American Lodging Corp.*, 365 B.R. 421 (Bankr. S.D.N.Y. 2007), a case where the court converted an involuntary Chapter 7 to Chapter 11 and simultaneously appointed a trustee. *Id*. at 860. The court then underwent a *Marrama* analysis, ultimately finding that APL and its manager failed to carry their burden of demonstrating "cause" and therefore granting the alleged debtor's motion to convert. *Id*. at 864.

Turning to the appointment of a Chapter 11 trustee, the court considered several relevant facts when considering whether such an appointment would be in the interests of creditors, equity shareholders, and the estate. First, the court found the testimony of the Receiver credible and convincing considering his experience serving as a receiver in more than 150 cases. *Id*. at 867. The Receiver testified to "warring factions" present in the case that had been disruptive to his employee's efforts to operate the property. *Id*. The Receiver additionally testified to disputes over ownership of proceeds generated by on-site laundry facilities and club dues between the alleged debtor and a non-debtor entity known as Knightsbridge—an entity that was owned by the same individuals who would be in control of the would-be debtor-in-possession, PZS.[15] *Id*. at 868.

Finally, the court considered the proposed plan sponsor, Gulfwater, and its ownership being directly and indirectly held by PZS and their family members, noting that while Gulfwater

---

[15] "PZS" is a reference to Fred Pezeshkan, Iraj Zand, and Raymond Sehayek, three individuals who owned Basil Investors, LLC, and who collectively held a 1% interest in Gulfwater NBR Investors, LLC ("Gulfwater"). *In re Basil Street Partners, LLC*, 477 B.R. at 861. The connection between the alleged debtor and Gulfwater (its proposed plan sponsor and financer) was concerning to the court, which noted that, while Gulfwater was technically a distinct legal entity from the alleged debtor, the "ultimate beneficial interest holders [were] essentially aligned" with the alleged debtor. *Id*.

characterized its projected $5 million loan as an equity infusion, the similarity in the ownership structure between the alleged debtor and Gulfwater gave the court "pause for concern." *Id*. Rather than focus on Gulfwater's intentions, the court asked whether the decision on whether to enter into an agreement with Gulfwater was in the best interests of creditors and the estate. *Id*. Based on the totality of the circumstances presented, the court was not convinced that the important fiduciary duties required to be performed by a debtor would be performed as expected without the intervention of a disinterested trustee. *Id*.

In applying the relevant legal standard, this Court has also considered the totality of the circumstances, including UFI's trustworthiness, its past and present performance, the confidence of creditors or the business community in present management, and, most importantly, conflicts of interest between UFI, its current management, and its equity shareholders.[16] First, it is not lost on the Court that much of the prepetition business decision-making was made by UFI's Original Board comprised of Belford and Gabauer—the same Original Board that appointed most, if not all, of UFI's current management, including Amin and Harper. Further, while the Court recognizes Amin's experience in management positions during his career in corporate restructuring, portions of Amin's testimony gives the Court pause, including the inconsistencies related to his review of UFI's code of regulations, his authority to appoint and terminate members of the New Board, and, most worrisome, the shareholders' authority to appoint and terminate members of the New Board—an act that the shareholders "always have [the] power to do" as argued by UFI's own counsel in closing arguments.

---

[16] While not a driving factor in the Court's decision to appoint a trustee in this bankruptcy case, the Court also considered (in the totality of the circumstances analysis) the cost of the appointment of a trustee compared to the professionals UFI would likely seek to retain as a debtor-in-possession based on the arguments made by Alomari and Amin's testimony.

What gives the Court most concern is Belford and Stage Capital's role in this bankruptcy case, as well as their relationship to UFI and its current management. During the relatively short pendency of this bankruptcy case, and at the hearing on January 13, 2023, Belford (and, at times, Gabauer) were referred to in a myriad of ways, including "equity," an "insider," and "Stage Capital." All of these identities have been discussed in the context of funding, whether that be the proposed $10 million debtor-in-possession loan offered to UFI for the sale of its real estate or to Riveron for compensation for their work. This raises a question of control. If allowed to operate as a debtor-in-possession, will UFI and its current management (who were all appointed by the Original Board, including Belford) operate independently of Belford? Will the majority equity shareholders—including Belford—remove the New Board and other management pursuant to their powers contained in UFI's code of regulations? Put another way, would UFI operate to the benefit of creditors, equity shareholders, and the estate, or would UFI operate to benefit only Belford and certain real estate security holders?

Several of the parties pointed out in their closing arguments that the debtor-in-possession is "under the thumb" of the equity shareholders. While there is no "smoking-gun" before the Court indicating that Belford is working behind the curtain to control UFI as a debtor-in-possession, there is more than enough evidence demonstrating an overlap between current management and Belford that raises questions as to whether UFI will perform its fiduciary duties as expected. The evidence presented to the Court demonstrates that the same person or entity that is funding UFI's operations, potential liquidation sale, and compensation of its professionals is the exact same person or entity responsible for UFI's abrupt shuttering of operations, termination of thousands of employees without notice, and inaction with respect to preserving assets or collateral.

As stated in this Court's ruling on January 18, 2023, UFI acting as the debtor-in-possession comes with questions regarding its ability to perform fiduciary duties; a Chapter 11 trustee does not. A Chapter 11 trustee can investigate Stage Capital's loan offer, solicit and evaluate other plans, formulate his or her own plan, decide the best course to liquidate assets, recommend conversion of the case back to Chapter 7, and manage the affairs of UFI. *See In re Basil Street Partners, LLC*, 477 B.R. at 868. All in all, a Chapter 11 trustee is an independent party holding no biases. A trustee can investigate matters independent of *any* interest that may be adverse to the estate and can serve in a capacity of disinterestedness above that of UFI. Accordingly, considering the aforementioned factors and the totality of the circumstances, and considering the best interests of the creditors, equity shareholders, and the bankruptcy estate, the Court finds that a Chapter 11 trustee should be appointed in this case.[17]

## IV. CONCLUSION

For the reasons stated above, the Court finds that UFI has made a *prima facie* case for conversion under § 706(a) but that Wells Fargo has failed to demonstrate prepetition "bad faith" or postpetition "cause" under § 1112(b) as required under *Marrama* and the courts that followed. In addition, a Chapter 11 trustee appointment is in the best interests of the Creditors and bankruptcy estate. Accordingly, it is therefore **ORDERED** that UFI's *Motion of United Furniture Industries, Inc. to Convert Debtor's Case to Chapter 11* (Dkt. #42) is **GRANTED** and this case is hereby converted to a case under Chapter 11. Additionally, it is **ORDERED** that Wells Fargo's

---

[17] The Court notes that both Wells Fargo and Alomari moved for the appointment of a Chapter 11 trustee in their respective pleadings. But even if certain parties had not requested a trustee appointment, this Court has the power to *sua sponte* appoint a Chapter 11 trustee under § 1104(a)(2) through § 105(a), and it would have done so based on the facts as articulated above. *See In re Thomas*, 596 B.R. 350, 359, n.5 (Bankr. W.D. Tenn. 2019)(citing a collection of cases holding the same).

*Emergency Motion of Wells Fargo Bank, National Association, for Appointment of an Interim Trustee and Certain Related Relief* (Dkt. #6) is **DENIED AS MOOT.** Finally, it is **ORDERED** that the United States Trustee shall make an appointment of a Chapter 11 trustee in this bankruptcy case as soon as possible.

**##END OF ORDER##**