---

**SO ORDERED,**



~~Selene D Maddox~~

**Judge Selene D. Maddox**

**United States Bankruptcy Judge**

**The Order of the Court is set forth below. The case docket reflects the date entered.**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## ABERDEEN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| UNITED FURNITURE INDUSTRIES, INC., *et al.*[1] | ) | Case No. 22-13422-SDM |
| | ) | Chapter 11 |
| Debtors. | ) | Jointly Administered |
| | ) | |

### FINAL ORDER (I) AUTHORIZING CHAPTER 11 TRUSTEE TO (A) OBTAIN POSTPETITION FINANCING AND (B) GRANT LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (II) MODIFYING AUTOMATIC STAY; AND (III) GRANTING RELATED RELIEF

Upon the *Motion for Entry of Interim and Final Orders (I) Authorizing Trustee to (A) Obtain Postpetition Financing and (B) Grant Liens and Superpriority Administrative Expense Claims; (II) Modifying Automatic Stay; (III) Setting a Final Hearing; and (IV) Granting Related Relief* [Dkt #181] (the "**Motion**")[2] filed by Derek Henderson, Chapter 11 Trustee ("**Trustee**") of

---

[1] The Debtors in these Chapter 11 cases, and the last four digits of each Debtor's federal tax identification number, are as follows: United Furniture Industries, Inc. (2576); United Furniture Industries NC, LLC.(9015); United Furniture Industries CA, Inc. (9966); FW Acquisition, LLC (2133); Furniture Wood, Inc. (9186);United Wood Products, Inc. (1061); Associated Bunk Bed Company (0569); UFI Royal Development, LLC (8143); UFI Exporter, Inc. (6518); UFI Transportation, LLC (9471); and LS Logistics, LLC (7004).

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Chapter 11 Trustee Credit Agreement or the Motion.

the above-captioned debtors and debtors in possession (collectively, the "**Debtors**")[3] for entry

of an interim order and a final order (the "**Final Order**") pursuant to sections 105, 362, 363, 364,

503, 506, 507, and 552 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules

2002, 4001, 6003, 6004, 9013, and 9014 of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**") and Rule 4001-1(b) of the Uniform Local Rules for the Northern and

Southern Districts of Mississippi (the "**Local Rules**"), *inter alia*:

(i)      authorizing the Chapter 11 Trustee on behalf of the Debtors to obtain secured

postpetition financing pursuant to the terms and conditions of that certain Chapter 11 Trustee Loan

and Security Agreement in substantially the form attached hereto (without exhibits or schedules)

as **Exhibit B** (as the same may be amended, supplemented, restated or otherwise modified from

time to time in accordance with its terms, and including the exhibits and schedules thereto, the

"**Chapter 11 Trustee Credit Agreement**"), by and among the Chapter 11 Trustee on behalf of

each of the Debtors and their bankruptcy estates, and United Finance Services, LLC, as lender (the

"**Postpetition Lender**"), in an aggregate principal amount not to exceed $20,000,000 (plus

interests, fees, costs, and expenses as set forth below), consisting of a multiple-draw term loan

facility (the "**Trustee Facility**", and any draws on the Trustee Facility, the "**Trustee Loans**");

(ii)     authorizing the Chapter 11 Trustee on behalf of each of the Debtors and their

bankruptcy estates to execute the Chapter 11 Trustee Credit Agreement and all other documents,

agreements, and instruments delivered pursuant thereto or executed or filed in furtherance or in

connection therewith, all of which shall be in form and substance customary for transactions of

this type, and acceptable to the Postpetition Lender and the Chapter 11 Trustee on behalf of each

of the Debtors and their bankruptcy estates (as the same may be amended, restated, supplemented

or otherwise modified from time to time in accordance with their respective terms, and collectively with the Chapter 11 Trustee Credit Agreement, the "**Trustee Loan Documents**");

(iii)    authorizing the Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates to use the proceeds from the Trustee Facility as permitted in the Trustee Loan Documents and in accordance with this Final Order and the Budget (as defined below);

(iv)    granting to the Postpetition Lender automatically perfected security interests in and liens and mortgages on all assets owned by the Debtors, not leased, that constitute the Postpetition Lender Collateral (as defined below) to secure the Trustee Facility and all obligations owing and outstanding thereunder and under the Trustee Loan Documents and this Final Order (collectively, and including all "**Obligations**" as described in the Chapter 11 Trustee Credit Agreement, the "**Trustee Obligations**")[3], which shall rank junior in priority to Permitted Liens and senior in priority to all other liens other than payment of the Carve-Out (as defined below);

(v)    granting superpriority administrative expense claims against the Debtors' estates to the Postpetition Lender with respect to the Trustee Obligations in accordance with section 364(c)(1) of Bankruptcy Code over all administrative expenses of any kind or nature subject and subordinate only to the payment of the Carve-Out;

(vi)    authorizing the Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates to provide the Adequate Protection Claims (as defined below) to Wells Fargo Bank, National Association, Renasant Bank, BNA Bank, the David A. Belford Separate Property

---

[3] For the avoidance of doubt, the Trustee Obligations include the Advances (as defined herein).

Trust, and any other prepetition lender to the Debtors or a Debtor that has a Permitted Lien on the assets of any Debtor (collectively, the "**Prepetition Lenders**");

(vii)    vacating and modifying the automatic stay pursuant to section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Final Order and the Trustee Loan Documents;

(viii)    waiving any applicable stay with respect to the effectiveness and enforceability of this Final Order (including under Bankruptcy Rule 6004); and

(ix)    granting such other and further relief as is just and proper.

The Court having reviewed the Motion and having heard the testimony and statements of counsel; and the Court having determined that the relief requested in the Motion is in the best interests of the Chapter 11 Trustee, the Debtors, their estates, creditors, and other parties in interest; and upon the record herein; and after due deliberation thereon; and good and sufficient cause appearing therefor:

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A. The Chapter 11 Cases. On December 30, 2022 (the "**Involuntary Petition Date**"), certain creditors of the Debtors filed an involuntary petition for relief under Chapter 7 of the Bankruptcy Code against United Furniture Industries, Inc. ("**Parent**") in the United States Bankruptcy Court for the Northern District of Mississippi (the "**Parent Bankruptcy Case**"). On January 6, 2023, Parent filed a motion to convert the Parent Bankruptcy Case to Chapter 11 (the "**Conversion Motion**"). The Court granted the Conversion Motion at a hearing held on January 18, 2023 and entered an order on January 27, 2023 converting the Parent's Chapter 7 Case to a case under Chapter 11 of the Bankruptcy Code. *See* Dkt #106.  In addition, on January 25, 2023,

the Court entered an order approving the Acting United States Trustee for Region 5's Application

for Approval of Appointment of Chapter 11 Trustee [Dkt #94] and appointed Derek Henderson,

Esq. as Chapter 11 Trustee of the Parent and its bankruptcy estate. *See* Dkt #101.  On January 31,

2023, the Chapter 11 Trustee filed voluntary petitions for relief under Chapter 11 of the Bankruptcy

Code for Parent's wholly owned subsidiaries (the "**Petition Date**"). On February 13, 2023, Derek

Henderson, Esq. was appointed as Chapter 11 Trustee for the remaining Debtors and on February

14, 2023, orders were entered approving his appointment.  On March 6, 2023, the Court entered

an order approving the Motion on an interim basis. The bankruptcy cases are being jointly

administered (the "**Chapter 11 Cases**").

    B.  <u>Chapter 11 Trustee is in Possession</u>. The Chapter 11 Trustee has displaced the Debtors

and he is control of the management, operation and/or liquidation of the Debtors' businesses and

properties as Chapter 11 Trustee pursuant to sections 1106 and 1108 of the Bankruptcy Code.

    C.  <u>Jurisdiction and Venue</u>. This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157 and

1334, over these proceedings and over the persons and property affected hereby. Venue for the

Chapter 11 Cases is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core

proceeding pursuant to 28 U.S.C. § 157(b). The Chapter 11 Trustee on behalf of each of the

Debtors and their bankruptcy estates has consented to the Court's entry of a final order regarding

the Motion, and the Court may enter a final order consistent with Article III of the United States

Constitution.

    D.  <u>Statutory Committee</u>. On April 4, 2023, the United States Trustee for the Northern

District of Mississippi (the "**U.S. Trustee**") appointed an Official Committee of Unsecured

Creditors (the "**Committee**") in the Chapter 11 Cases.

Case 22-13422-SDM    Doc 567    Filed 05/19/23    Entered 05/19/23 13:56:14    Desc Main
Document    Page 6 of 94

E. <u>Necessary Approvals</u>. Upon entry of this Final Order by the Court, the Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates will have obtained all authorizations, consents, and approvals required to be obtained from, and have made all filings with and given all notices required to be given to, all federal, state, and local governmental agencies, authorities, and instrumentalities in connection with the execution, delivery, validity, and enforceability of the Trustee Loan Documents as provided herein.

F. <u>Advances</u>.

(i) To avoid immediate and irreparable harm to the Debtors and their creditors, following the Involuntary Petition Date and prior to the Petition Date, the Debtors requested from the Postpetition Lender, and the Postpetition Lender agreed to provide to the Debtors, an advance in the amount of $1,226,282 (the "**Total Gap Period Advance**") to fund immediate and necessary expenses for the Debtors' operations, including, but not limited to, utilities, property insurance, the Debtors' payroll obligations and to fund payments to professionals to advise the Debtors of their rights and obligations.[4]

(ii) Thereafter, following January 18, 2023, (the "**Commencement Date**") but before entry of this Final Order, to avoid immediate and irreparable harm to the Estates and their creditors, the Chapter 11 Trustee requested from the Postpetition Lender, and the Postpetition Lender agreed to provide to the Chapter 11 Trustee, an advance in the amount of $141,314.77 (the "**Post-Commencement Advance,**") to fund immediate and necessary expenses for the Debtors'

---

[4] For the avoidance of doubt, the Total Gap Period Advance includes retainers or payments made to the following former Debtor professionals: (a) Hahn Loeser & Parks, LLP in the amount of $100,000.00; (b) Oxford Restructuring Advisors, LLC in the amount of $100,000.00; (c) Riveron Management Services LLC in the amount $200,000.00; (d) Sugar Felsenthal Grais & Helsinger LLP in the amount of $150,000.00; and (e) WARN services by William E. Burke, III in the amount of $6,120.00 plus the amount of $2,550.00 (collectively, the amounts listed in (a) through (e) directly above are referred to herein as the "**Replenishing Retainer Amounts**"). Since entry of the interim order, Sugar Felsenthal Grais & Helsinger LLP has merged into the law firm Raines Feldman LLP.

operations, including, but not limited to the Debtors' payroll obligations. The Total Gap Period

Advance together with the Post-Commencement Advance is referred to herein as the "**Advances.**"

(iii) On March 6, 2023, the Court entered an order which authorized inclusion of the

Advances with the exception of the Replenishing Retainer Amounts, to which the Court reserved

judgment. Specifically, the Court directed the Chapter 11 Trustee to provide information to the

Court no later than the date of the Final Hearing concerning: (a) the actual amounts paid; (b) when

the services were performed for the amounts paid; (c) the scope of the services; and (d) any other

information the Chapter 11 Trustee considers relevant for the Court to determine whether the

services performed were reasonable and necessary and are allowed gap period claims under the

Bankruptcy Code. The interim order provided that to the extent that the Court approves the

payment of all or a portion of the Replenishing Retainer Amounts, such amounts shall be included

as part of the Trustee Loans and Trustee Obligations. On March 28, 2023, the Chapter 11 Trustee

submitted fee information regarding the Replenishing Retainer Amounts for the Debtors' former

professional firms, including: (a) Hahn Loeser & Parks, LLP; (b) Oxford Restructuring Advisors,

LLC; (c) Riveron Management Services LLC; and (d) Sugar Felsenthal Grais & Helsinger LLP.

On April 4, 2023, the Chapter 11 Trustee submitted fee information for Mr. William E. Burke, III,

who provided WARN related services to the Debtors.

G. <u>Necessity of Relief Requested; Best Interest</u>. The Chapter 11 Trustee on behalf of each

of the Debtors and their bankruptcy estates requires the Trustee Loans, including the Advances, in

order to finance the administration of these Chapter 11 Cases, the preservation and disposition of

assets, and effective liquidations of the Debtors' bankruptcy estates, absent which immediate and

irreparable harm will result to the Debtors, their estates and creditors, and the prospects for a

successful conclusion of the Chapter 11 Cases. Without the Trustee Loans it would be

impracticable for the Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates to manage and administer these estates for purposes of maximizing the value of the Debtors' assets, even for a limited period of time, and serious and irreparable harm to the Debtors, their estate, and creditors would occur. The Chapter 11 Trustee and the Debtors do not have sufficient available sources of working capital and financing to remain in Chapter 11 of the Bankruptcy Code without the Trustee Loans. The relief requested in the Motion is therefore necessary to the preservation and maintenance of the value of the Debtors' assets and their bankruptcy estates. The Postpetition Lender and the Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates have negotiated at arms' length and in good faith regarding the Trustee Loans to fund the liquidation of the Debtors' owned real property for the period through the Termination Date, all subject to the terms and conditions set forth in this Final Order and the Trustee Loan Documents, including the protection afforded an entity acting in "good faith" under section 364(e) of the Bankruptcy Code. Based on the record presented to the Court at the Interim and Final Hearings, the terms of the Trustee Facility are fair and reasonable under the circumstances, reflect the Chapter 11 Trustee's exercise of prudent business judgment consistent with his fiduciary duties, and is supported by reasonably equivalent value and fair consideration. Entry of this Final Order is in the best interests of the Debtors, their estates, and creditors.

H.  <u>No Credit Available on More Favorable Terms</u>. The Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates has been unable to obtain post-petition financing on terms more favorable than those offered by the Postpetition Lender under the Trustee Loan Documents.

I.  <u>Business Judgment and Good Faith</u>.

(i)     The Postpetition Lender has indicated a willingness to provide financing to the

Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates, but solely on the

terms and conditions set forth in the Trustee Loan Documents, including, without limitation: (a)

entry of this Final Order; (b) approval of the terms and conditions of the Trustee Facility and the

Trustee Loan Documents, including, without limitation, the Chapter 11 Trustee's ability, on behalf

of each of the Debtors and their bankruptcy estates, to enter into such documents and to incur all

of the obligations thereunder, and to confer upon the Postpetition Lender all rights, powers and

remedies thereunder; (c) satisfaction of the closing conditions set forth in the Trustee Loan

Documents; and (d) findings by this Court that the Trustee Facility and the Chapter 11 Trustee's

use of the Trustee Loans on behalf of the Debtors and their bankruptcy estates are essential, that

the Postpetition Lender is extending credit to the Chapter 11 Trustee on behalf of each of the

Debtors and their bankruptcy estates pursuant to the Trustee Loan Documents and this Final Order

in good faith, and that the Postpetition Lender's claims, superpriority claims, security interests and

liens and other protections granted pursuant to this Final Order and the Trustee Loan Documents

will have the protections provided by section 364(e) of the Bankruptcy Code.  Accordingly, after

considering all of its practical alternatives, the Chapter 11 Trustee on behalf of each of the Debtors

and their bankruptcy estates has concluded, in an exercise of his sound business judgment, that the

Trustee Loans to be provided by the Postpetition Lender, pursuant to the terms of the Trustee Loan

Documents, represent the best financing currently available to the Debtors and their bankruptcy

estates.

(ii)     The terms of the Trustee Loan Documents, including, without limitation, the

interest rates and fees applicable, are more favorable to the Debtors than any available from

alternative sources. Based upon the record before the Court, the Trustee Loan Documents have

been negotiated in good faith and at arm's-length among the Chapter 11 Trustee on behalf of each

of the Debtors and their bankruptcy estates and the Postpetition Lender. Any Trustee Loans and

other financial accommodations made to the Chapter 11 Trustee on behalf of each of the Debtors

and their bankruptcy estates by the Postpetition Lender pursuant to the Trustee Loan Documents

and this Final Order shall be deemed to have been extended by the Postpetition Lender in good

faith, as that term is used in section 364(e) of the Bankruptcy Code, and the Postpetition Lender

shall be entitled to all protections afforded thereby.

J.    Fair Consideration and Reasonably Equivalent Value. The Chapter 11 Trustee on

behalf of each of the Debtors and their bankruptcy estates will receive fair and reasonable

consideration in exchange for access to the Trustee Loans and all other financial accommodations

provided under the Trustee Loan Documents and this Final Order. The terms of the Trustee Loan

Documents are fair and reasonable, reflect the Chapter 11 Trustee's exercise of prudent business

judgment on behalf of each of the Debtors and their bankruptcy estates, are consistent with the

Chapter 11 Trustee's fiduciary duties, and are supported by reasonably equivalent value and fair

consideration.

K.    Prior Liens.  The Chapter 11 Trustee, on his own behalf and on behalf of the Debtors,

but without prejudice to the rights of other duly authorized parties in interest, to initiate a Challenge

(as defined herein) as set forth in paragraph 19 below, admits, stipulates, acknowledges and agrees

that (paragraph K(i) shall be referred to herein as the "**Chapter 11 Trustee's Stipulations**"):

(i)    Prepetition Liens of the David A. Belford Separate Property Trust.  On June 30,

2022, Debtor United Furniture Industries NC, LLC ("**UFNC**") and the David A. Belford Separate

Property Trust, an irrevocable trust established under Ohio law and that certain trust deed dated

December 26, 2001, as amended (the "**Trust**"), entered into that certain Loan and Security

10

Agreement in the principal sum of $25,000,000.00 (the "**UFNC Loan Agreement**"). The

obligations of UFNC under the UFNC Loan Agreement are secured by a first-priority lien on the

real property located at (a) 401 W. Hanes Road, Winston-Salem, North Carolina 27105; (b) 100

United Furniture Drive, Lexington, North Carolina 27292; and (c) 3761 Old Glenola Road, Trinity,

North Carolina 27370 (collectively, the "**Trust Real Property Collateral**"), pursuant to that

certain (x) Deed of Trust and Assignment of Rents and Leases dated June 30, 2022, by and between

UFNC and the Trust, which was recorded with the Forsyth County, NC Register of Deeds on July

7, 2022, recordation number 2022032025 00074 (the "**Winston-Salem Deed of Trust**"), (y) Deed

of Trust and Assignment of Rents and Leases dated June 30, 2022, by and between UFNC and the

Trust, which was recorded with the Davidson County, NC Register of Deeds on July 7, 2022,

recordation number 2022015339 (the "**Lexington Deed of Trust**"), and (z) Deed of Trust,

Assignment of Rent and Leases, Security Agreement and Fixture Filing dated June 30, 2022, by

and between UFNC and the Trust, which was recorded with the Randolph County, NC Register of

Deeds on July 7, 2022, recordation number 20148331, in Book 2813 pages 586-607 (22) (the

"**Trinity Deed of Trust**," and collectively with the Winston-Salem Deed of Trust and the

Lexington Deed of Trust, the "**UFNC Deeds of Trust**").  Pursuant to the UFNC Loan agreement

and the UFNC Deeds of Trust, UFNC granted the Trust a first-priority valid, perfected and

enforceable lien on and continuing security interest in the Trust Real Property Collateral to secure

the performance of the covenants and agreements contained in the UFNC Loan Agreement and

the UFNC Deeds of Trust and to secure the payment when due of (a) the obligations of UFNC

under the UFNC Loan Agreement and the Note (as defined in the UFNC Loan Agreement),

together with applicable interest, (b) all amounts expended or advanced by the Trust pursuant to

the UFNC Loan Agreement and/or the UFNC Deeds of Trust, and (c) all unpaid advances made

by the Trust with respect to the Trust Real Property Collateral, for the payment of taxes, assessments, insurance premiums and all other liabilities and indebtedness owing by UFNC to the Trust. The liens, security interests and/or UFNC Deeds of Trust granted by UFNC to the Trust prior to the Petition Date on the Trust Real Property Collateral are referred to herein as the "**Trust Prepetition Liens**." As of January 31, 2023, the principal amount of the obligations owed by UFNC  to the Trust under the UFNC Loan Agreement and the Note (as defined in the UFNC Loan Agreement) was $25,000,00.00, plus unpaid interest, fees and expenses.

(ii)    Subject to the Challenge rights set forth in paragraph 19 below with respect to the Trust Prepetition Liens and the Chapter 11 Trustee's Stipulations, nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Lien is valid, senior, enforceable, prior, perfected or non-avoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest with standing to do so, including, but not limited to, the Chapter 11 Trustee, the Postpetition Lender, or the Committee to Challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any alleged Permitted Lien.

L.  <u>Notice</u>. Notice of the Final Hearing and relief requested in the Motion has been provided by the Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates, whether by facsimile, email, overnight courier or hand delivery, to (i) the Office of the United States Trustee for the Northern District of Mississippi; (ii) the Office of the United States Attorney for the Northern District of Mississippi; (iii) the Internal Revenue Service; (iv) counsel for the Postpetition Lender; (v) counsel for Wells Fargo Bank, National Association; (vi) counsel for Renasant Bank; (vii) counsel for BNA Bank; (viii) the Trust; and (ix) the Committee. Notice of the Motion and the hearing thereon was provided pursuant to Bankruptcy Rules 2002, 4001(c) and (d), 6004, and 9014 and any applicable Local Rules.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.      <u>Motion Approved</u>. The Motion is granted in accordance with the terms and conditions set forth in this Final Order and the Trustee Loan Documents. This Final Order shall become effective immediately upon its entry. Any objections to the Motion with respect to the entry of this Final Order that have not been withdrawn, waived or settled, are denied and overruled with prejudice.

<b><u>AUTHORIZATION FOR TRUSTEE FINANCING</u></b>

2.      <u>Authorization for Trustee Financing Pursuant to Budget</u>.

        a.      The Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates is hereby immediately authorized on a final basis to incur Trustee Obligations, subject to the terms of this Final Order, the Budget attached hereto as **<u>Exhibit A</u>** (the "**Budget**") (subject to the Permitted Variances), and the Trustee Loan Documents, in the aggregate principal amount of up to $20,000,000 (the "**Approved Amount**"), inclusive of the Advances,[5] subject to any conditions and limitations on availability in the Chapter 11 Trustee Credit Agreement, plus all interest, fees and other charges payable in connection with such Trustee Loans as provided in the Chapter 11 Trustee Credit Agreement and other Trustee Loan Documents.[6] The Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates is hereby authorized to borrow money pursuant to the Chapter 11 Trustee Credit Agreement, subject to any limitations on and conditions precedent to borrowing under the Trustee Loan Documents, and to use the proceeds

---

[5] All unapplied Replenishing Retainer Amounts still held by the Debtors' professionals shall be returned to the Trustee for use and application in accordance with this Final Order and the Budget. Each of said professionals shall remit all unapplied Replenishing Retainer Amounts to the Trustee within ten (10) days after the date of entry of this Final Order.

[6] To the extent any budgeted expenses are not approved on a final basis, availability under the Trustee Facility will be reduced on a dollar-for-dollar basis.

of such borrowings to fund the Chapter 11 Cases, for working capital and general corporate purposes of the Debtors, for other uses permitted under the Chapter 11 Trustee Credit Agreement, bankruptcy-related costs and expenses, and any other amounts required or allowed to be paid in accordance with this Final Order, but only as and to the extent authorized by the Budget (subject to the Permitted Variances) and the Trustee Loan Documents.

b.      The Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates is authorized to enter into and deliver the Trustee Loan Documents, in each case including any amendments thereto. The Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates is further authorized to enter into and deliver any UCC financing statements, pledge and security agreements, deposit account control agreements, mortgages or deeds of trust, or similar documents or agreements encumbering all of the Postpetition Lender Collateral and securing all of the Chapter 11 Trustee's Trustee Obligations under the Trustee Loan Documents, each as may be provided for under the Chapter 11 Trustee Credit Agreement or as otherwise reasonably requested by the Postpetition Lender.

c.      The Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates is further authorized to (i) perform and incur all of the Trustee Obligations under the Trustee Loan Documents, and such other agreements as may be required by the Trustee Loan Documents to give effect to the terms of the financing provided for therein and in this Final Order, and (ii) perform all acts required under the Trustee Loan Documents and this Final Order, including without limitation, the non-refundable payment or reimbursement of the reasonable and documented fees, costs and expenses referred to in the Trustee Loan Documents, including the fees and expenses of the Postpetition Lender, including its legal fees, and costs and expenses payable under the Trustee Loan Documents.

14

3.    <u>Payment of Expenses</u>. The Chapter 11 Trustee on behalf of each of the Debtors and

their bankruptcy estates is authorized and directed, without further order of this Court, to pay or

reimburse the Postpetition Lender when due for all present and future costs, expenses and

indemnities, including, without limitation, all reasonable professional fees and reasonable legal

expenses, paid or incurred by the Postpetition Lender on or after the Involuntary Petition Date in

connection with the financing transactions as provided in this Final Order, any Final Order and the

Trustee Loan Documents (payable on demand), including, without limitation, all such reasonable

professional fees and reasonable legal expenses paid or incurred by the Postpetition Lender in

connection with the Advances, all of which shall be and are included as part of the principal amount

of the Trustee Obligations and shall be secured by the Postpetition Lender Collateral. Professionals

for the Postpetition Lender (collectively, the "**Postpetition Lender Professionals**") shall not be

required to comply with the U.S. Trustee fee rules and guidelines and no recipient of any such

payment shall be required to file with respect thereto any interim or final fee application with this

Court, but the Postpetition Lender Professionals shall provide summary invoices (redacted if

necessary for privileged, confidential or otherwise sensitive information, as to those invoices

provided to any party other than the U.S. Trustee) for fees incurred after entry of the interim order

to the Office of the U.S. Trustee, counsel for the Committee and the Chapter 11 Trustee and his

counsel.  Within ten (10) Business Days of presentment of such statements, if no written objections

to the reasonableness of the fees and expenses charged in any such invoice (or portion thereof) is

made (the "**Professional Fee Review Period**"), the Chapter 11 Trustee shall pay in cash, to the

extent of available cash to do so, all such fees and expenses of the Postpetition Lender, and its

Postpetition Lender Professionals promptly, and in any event within five (5) calendar days after

the expiration of the Professional Fee Review Period, without the need for further application to

or order of the Court. Any objection to the payment of such fees or expenses shall be made only on the basis of "reasonableness," and shall specify in writing the amount of the contested fees and expenses and the detailed basis for such objection Any objection shall be submitted by the objecting party to the respective professional by email correspondence. To the extent an objection only contests a portion of an invoice, the undisputed portion thereof shall be promptly paid and in any event within three (3) Business Days following the end of the Professional Review Period, without the need for further application to or order of the Court. If any such objection to payment of an invoice (or any portion thereof) is not otherwise resolved between the objecting party and the issuer of the invoice, either party may submit such dispute to the Court for a determination as to the reasonableness of the relevant disputed fees and expenses set forth in the invoice. This Court shall resolve any dispute as to the reasonableness of any fees and expenses.

4.    <u>Amendments, Consents, Waivers, and Modifications</u>. The Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates, with the express written consent of the (y) Committee and (z) Postpetition Lender in accordance with the Chapter 11 Trustee Credit Agreement, may enter into any non-material amendments, consents, waivers, or modifications to the Trustee Loan Documents without the need for further notice and hearing or any order of this Court, it being further understood that further approval of this Court, upon notice and a hearing, shall be required for any such authorizations, amendments, waivers, consents or other modifications to and under the Trustee Loan Documents that are material or that shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments or the rate of interest payable thereunder; provided that, for the avoidance of doubt, updates and supplements to the Budget required to be delivered under the Trustee Loan Documents shall not be considered amendments or modifications to the Budget or the Trustee Loan Documents; provided further that,

the Debtors and the Postpetition Lender shall have the right to seek approval from the Court of material amendments, waivers, consents or other modifications on an expedited basis. The Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates shall provide written notice of any such amendment, supplement or modification to the U.S. Trustee and the Committee.

5.    Valid and Binding Obligations. All Trustee Obligations under the Trustee Loan Documents shall constitute valid, binding, and non-avoidable Trustee Obligations of the Chapter 11 Trustee and the Debtors, enforceable against the Chapter 11 Trustee, the Debtors, and their respective successors and assigns, in accordance with their terms and the terms of this Final Order, and no obligation, payment, transfer, or grant of a lien or security interest under the Trustee Loan Documents or this Final Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code) or subject to any avoidance, reduction, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity. Without limiting the generality of the foregoing, in no event shall the Chapter 11 Trustee and/or the Debtors be authorized to offset or recoup any amounts owed, or allegedly owed, by the Postpetition Lender or any of its owners and affiliates to the Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates, and/or the Debtors, against any of the Trustee Obligations without the prior written consent of the Postpetition Lender, and no such consent shall be implied by any action, inaction, or acquiescence by the Postpetition Lender.

6.    Postpetition Lender's Superpriority Claim. For any and all Trustee Obligations of the Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates to the Postpetition Lender under and pursuant to the Trustee Loan Documents, and in addition to the

rights granted below, subject to the Carve-Out, the Postpetition Lender is hereby granted an allowed superpriority administrative claim (the "**Postpetition Lender Superpriority Claims**"), in accordance with section 364(c)(1) of the Bankruptcy Code, having a priority in right of payment (to the extent permitted by the Bankruptcy Code and other applicable law) over any and all other obligations, expenses, claims, liabilities and indebtedness of the Chapter 11 Trustee and/or the Debtors, whether or not such obligations, expenses, claims, liabilities and indebtedness may become secured by a judgment lien or other non-consensual lien, levy or attachment (including, but not limited to, the obligations owed to the Prepetition Lenders, which for avoidance of doubt are not entitled to treatment as an ordinary or superpriority administrative claim except to the extent of any Adequate Protection Claim, as defined below, for diminution in value, or as otherwise ordered by this Court), now in existence or hereafter incurred by the Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates, and/or the Debtors, and over any and all administrative expenses or priority claims of any kind including as specified in, or ordered pursuant to, sections 105, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113 and/or 1114 and any fees not allowed under Section 326 and/or 330 of the Bankruptcy Code (in each case to the extent permitted by law), whether arising in the Chapter 11 Cases or any case under chapter 7 of the Bankruptcy Code upon the conversion of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, a "**Successor Case**"). The Postpetition Lender Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates, and the Debtors, and all proceeds thereof, including, without limitation, (x) Commercial Tort Claims (as defined in the Chapter 11 Trustee Loan and Security Agreement) and related proceeds, (y) any claims pursuant to Sections 502(d), 544, 545, 547, 548,

549, 550, 551 or 553 of the Bankruptcy Code (the "**Avoidance Claims**"), and (z) any proceeds of property recovered in connection with the successful prosecution or settlement of Avoidance Claims (the "**Avoidance Proceeds**"). Notwithstanding any contrary language in this Final Order or the Trustee Documents, however, any Commercial Tort Claims and the proceeds thereof, Avoidance Claims, and Avoidance Proceeds recovered in connection with a successful final, non-appealable order approving or awarding such claims, or the settlement of such claims against Postpetition Lender and/or Postpetition Lender's Related Parties shall be excluded and the proceeds resulting from such claims against Postpetition Lender and/or Postpetition Lender's Related Parties shall be excluded from Postpetition Lender's Superpriority Claims. Postpetition Lender's Superpriority Claims granted in this paragraph shall be subject and subordinate in priority of payment only to prior payment of the Carve-Out.

7.    <u>Postpetition Lender Liens</u>.

a.    To secure the Trustee Obligations, including the Advances, immediately effective and perfected upon the date of entry of the interim order and without the necessity of the execution and/or recordation of filings of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, the Postpetition Lender Liens set forth below (the "**Postpetition Lender Liens**") are hereby granted to the Postpetition Lender on the Collateral (as defined in the Chapter 11 Trustee Credit Agreement), whether existing on the Involuntary Petition Date or thereafter acquired, including, without limitation, all real and personal property owned by the Debtors and/or any Debtor, including, without limitation: (i) all cash, money, cash equivalents, deposit accounts, securities accounts, accounts, other receivables, chattel paper, contract rights, goods and inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including, without limitation, all of the

issued and outstanding capital stock of each of its subsidiaries), furniture, fixtures, equipment, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, intellectual property, general intangibles of any kind, rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments, supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action and all substitutions, books and records related to the foregoing, and accessions, and the equity interests owned by the Debtors, and proceeds (as defined in the Uniform Commercial Code) of the foregoing, wherever located, including insurance or other proceeds), and (ii) all owned real property, all leased real property, all rents and leases from any real property interests, and all other proceeds of real property; (collectively, the "**Postpetition Lender Collateral**"). Notwithstanding the foregoing provisions of this section 7(a) or anything to the contrary in the Trustee Loan Documents or any other document: the Postpetition Lender Liens shall not attach to and the Postpetition Lender Collateral does not include any of the following property: (x) Commercial Tort Claims and the proceeds thereof recovered in connection with a successful final, non-appealable order approving or awarding such a claim or the settlement of such a claim against the Postpetition Lender and/or the Postpetition Lender's Related Parties, (y) Avoidance Claims or Avoidance Proceeds, or (z) any real or personal property not owned by any Debtor ((x)-(z), above, collectively the "**Excluded Collateral**").

b.    <u>First Lien on Unencumbered Property</u>. Pursuant to section 364(c)(2) of the Bankruptcy Code, subject to the Carve-Out, the Postpetition Lender is hereby granted and shall have a binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon any and all Postpetition Lender Collateral that is not subject to valid, perfected, non-

avoidable and enforceable Permitted Liens, provided, however, that the foregoing Postpetition Lender Liens shall not attach to any of the Excluded Collateral.

c.      Junior Lien. Pursuant to section 364(c)(3) of the Bankruptcy Code. Subject to the Carve-Out, the Postpetition Lender is hereby granted and shall have a binding, continuing, enforceable, fully-perfected best available junior priority security interest in and lien upon any and all Postpetition Lender Collateral that is subject to a valid, perfected, non-avoidable and enforceable Permitted Lien, provided, however, that the foregoing Postpetition Lender Liens shall not attach to any of the Excluded Collateral.

d.      Liens Senior to Certain Other Liens. The Postpetition Lender Liens granted to the Postpetition Lender shall be senior to and shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and/or the Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates under section 551 of the Bankruptcy Code (other than any transfer avoided as part of an Avoidance Claim), or (ii) subject to applicable law, any liens arising after the Involuntary Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Chapter 11 Trustee and/or the Debtors other than as expressly permitted under the Trustee Loan Documents. The Postpetition Lender Liens are subject only to the Carve-Out.

e.      Trustee Funding/Proceeds Account. Any and all Trustee Loans shall be deposited into one or more accounts of the Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates designated for the sole purpose of holding Trustee Loan proceeds of the Trustee Facility (collectively, the "Trustee Proceeds Account"). The Postpetition Lender is hereby granted a valid, enforceable, fully perfected and non-avoidable lien on the Trustee Proceeds

21

Account.  Disbursements from the Trustee Proceeds Account shall be made solely in accordance with this Final Order, the Budget, and the other Trustee Loan Documents.

        f.      The Postpetition Lender is not granted a Postpetition Lender Lien on any assets that are not property of the Debtors' bankruptcy estates.

        g.      The Postpetition Lender Liens shall be enforceable against the Chapter 11 Trustee, the Debtors, their estates, and any successors thereto, including without limitation, any successor trustee or other estate representative appointed in the Chapter 11 Cases, or any Successor Case.  The Postpetition Lender Liens were effective upon the entry of the interim order and shall not at any time be made subject or subordinated to, or made pari passu with, any other lien, security interest or claim existing as of the Involuntary Petition Date or created under sections 363 or 364 of the Bankruptcy Code or otherwise, other than (i) Permitted Liens and (ii) prior payment of the Carve-Out. No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be made pari passu with or senior to the Postpetition Lender Liens.

        8.      <u>Adequate Protection of Prepetition Lenders' Interests</u>. In this Final Order, the term "**Replacement Lien**" shall mean that, subject to the terms and conditions set forth in this Final Order, the Prepetition Lenders shall have and are hereby granted (effective upon the date of entry of this Final Order and without the necessity of the Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates, the Debtors, or the Prepetition Lenders' execution of mortgages, deeds of trust, security agreements, pledge agreements, control agreements, financing statements or otherwise), perfected, security interests in, and liens upon the Postpetition Lender Collateral, in the same priority and to the same extent, priority, enforceability, unavoidability and validity applicable to the Prepetition Liens in the Prepetition Collateral, which Replacement

Lien(s) shall have the priority set forth herein provided, however, that the foregoing lien(s) shall not attach to any of the Excluded Collateral. The Prepetition Lenders are granted the following adequate protection postpetition as such term is used in section 361 of the Bankruptcy Code under sections 362 and 363 of the Bankruptcy Code solely for any diminution in the value of their respective interests in the Prepetition Collateral from the Involuntary Petition Date (collectively, the "**Adequate Protection Claims**") provided, however, that the Adequate Protection Claims shall not attach to or be payable from or have recourse to any of the Excluded Collateral:

a.        The Prepetition Lenders shall have and are hereby granted the Replacement Liens subject to (i) unavoidable, duly perfected Permitted Liens existing as of the Involuntary Petition Date, and (ii) the priorities set forth in this subsection. Subject to the foregoing, the Replacement Liens granted to the Prepetition Lenders pursuant to this Final Order shall be (x) prior and senior to all liens and encumbrances (other than fees arising under 28. U.S.C. §1930) of all other secured creditors in and to such property granted, or arising, subsequent to the date of this Final Order, and (y) junior and subordinate to the Carve-Out and the Postpetition Lender Liens granted to the Postpetition Lender, to which the Replacement Liens shall be immediately junior and subordinate;

b.        Subject to the priorities set forth below in this subsection, pursuant to section 364(c)(1) of the Bankruptcy Code, the Adequate Protection Claims shall constitute allowed claims against the Debtors and their bankruptcy estates with priority over all administrative expenses (other than any fees arising under 28 U.S.C. §1930), diminution claims and all other claims against the Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates and the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the

Bankruptcy Code, and over all administrative expenses or other claims arising under sections 105, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 726, 1113, and/or 1114 and any fees not allowed under Section 326 and/or 330 of the Bankruptcy Code (in each case to the extent permitted by law) (collectively, the "**Prepetition Lenders 507(b) Claims**"), whether or not such expenses or claims may become secured by judgment lien or other non-consensual lien, levy, or attachment or otherwise, which allowed Prepetition Lenders 507(b) Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors, their bankruptcy estates, and all proceeds thereof; provided, however, that the Prepetition Lenders 507(b) Claims granted to Prepetition Lenders shall be junior and subordinate to the Carve-Out and the Postpetition Lender Superpriority Claims, which are also subject to the Carve-Out, and shall not attach to or be payable from or have recourse to any of the Excluded Collateral.

c.      All net payments of accounts for inventory, machinery and equipment, raw materials, work-in-process, or net proceeds of sales of prepetition priority collateral of Wells Fargo Bank, National Association will be paid to Wells Fargo Bank, National Association, to be applied to the Revolving Note (as defined in the Wells Fargo Prepetition Credit Agreement) until paid in full, and thereafter to the Trustee Obligations, provided, however, any payments in connection with a surcharge under section 506(c) of the Bankruptcy Code ordered by the Court against Wells Fargo Bank, National Association shall be held by the Chapter 11 Trustee in trust until all Trustee Obligations are paid in full.

d.      All net proceeds resulting from the sale of any or all of the Trust Real Property Collateral shall be paid to the Trust at the closing of such sale(s) to be applied to the obligations owed by UFNC to the Trust under the UFNC Loan Agreement and the UFNC Deeds of Trust until paid in full, and thereafter to the Trustee Obligations, provided, however, any

24

payments in connection with a surcharge under section 506(c) of the Bankruptcy Code ordered by the Court against the Trust shall be held by the Chapter 11 Trustee in trust until all Trustee Obligations are paid in full.

e.    All net proceeds resulting from the sale of any or all of the real property serving as collateral of Renasant Bank (and to Three Rivers Planning & Development District as co-lender and co-first deed of trust holder with respect to the proceeds from the sale of the Debtors' Nettleton, Mississippi, property) shall be paid to Renasant Bank (and, as applicable, Three Rivers Planning & Development District) at the closing of such sale(s) to be applied to the obligations owed by the Debtors to Renasant Bank (and, as applicable, Three Rivers Planning & Development District) under its loan and security documents until paid in full, and thereafter to the Trustee Obligations, provided, however, any payments in connection with a surcharge under section 506(c) of the Bankruptcy Code ordered by the Court against Renasant Bank shall be held by the Chapter 11 Trustee in trust until all Trustee Obligations are paid in full.

f.    All net proceeds resulting from the sale of any or all of the real property serving as collateral of Bank of New Albany shall be paid to Bank of New Albany at the closing of such sale(s) to be applied to the obligations owed by the Debtors to Bank of New Albany under its loan and security documents until paid in full, and thereafter to the Trustee Obligations, provided, however, any payments in connection with a surcharge under section 506(c) of the Bankruptcy Code ordered by the Court against Bank of New Albany shall be held by the Chapter 11 Trustee in trust until all Trustee Obligations are paid in full.

g.    All net proceeds resulting from the sale of any or all of the collateral subject to a holder of a Permitted Lien shall be paid to the holder of such Permitted Lien at the closing of such sale(s) to be applied to the obligations owed by the Debtors to the holder of such Permitted

Lien under its note, loan and security documents until paid in full, and thereafter to the Trustee

Obligations, provided, however, any amounts withheld by the Trustee as (i) Trustee compensation

under § 326 of the Bankruptcy Code or (ii) as a surcharge under section 506(c) of the Bankruptcy

Code against the holder of such Permitted Lien shall be held by the Chapter 11 Trustee in trust

until all Trustee Obligations are paid in full.

h.    The Prepetition Lenders reserve, and this Final Order is without prejudice

to, their rights to, among other things: (i) object to any surcharge of their alleged collateral; (ii)

object to the terms of any sale of their alleged collateral; and (iii) seek additional adequate

protection; provided that any adequate protection provided hereafter shall be junior and

subordinate to the Postpetition Lender Liens, the Carve-Out and the Postpetition Lender

Superpriority Claims, and provided, further, that the Postpetition Lender, the Chapter 11 Trustee,

and any other party in interest with standing to do so may object to any such request for additional

adequate protection.

## AUTOMATIC PERFECTION AND SURVIVAL

9.    Perfection of Postpetition Lender Liens and the Replacement Liens. This Final

Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the

Postpetition Lender Liens and the Replacement Liens without the necessity of filing or recording

any mortgage, financing statement, pledge agreements, control agreements, assignment documents

with any applicable governmental agency, or other instrument or document which may otherwise

be required under the law or regulation of any jurisdiction or the taking of any other action

(including, for the avoidance of doubt, entering into any deposit account control agreement) to

validate or perfect (in accordance with applicable non-bankruptcy law) the Postpetition Lender

Liens, the Replacement Liens, or to entitle the Postpetition Lender and/or the Prepetition Lenders

26

to the priorities granted herein. The Chapter 11 Trustee, in his business judgement and consistent with this Final Order, on behalf of the Debtors and their bankruptcy estates, is authorized and directed to execute and deliver promptly to the Postpetition Lender and/or the Prepetition Lenders, as applicable, all such financing statements, mortgages, notices and other documents as the Postpetition Lender and/or the Prepetition Lenders may reasonably request, and the Postpetition Lender and/or the Prepetition Lenders may file a photocopy of this Final Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instruments.

10.    <u>Survival of Postpetition Lender Liens, Replacement Liens, and Claims</u>. The Postpetition Lender Liens, Postpetition Lender Superpriority Claims, the Replacement Liens, the Prepetition Lenders 507(b) Claims, and other rights and remedies granted under this Final Order to the Postpetition Lender and the Prepetition Lenders shall continue in this and any Successor Case and shall be valid and enforceable against the Chapter 11 Trustee, the Debtors, any successor trustee appointed in the Debtors' Chapter 11 Cases and/or upon the dismissal or conversion of the Debtors' Chapter 11 Cases or any Successor Case, and such liens, security interests, and claims shall maintain their priority as provided in this Final Order until all Trustee Obligations have been indefeasibly paid in full in cash and the Postpetition Lender's commitments have been terminated in accordance with the Trustee Loan Documents. For the avoidance of doubt, the Postpetition Lender shall have no obligation to release its security interest in or any other Postpetition Lender Lien on any Postpetition Lender Collateral until (y) Full Payment has occurred and the Postpetition Lender shall have received a general release by Debtors of all claims and causes of action arising under or with respect to the Trustee Loan Documents, Trustee Obligations, and Trustee Loans or (z) Postpetition Lender Collateral has been sold pursuant to Court order providing that the

Postpetition Lender's liens attach to the proceeds from such sale with the same validity, extent, and priority as set forth in this Final Order.

## DISPOSITION OF COLLATERAL: ADDITIONAL FINANCING

11.    <u>Disposition of Collateral</u>. The Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates shall not sell, transfer, lease, encumber, or otherwise dispose of any of the Postpetition Lender Collateral other than in the ordinary course of business, without the prior written consent of the Postpetition Lender.

12.    <u>Protection of Postpetition Lender's Rights.</u>

a.    Unless the Postpetition Lender shall have provided its prior written consent or all Trustee Obligations have been indefeasibly paid in full in cash and the Trustee Facility has terminated, there shall not be entered in these Chapter 11 Cases or in any Successor Case any order which authorizes (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the Postpetition Lender Collateral or that is entitled to administrative priority status, in each case which is superior to or *pari passu* with the Postpetition Lender Liens or Postpetition Lender Superpriority Claims granted pursuant to this Final Order; or (ii) the use of Postpetition Lender Collateral or Trustee Facility advances and/or proceeds for any purpose other than in accordance with the Budget and the Trustee Loan Documents.

b.    Without limiting the provisions and protections herein, if at any time prior to the indefeasible payment in full in cash of all Trustee Obligations and the termination of the Trustee Facility, the Debtors' estates, the Chapter 11 Trustee, any successor trustee, any examiner with enlarged powers or any responsible officer subsequently appointed shall obtain credit or incur debt pursuant to sections 364(b), 364(c), 364(d) or any other provision of the Bankruptcy Code or

other applicable law in violation of the Trustee Loan Documents (including this Final Order), then

all of the cash proceeds derived from such credit or debt shall immediately be turned over to the

Postpetition Lender until indefeasible payment in full in cash of the Trustee Obligations.

## EVENTS OF DEFAULT; REMEDIES

13.     <u>Events of Default</u>. The following shall constitute an event of default under this Final

Order, unless waived in writing by the Postpetition Lender (the "**Events of Default**"):

a.      The Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates and/or any Debtor fails to pay when due any of the Trustee Obligations, including but not limited to any payment of principal or interest on the Trustee Loans;

b.      The Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates and/or any Debtor fails to perform any of the terms, covenants, conditions or provisions contained in this Final Order, the Final Order, or any of the Trustee Loan Documents;

c.      An order is entered, modifying, reversing, revoking, staying, rescinding, vacating, or amending this Final Order or any of the Trustee Loan Documents, without the consent and approval of the Postpetition Lender;

d.      An order is entered approving or allowing any claim, security interest or other Lien ranking junior, equal or senior in priority to the Postpetition Lender Liens, the Postpetition Lender Superpriority Claims, and any other Liens granted to the Postpetition Lender under this Final Order or the Trustee Loan Documents or any such equal or prior claim, security interest or other Lien shall be established in any manner, except, in any case, as expressly permitted under this Final Order and any Final Order;

e.      The entry of an order dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code;

f.      The entry of an order which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code, which order permits any creditor, other than Postpetition Lender, to realize upon, or to exercise any right or remedy with respect to, any real Property Postpetition Lender Collateral, which would result in triggering an Event of Default under this Final Order, the Final Order, or any of the Trustee Loan Documents, without the prior written consent of the Postpetition Lender;

g.      The Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates and/or any Debtor fails to pay employee benefit liabilities at the time such liabilities come due related to any Debtor's unpaid payroll taxes or IBNR;

h.       The Court enters any order approving an asset purchase agreement with any third party which would result in triggering an Event of Default under this Final Order, or any of the Trustee Loan Documents unless such asset purchase agreement has been approved in writing by the Postpetition Lender in Postpetition Lender's sole discretion; and

i.       <u>Bankruptcy Case Milestones</u>. If any of the following shall fail to occur in the Chapter 11 Cases:

      i.   the failure of the Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates to file an application to retain a real estate broker or investment banker acceptable to the Postpetition Lender in its sole reasonable discretion to market and sell the Property (as defined in the Chapter 11 Trustee Credit Agreement) on or before fifteen (15) days after the date of this Final Order;

      ii.   the failure of the Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates to obtain an order approving bidding procedures for the sale of the any owned real Property in form and substance acceptable to the Postpetition Lender in its sole reasonable discretion to be entered by the Court on or before May 19, 2023;

      iii.   the failure of the Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates to obtain any Sale Order for the sale of the any owned real Property in form and substance satisfactory to the Postpetition Lender in its sole reasonable discretion to be entered by the Court on or before August 18, 2023.

14.       <u>Remedies and Stay Modification</u>. Subject to the Carve-Out and applicable law, if any Event of Default occurs and is continuing, Postpetition Lender may deliver written notice to the Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates and file a notice with the Court declaring the occurrence of an Event of Default, the termination of the Trustee Facility and/or subject to paragraph 15 of this Final Order, that the automatic stay provisions of Section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the Postpetition Lender to exercise all rights and remedies provided for in the Trustee Loan Documents and applicable law, and to take any or all of the following actions without further order of or application to the Court (as applicable):

30

a.       Declare (with notice to the Chapter 11 Trustee and the United States Trustee) the commitment of the Postpetition Lender to make any Trustee Loan to be terminated, whereupon such commitments and obligation shall be terminated;

b.       Declare (with notice to the Committee, Chapter 11 Trustee and the United States Trustee) the unpaid principal amount of the Trustee Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any of the Trustee Loan Documents, including, without limitation, the Trustee Obligations, to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates;

c.       Exercise any and all remedies available under the Trustee Loan Documents and otherwise available under applicable law, including without limitation the remedies available under Article 9 of the UCC;

d.       Immediately terminate the Chapter 11 Trustee's use on behalf of each of the Debtors and their bankruptcy estates, and/or the Debtors' or any Debtor's use of any and all cash collateral;

e.       Freeze monies or balances in the Chapter 11 Trustee's Trustee Proceeds Account, *provided*, *however*, Postpetition Lender shall be prohibited from sweeping and transferring funds in the Trustee Proceeds Account for a period of 14 days from and after freezing the account to allow any party to seek emergency relief from the Court, to include injunctive relief; and/or

f.       Take any other actions or exercise any other rights or remedies permitted under this Final Order, the Trustee Loan Documents or applicable law to effectuate the repayment of the Trustee Obligations;

provided, however, that (y) although the Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates and/or any Debtor, as applicable, shall be prohibited from requesting any further draws under the Trustee Facility, the Chapter 11 Trustee shall be permitted to continue to use proceeds of the Trustee Facility (to the extent drawn prior to the occurrence of an Event of Default) solely (i) in the ordinary course of business and in accordance with the Budget and the other Trustee Loan Documents and (ii) to satisfy the Carve-Out.

15.     Prior to the exercise of any rights in the above clauses of paragraph 14 of this Final Order, the Postpetition Lender, the Chapter 11 Trustee on behalf of the Debtors and the bankruptcy estates, and any other party in interest with standing in these Chapter 11 cases shall provide (5)

days written notice of the right to cure the Event of Default. In the event that the Default is not cured, the parties shall request, in accordance with the Local Rules, an expedited hearing before this Court (the "**Remedies Hearing**"). Upon the effectiveness of any relief from the automatic stay granted or deemed to have been granted pursuant to this Final Order, the Postpetition Lender  may, in its discretion, enforce the Postpetition Lender Liens, and, as applicable, take all other actions and exercise all other rights and remedies under the Trustee Loan Documents, this Final Order and applicable law that may be necessary or deemed appropriate to collect any of its Trustee Obligations, proceed against or realize upon all or any portion of the Postpetition Lender Collateral as if these Chapter 11 Cases or any Successor Cases were not pending, and otherwise enforce any of the provisions of this Final Order. The Postpetition Lender's delay or failure to exercise rights and remedies under any Trustee Loan Documents, this Final Order or applicable law shall not constitute a waiver of any of its rights and remedies hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed by the Postpetition Lender.  If at the Remedies Hearing, the Court declines to stay the enforcement thereof, the Termination Date shall be deemed to have occurred for all purposes and the Postpetition Lender will have automatic and immediate relief from the automatic stay with respect to the Postpetition Lender Collateral. Subject to entry of a Final Order, at any Remedies Hearing, the Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates, and each Debtor, hereby waive, and shall not be entitled to assert (including, without limitation, under section 105 of the Bankruptcy Code), the right to challenge or dispute the effectiveness of any provision of the Financing Orders, to the extent such relief would impair or restrict the rights and remedies of the Postpetition Lender as set forth in the Financing Orders or in any of the Trustee Loan Documents.

**BUDGET MAINTENANCE; CARVE OUT**

16.    <u>Budget Maintenance</u>. Except as otherwise expressly set forth herein, the Budget may be amended or modified in writing from time to time only with the written consent of the Postpetition Lender and Committee, in their sole discretion, and any modifications to, or extensions, amendments or updates of, the Budget shall be in form and substance acceptable to and approved in writing by the Postpetition Lender in its sole discretion; <u>provided</u> that any amendment to the Budget shall not provide for advances under the Trustee Facility in excess of the Approved Amount, subject to the Permitted Variances. The Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates shall deliver to the Postpetition Lender and Committee on or before the close of business on the third day of each week (and if such day is not a business day, then the next succeeding business day) the following: (a) comparison for the prior week of actual results of all items contained in the Budget to the amounts originally contained in the Budget and (b) cumulative comparison for the period from the Petition Date through the end of the prior week of the actual results of all items contained in the Budget to the amounts originally contained in the Budget, in each case along with such supporting information and additional reporting as the Postpetition Lender may request. The Chapter 11 Trustee's and/or the Debtors' aggregate expenditures shall not exceed 110% of the aggregate of the Budget expenditures (the "**Permitted Variances**"), tested on a cumulative weekly basis (for the avoidance of doubt, excluding disbursements for Professional Fees (as defined below), which shall not be subject to a variance). The Chapter 11 Trustee, the Debtors, and their professionals, consultants, and other advisors shall be available weekly (subject to reasonable scheduling conflicts) for a telephonic conference call with the Postpetition Lender and/or its professionals to discuss the status of the Chapter 11 Cases, the liquidation of assets, asset sales, results of operation, if any, other matters pertaining to the

33

Chapter 11 Trustee and/or the Debtors, including sale and liquidation efforts. The Postpetition

Lender shall have independent access to the Chapter 11 Trustee's and the Debtors' advisors,

including any financial advisors, to discuss matters relating to the Postpetition Collateral and

Trustee Loans.

17.    <u>Carve-Out</u>. Subject to the terms and conditions contained in this paragraph 17, the

Postpetition Lender Liens and Postpetition Lender Superpriority Claims shall be subject to and

subordinate in all respects to payment of the Carve-Out (as defined below):

a.    For purposes of this Final Order, "**Carve-out**" means (i) all unpaid fees

required to be paid in these Chapter 11 Cases to the Clerk of the Court and to the office of the

United States Trustee under 28 U.S.C. § 1930 and 31 U.S.C. § 3717, and (ii) all reasonable and

documented unpaid fees and expenses (the "**Professional Fees**") of professionals retained by the

Chapter 11 Trustee or Committee in these Chapter 11 Cases (collectively, the "**Estate's**

**Professionals**") that are allowed by the Court under sections 105(a), 327, 330,331, or 1103 of the

Bankruptcy Code and remain unpaid after application of any retainers or available funds remaining

in the Debtors' estates for such Estate's Professionals, up to an aggregate amount for all such

Professional Fees not to exceed $815,000 (the "**Carve-Out Cap**").   The Committee's

professionals are limited to the $110,000 provided to the Committee in the Budget through July

31, 2023 with payment of such amount to come from the Replenishing Retainer Amounts. The

Court specifically reserves to the Committee, with the consent of the Postpetition Lender and

Chapter 11 Trustee, the Committee's right to seek continued or additional compensation to

compensate the Committee's professionals for services performed after July 31, 2023,

notwithstanding this Final Order, the Trustee Documents, the Replenishing Retainer Amounts,

Budget, Carve-Out and Carve-Out Cap.  The Chapter 11 Trustee and Postpetition Lender reserve

34

all rights to object to any such additional compensation request and any fee application filed by the Committee's professionals.

b.        Any payments actually made pursuant to Bankruptcy Code sections 327, 328, 330, 331, 503 or 1103 or otherwise to the Estate's Professionals and/or the Chapter 11 Trustee shall (i) not be paid from the proceeds of any Postpetition Lender Collateral (including, without limitation, Cash Collateral) until such time as all retainers, if any, held by the Estate's Professionals have been reduced to zero, and (ii) in the case of any payments made on account of any fees and expenses described in clauses (ii) of the definition of Carve-Out, reduce the applicable Carve-Out Cap on a dollar-for-dollar basis. So long as no Event of Default has occurred, the Chapter 11 Trustee on behalf of the Debtors and their bankruptcy estates is authorized to use advances under the Trustee Facility, in accordance with and limited to the amounts set forth on the Budget, on a cumulative basis by the Estate's Professionals, as applicable, to pay such compensation and expense reimbursements of the Estate's Professionals as the same may be due and payable (but regardless of when such compensation and reimbursement of expenses are so allowed).

c.        No portion of the Carve-Out, Postpetition Lender Collateral proceeds, or any proceeds of the Trustee Facility may be used for the payment of the fees, costs and expenses of any person incurred challenging (the "**Challenge**"), or in relation to the Challenge of, the Postpetition Lender Liens, the Postpetition Lender Superpriority Claims, the other Trustee Obligations, or any other Liens or claims of the Postpetition Lender or the Related Parties to the Postpetition Lender, including, without limitation, the Trust Liens, or in the initiation or prosecution of any claim or cause of action against any or all of the Postpetition Lender, including, without limitation, any claim under Chapter 5 of the Bankruptcy Code, provided, further, however, that no more than a total of $10,000.00 of the proceeds of the Trustee Facility or any proceeds of

the Collateral may be used to fund an investigation by the Chapter 11 Trustee, the Debtors, or any

other duly authorized interested party into the existence of any Challenge, cause of action or other

type of litigation against the Trust or any Related Party to the Trust solely with respect to the Trust

Liens and/or the obligations owed by UFNC to the Trust under the UFNC Loan Agreement and

the UFNC Deeds of Trust.

d.      Furthermore, none of the Carve-Out, Postpetition Lender Collateral

proceeds, or any proceeds of the Trustee Facility shall be used to prevent, hinder or delay the

Postpetition Lender and/or its designee from enforcing or realizing upon the Postpetition Lender

Collateral once a default or Event of Default has occurred and is continuing under the Trustee

Loan Documents in accordance with this Final Order.

e.      Nothing herein shall be construed as consent to the allowance of any

Professional Fees, fees and expenses of the Chapter 11 Trustee, or the professional fees or expenses

of any other party in interest, or shall affect the right of the Postpetition Lender to object to the

allowance and payment of such fees and expenses.

f.      The Postpetition Lender shall not be responsible for the direct payment or

reimbursement of any Professional Fees and/or fees or expenses of the Chapter 11 Trustee incurred

in these Chapter 11 Cases or any Successor Case. Nothing in this Final Order or otherwise shall

be construed (i) to obligate the Postpetition Lender in any way to pay compensation or to reimburse

expenses of any of the Estate's Professionals, any professionals retained by the Debtors, or to

guarantee that the Chapter 11 Trustee and/or the Debtors have  sufficient funds to pay such

compensation or reimbursement; (ii) to increase the Carve-Out if the actual Professional Fees are

higher than reflected in the Budget or there are otherwise permitted by this Final Order; or (iii) as

consent to the allowance of any Professional Fees. Any funding of the Carve-Out shall be added

to and made a part of the Trustee Obligations and secured by the Postpetition Lender Collateral and otherwise entitled to the protections granted under this Final Order, the Trustee Loan Documents, the Bankruptcy Code and applicable law. Notwithstanding anything to the contrary herein, the Postpetition Lender shall have the right to establish a reserve against its commitments under the Trustee Facility in an amount equal to the Carve-Out (including the Carve-Out Cap), as such amount may change from time to time.

## MISCELLANEOUS

18.    <u>Postpetition Lender Not Responsible Person; No Control</u>. In (a) making the decision to make the Trustee Loans; (b) administering the Trustee Loans; (c) extending other financial accommodations to the Debtors under the Trustee Loan Documents; and (d) making the decision to collect the indebtedness and obligations of the Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates, the Postpetition Lender shall not be considered to (i) owe any fiduciary obligation to the Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates, and/or any Debtor, or any other party with respect to its exercise of any consent rights afforded them under the Trustee Loan Documents or this Final Order or (ii) be exercising control over the Chapter 11 Trustee, the Debtors or their operations, have authority to determine the manner in which any of the Chapter 11 Trustee's and/or the Debtors' operations are conducted, or acting in any way as a responsible person, a control person, insider or as an owner or operator of the Chapter 11 Trustee, the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from this Final Order, the Trustee Facility, and/or the Trustee Loan Documents, under any applicable law.

19.    <u>Challenge Rights and Deadline</u>.    Nothing in this Final Order shall prejudice the rights of any party in interest to object to or Challenge the Chapter 11 Trustee's Stipulations;

provided however, that unless such other party in interest obtains proper standing and commences a contested matter or adversary proceeding raising such objection or Challenge to any claim or cause of action against the Trust objecting to the Trust Prepetition Liens or in the nature of a setoff, counterclaim or defense to the obligations owed by UFNC to the Trust under the UFNC Loan Agreement and/or the UFNC Deeds of Trust (including, but not limited to, those under sections 506, 544, 547, 548, 550 and/or 552 of the Bankruptcy Code or by way of suit against the Trust) within 90 days from the entry of the Final Order approving the Motion (the "**Challenge Period**", unless such Challenge Period is extended in a writing signed by the Trust and filed with the Court[7], and in the event that no contested matter or adversary proceeding is commenced during the Challenge Period shall be referred to as the "**Challenge Period Termination Date**"), then, upon the Challenge Period Termination Date, any Challenge and all such Challenges and objections by any party (including, without limitation, the Chapter 11 Trustee and any other chapter 11 or chapter 7 trustee appointed in the Chapter 11 Cases or in any Successor Case) shall be deemed to be forever waived, barred and discharged and the Chapter 11 Trustee's Stipulations shall be binding on all persons, entities, creditors, interest holders and parties in interest in the Chapter 11 Cases or any Successor Case, and upon the Challenge Termination Period Date, the obligations owed by UFNC to the Trust under the UFNC Loan Agreement and/or the UFNC Deeds of Trust and the Trust Prepetition Liens shall be deemed to be fully and finally allowed under the Bankruptcy Code for all purposes in connection with the Chapter 11 Cases and any Successor Case. Only those parties in interest that have properly and with requisite standing initiated an

---

[7] The Challenge Period of 90 days from the entry of the Final Order provides more time to commence a Challenge than the time period required by Local Rule 4001(b)(1)(B)(ii) - at least seventy-five (75) days from the entry of the order and at least sixty (60) days from the date of formation of the Committee. In the event an extension is allowed by the Court, such extension of the Challenge Period shall only apply to the UFNC Loan Agreement and/or the UFNC Deeds of Trust and shall not apply to other investigations by parties in interests or the Committee.

adversary proceeding or contested matter challenging the Chapter 11 Trustee's Stipulations prior to the Challenge Period Termination Date shall be permitted to prosecute such adversary proceeding or contested matter.  If any such Challenge is timely commenced within the Challenge Period, the agreements, stipulations and findings contained in this Final Order shall nonetheless remain binding and preclusive on the Chapter 11 Trustee, the Debtors, the Debtors' bankruptcy estates, and their creditors, the Committee, equity holders, and all other parties in interest in these Chapter 11 Cases, except to the extent that such findings or admissions are expressly and successfully challenged and the Court enters a final order with respect thereto.  If a Challenge is timely commenced hereunder and the case is subsequently converted to a case under chapter 7 of the Bankruptcy Code, the chapter 7 trustee shall be deemed to have timely initiated such Challenge and may pursue it on behalf of the Debtors' bankruptcy estates.

20. <u>No Third-Party Rights</u>. Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third-party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

21. <u>Section 506(c) Claims</u>.  No costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases at any time shall be charged against the Postpetition Lender, any of its claims, or the Postpetition Lender Collateral pursuant to section 506(c) of the Bankruptcy Code, or otherwise.[8]

22. <u>No Marshaling/Application of Proceeds</u>. The Postpetition Lender and the Trust shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Postpetition Lender Collateral and the Real Property Collateral, as applicable,

---

[8] The Prepetition Lenders, including, without limitation, the Trust, retain all rights to consent to or object to any surcharge of their alleged collateral.

and proceeds thereof shall be received and applied in accordance with this Final Order and the

Trustee Loan Documents notwithstanding any other agreement or provision to the contrary

23.    Section 552(b). The Postpetition Lender and the Prepetition Lenders are entitled to

all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the

case' exception therein shall not apply.

24.    Termination Date.  Subparagraph (c) of the definition of Termination Date in the

Chapter 11 Trustee Loan and Security Agreement is modified so that only the consummation of a

Sale Order for all or substantially all of the Collateral (and in the event of a series of transactions

resulting in the sale of all or substantially all of the Collateral, the latest date of consummation of

such sale under any applicable Sale Order) shall trigger the Termination Date.

25.    Rights Preserved.

a.    Notwithstanding anything herein to the contrary, the entry of this Final Order

is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the

Postpetition Lender's right to seek any other or supplemental relief in respect of the Chapter 11

Trustee and/or the Debtors; or (b) any of the rights of the Postpetition Lender under the Bankruptcy

Code or under non-bankruptcy law, including, without limitation, the right to (i) request further

modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal

of the Chapter 11 Cases or a Successor Case, conversion of the Chapter 11 Cases to cases under

chapter 7, or appointment of an or examiner with expanded powers, or (iii) propose, subject to the

provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans.

b.    Notwithstanding anything herein to the contrary, the entry of this Final

Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the

Prepetition Lenders' rights to seek any other or supplemental relief relating to the Chapter 11

Trustee and/or the Debtors; or (b) any of the rights of the Prepetition Lenders under the Bankruptcy Code or under non-bankruptcy law or at equity, including, without limitation, the right to (i) request further modification of the automatic stay of section 362 of the Bankruptcy Code; (ii) advance or object to the sale of any real or personal property securing the respective Prepetition Lenders' pre-petition claim or the terms and conditions thereof or submit a credit bid in connection with any such sale; (iii) request dismissal of the Chapter 11 Cases or Successor Case, conversion of the Chapter 11 Cases to cases under Chapter 7, or appointment of an examiner with expanded powers; (iv) object to any proposed abandonment of property of the estate under 11 U.S.C. §554; (v) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (vi) seek additional or supplemental relief with respect to this Final Order including, without limitation, the right to seek the Court's determination as to whether an "Event of Default" has occurred.

c.    Notwithstanding anything herein to the contrary, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly the right of any party in interest to oppose any actions taken by the Prepetition Lenders or the Postpetition Lenders set forth in this paragraph 24.

26.    No Waiver by Failure to Seek Relief. The failure of the Postpetition Lender to seek relief or otherwise exercise its rights and remedies under this Final Order or applicable law, as the case may be, shall not constitute a waiver of any rights hereunder, thereunder, or otherwise of the Postpetition Lender.

27.    Permitted Liens. Other than with respect to the Chapter 11 Trustee's Stipulations, nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Lien is valid, senior, enforceable, prior, perfected or non-avoidable. Moreover, subject to paragraphs 17

41

and 19 of this Final Order, nothing herein shall prejudice the rights of any party-in-interest with standing to do so, including, but not limited to, the Chapter 11 Trustee, the Debtors, the Postpetition Lender, or any other duly authorized interested party to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any alleged Permitted Lien.

28.   Good Faith. The Postpetition Lender has acted in good faith in connection with this Final Order and its reliance on this Final Order is in good faith.  Postpetition Lender is entitled to the protections of section 364(e) of the Bankruptcy Code.

29.   Access to Debtors. The Chapter 11 Trustee and the Debtors shall permit representatives, agents and/or employees of the Postpetition Lender, including professionals retained by the Postpetition Lender's legal professionals, to have reasonable access to its premises and records during normal business hours and shall cooperate, consult with, and provide to such persons all such non-privileged information as they may reasonably request.

30.   Postpetition Lender Credit Bid Rights. Subject to section 363(k) of the Bankruptcy Code, the Postpetition Lender shall be entitled to credit bid up to the full amount of the outstanding Trustee Obligations, including, without limitation, any accrued interest and expenses, in any sale of any Postpetition Lender Collateral, whether such sale is effectuated through section 363 of the Bankruptcy Code in a chapter 11 or chapter 7 proceeding, under section 1129 of the Bankruptcy Code in a chapter 11 proceeding, by a chapter 7 trustee in a chapter 7 proceeding, or otherwise. Nothing in this Final Order shall prohibit the Postpetition Lender from being a stalking horse purchaser or actual purchaser of any of the Debtors' assets and/or the assets being administered and sold by the Chapter 11 Trustee.

31.   Trust Credit Bid Rights. Subject to section 363(k) of the Bankruptcy Code, the Trust shall be entitled to credit bid up to the full amount of the outstanding obligations it is owed

by UFNC under the UFNC Loan Agreement and UFNC Deeds of Trust, including, without limitation, any accrued interest and expenses, in any sale of any Trust Real Property Collateral, whether such sale is effectuated through section 363 of the Bankruptcy Code in a chapter 11 or chapter 7 proceeding, under section 1129 of the Bankruptcy Code in a chapter 11 proceeding, by a chapter 7 trustee in a chapter 7 proceeding, or otherwise. Nothing in this Final Order shall prohibit the Trust from being a stalking horse purchaser or actual purchaser of any of the Debtors' assets and/or the assets being administered and sold by the Chapter 11 Trustee. In addition, nothing in this Final Order impairs or prohibits any of the other Prepetition Lenders from seeking Court approval under section 363(k) of the Bankruptcy Code to credit bid in connection with any sale of any of their alleged collateral that is subject to a Permitted Lien, whether such sale is effectuated through section 363 of the Bankruptcy Code in a chapter 11 or chapter 7 proceeding, under section 1129 of the Bankruptcy Code in a chapter 11 proceeding, by a chapter 7 trustee in a chapter 7 proceeding, or otherwise.

32.    <u>Indemnification</u>.  Notwithstanding anything to the contrary contained in Section 11 of the Chapter 11 Trustee Credit Agreement, the "Indemnitee" shall only be defined to mean the Postpetition Lender, the Trust in connection with its ownership of the Postpetition Lender, and the Postpetition Lender's Related Parties solely in connection with the Trustee Loans, the Trustee Loan Documents, and this Final Order, provided, however, that the Chapter 11 Trustee and the Debtors' bankruptcy estates shall not use the proceeds of Excluded Collateral against the Postpetition Lender and/or the Postpetition Lender's Related Parties to indemnify such Indemnitee.

33.    <u>Proof of Claim</u>. Any order entered by the Court establishing a bar date for any claims (including without limitation administrative claims) in any of the Chapter 11 Cases shall

not apply to the Postpetition Lender. The Postpetition Lender shall not be required to file a proof of claim or requests for approval of administrative expenses authorized by this Final Order in any of the Chapter 11 Cases, and the provisions of this Final Order, relating to the amount of the Trustee Obligations and the Postpetition Lender Superpriority Claim, and the Postpetition Lender Liens shall constitute a timely filed proof of claim and/or administrative expense request. For the avoidance of doubt, the books and records of the Postpetition Lender shall be deemed conclusive as to the amount of the claims of the Postpetition Lender.

34. <u>Binding Effect of Final Order</u>.

a. This Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Involuntary Petition Date immediately upon execution thereof. Immediately upon entry by this Court (notwithstanding any applicable law or rule to the contrary), the terms and provisions of this Final Order shall become valid and binding upon and inure to the benefit of the Chapter 11 Trustee, the Debtors, the Postpetition Lender, the U.S. Trustee, all other creditors of the Debtors, the Committee, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the Chapter 11 Cases, any Successor Case, or upon dismissal of the Chapter 11 Cases or a Successor Case.

b. The Chapter 11 Trustee on behalf of each of the Debtors and their bankruptcy estates expressly stipulates, and the Court finds and adjudicates that, the Trustee Obligations shall not be discharged or otherwise impaired by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of sections 524 and/or 1141(d) of the Bankruptcy Code, unless the Trustee Obligations have been indefeasibly paid in full in cash on or

44

before the effective date of a confirmed plan of reorganization and all commitments under the Trustee Facility have been terminated.

35.     No Modification of Final Order. If any of the provisions of this Final Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court, such modification, amendment, or vacatur shall not affect the validity, perfection, priority, allowability, enforceability, or non-availability of any advances, payments, or use of cash whether previously or hereunder, or lien, claim, or priority authorized or created hereby. Any liens or claims granted to the Postpetition Lender hereunder arising prior to the effective date of any such modification, amendment, or vacatur of this Final Order shall be governed in all respects by the original provisions of this Final Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

36.     Survival. The provisions of this Final Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of liquidation or reorganization in the Chapter 11 Cases; (b) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (c) dismissing the Chapter 11 Cases or any Successor Case; or (d) pursuant to which this Court abstains from hearing the Chapter 11 Cases or a Successor Case. The terms and provisions of this Final Order, including the claims, liens, security interests, and other protections granted to the Postpetition Lender pursuant to this Final Order, notwithstanding the entry of any such order, shall continue in the Chapter 11 Cases, in any Successor Case, or following dismissal of the Chapter 11 Cases or any Successor Case, and shall maintain their priority as provided by this Final Order until the Trustee Obligations have been indefeasibly paid in full.

45

37.    <u>Rights Preserved</u>.  Other than as expressly set forth in this Final Order, any other rights, claims, or privileges (whether legal, equitable, or otherwise) of the Postpetition Lender, the Prepetition Lenders, or any other party in interest are preserved.

38.    <u>Controlling Effect</u>. To the extent that any provision of this Final Order conflicts with any provision of any of the Trustee Loan Documents, this Final Order controls and shall supersede the conflicting provision(s).

39.    <u>Retention of Jurisdiction</u>. The Court has and will retain exclusive jurisdiction to enforce this Final Order according to its terms.

### End of Order ###

Order submitted by:

Douglas C. Noble, MS Bar No. 10526
**McCraney | Montagnet | Quin | Noble PLLC**
602 Steed Road • Suite 200
Ridgeland, Mississippi 39157
Telephone: (601) 707-5725
Facsimile:  (601) 510-2939
Email:  dnoble@mmqnlaw.com

*Counsel to Chapter 11 Trustee*

# EXHIBIT A

United Furniture Industries
Weekly Cash Flow

| week ended date | 2/25/2022 Week 1 | 3/4/2022 Week 2 | 3/11/2022 Week 3 | 3/18/2022 Week 4 | 3/25/2022 Week 5 | 4/1/2022 Week 6 | 4/8/2022 Week 7 | 4/15/2022 Week 8 | 4/22/2022 Week 9 | 4/29/2022 Week 10 | 5/6/2022 Week 11 | 5/13/2022 Week 12 | 5/20/2022 Week 13 | Total 13 week exp |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash Balance** | $ - | | | | | | | | | | | | | $ - |
| **Receipts:** | | | | | | | | | | | | | | |
| DIP Funding | | | | | | | | | | | | | | $ - |
| Accounts Receivable Collections | | | | | | | | | | | | | | $ - |
| Other | | | | | | | | | | 341,386 | | | | 341,386 |
| **Total Receipts** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 341,386 | $ - | $ - | $ - | $ 341,386 |
| **Disbursements:** | | | | | | | | | | | | | | |
| Payroll/Contract Labor-Administrative | $ 53,153 | $ 53,153 | $ 53,153 | $ 53,153 | $ 53,153 | $ 53,153 | $ 53,153 | $ 53,153 | $ 53,153 | $ 53,153 | $ 53,153 | $ 53,153 | $ 53,153 | $ 690,983 |
| IT services, monthly | $ 57,547 | $ - | $ - | $ - | $ 57,547 | $ - | $ - | $ - | $ - | $ 57,547 | $ - | $ - | $ - | $ 172,642 |
| Phone & Utilities- all locations | $ 561,000 | $ - | $ - | $ - | $ 281,000 | $ - | $ - | $ - | $ - | $ 264,000 | $ - | $ - | $ - | $ 1,106,000 |
| Fire Alarms/Monitoring Services | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 65,000 |
| Security - Guards | $ 55,000 | $ 55,000 | $ 55,000 | $ 55,000 | $ 55,000 | $ 55,000 | $ 55,000 | $ 55,000 | $ 55,000 | $ 55,000 | $ 55,000 | $ 55,000 | $ 55,000 | $ 715,000 |
| Misc Maintenance services/costs | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 55,000 |
| Waste Management Services | $ 800 | $ 800 | $ 800 | $ 800 | $ 800 | $ 2,400 | $ 2,400 | $ 2,400 | $ 2,400 | $ 2,400 | $ 2,400 | $ 2,400 | $ 2,400 | $ 23,200 |
| Building Lease payments | $ 780,843 | $ - | $ - | $ - | $ 432,992 | $ - | $ - | $ - | $ - | $ 425,168 | $ - | $ - | $ - | $ 1,639,003 |
| Equipment Rent/Lease payments | $ 75,000 | $ - | $ - | $ - | $ 75,000 | $ - | $ - | $ - | $ - | $ 75,000 | $ - | $ - | $ - | $ 225,000 |
| Trailer Lease payments | $ 75,000 | $ - | $ - | $ - | $ 75,000 | $ - | $ - | $ - | $ - | $ 75,000 | $ - | $ - | $ - | $ 225,000 |
| Misc office exp (reimburse 1099 filing fees) | $ 1,000 | $ 250 | $ 250 | $ 250 | $ 250 | $ 250 | $ 250 | $ 250 | $ 250 | $ 250 | $ 250 | $ 250 | $ 250 | $ 4,000 |
| Unum payments past due | $ 305,520 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 305,520 |
| UMR - Health Insurance | $ 616,484 | $ 250,000 | $ 250,000 | $ 250,000 | $ 250,000 | $ 250,000 | $ 250,000 | $ 250,000 | $ 250,000 | $ 250,000 | $ - | $ - | $ - | $ 2,866,484 |
| CARES ACT - Covid Payroll Tax deferred | $ 2,580,983 | $ - | $ - | $ - | $ - | $ 94,423 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 2,675,406 |
| Employee garnishments & child supports | | | | | | $ 162,266 | | | | | | | | $ 162,266 |
| Insurance - Equipment | $ 230,493 | $ 68,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 298,493 |
| Insurance - Building | $ 1,115,818 | $ 332,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,447,818 |
| Miscellaneous | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 195,000 |
| **Total Operating Expenses** | $ (6,531,141) | $ 781,703 | $ 381,703 | $ 381,703 | $ 1,305,742 | $ 642,491 | $ 385,803 | $ 385,803 | $ 385,803 | $ 1,282,518 | $ 135,803 | $ 135,803 | $ 135,803 | $ 12,871,815 |
| **Operating Cash Flow** | $ (6,531,141) | $ (781,703) | $ (381,703) | $ (381,703) | $ (1,305,742) | $ (642,491) | $ (385,803) | $ (385,803) | $ (385,803) | $ (941,132) | $ (135,803) | $ (135,803) | $ (135,803) | $ (12,530,429) |
| **Restructuring Fees:** | | | | | | | | | | | | | | |
| Professionals: | | | | | | | | | | | | | | |
| Debtor Counsel | $ - | $ - | $ - | $ - | $ 310,000 | $ - | $ - | $ - | $ 195,000 | $ - | $ - | $ - | $ 195,000 | $ 700,000 |
| FA | $ - | $ - | $ - | $ - | $ 15,000 | $ - | $ - | $ - | $ 50,000 | $ - | $ - | $ - | $ 50,000 | $ 115,000 |
| Committee Counsel | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 27,500 | $ 27,500 |
| Claims Agent | $ - | $ - | $ - | $ - | $ 25,000 | $ - | $ - | $ - | $ 65,000 | $ - | $ - | $ - | $ 65,000 | $ 155,000 |
| Ordinary Course Professionals | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 25,000 | $ - | $ - | $ - | $ 25,000 | $ 50,000 |
| Chapter 11 Trustee Fees | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Critical Vendors: | | | | | | | | | | | | | | $ - |
| | | | | | | | | | | | | | | $ - |
| | | | | | | | | | | | | | | $ - |
| DIP Lender Fees and Expenses | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| US Trustee Fee | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 75,000 | $ - | $ - | $ - | $ 75,000 |
| **Total Restructuring Disbursements** | $ - | $ - | $ - | $ - | $ 350,000 | $ - | $ - | $ - | $ 335,000 | $ - | $ 75,000 | $ - | $ 362,500 | $ 1,122,500 |
| **Net Cash Flow** | $ (6,531,141) | $ (781,703) | $ (381,703) | $ (381,703) | $ (1,655,742) | $ (642,491) | $ (385,803) | $ (385,803) | $ (720,803) | $ (941,132) | $ (210,803) | $ (135,803) | $ (498,303) | $ (13,652,929) |
| **Ending Cash Balance** | $ (6,531,141) | $ (781,703) | $ (381,703) | $ (381,703) | $ (1,655,742) | $ (642,491) | $ (385,803) | $ (385,803) | $ (720,803) | $ (941,132) | $ (210,803) | $ (135,803) | $ (498,303) | $ (13,652,929) |
| **DIP:** | | | | | | | | | | | | | | |
| Beginning Balance | $ - | $ 7,881,264 | $ 8,662,967 | $ 9,044,669 | $ 9,426,372 | $ 11,082,113 | $ 11,724,604 | $ 12,110,407 | $ 12,496,209 | $ 13,217,012 | $ 14,158,144 | $ 14,368,947 | $ 14,504,749 | $ - |
| GAP Period Advances | $ 1,226,282 | | | | | | | | | | | | | $ 1,226,282 |
| Post Commencement Advances | $ 123,841 | | | | | | | | | | | | | $ 123,841 |
| Draws | $ 6,531,141 | $ 781,703 | $ 381,703 | $ 381,703 | $ 1,655,742 | $ 642,491 | $ 385,803 | $ 385,803 | $ 720,803 | $ 941,132 | $ 210,803 | $ 135,803 | $ 498,303 | $ 13,652,929 |
| Interest | | | | | | | | | | | | | | $ - |
| DIP Fees | | | | | | | | | | | | | | $ - |
| Other | | | | | | | | | | | | | | $ - |
| **Ending DIP** | $ 7,881,264 | $ 8,662,967 | $ 9,044,669 | $ 9,426,372 | $ 11,082,113 | $ 11,724,604 | $ 12,110,407 | $ 12,496,209 | $ 13,217,012 | $ 14,158,144 | $ 14,368,947 | $ 14,504,749 | $ 15,003,052 | $ 15,003,052 |

United Furniture Industries
Weekly Cash Flow

| week ended date | 5/27/2022 Week 14 | 6/3/2022 Week 15 | 6/10/2022 Week 16 | 6/17/2022 Week 17 | 6/24/2022 Week 18 | 7/1/2022 Week 19 | 7/8/2022 Week 20 | 7/15/2022 Week 21 | 7/22/2022 Week 22 | 7/29/2022 Week 23 | 8/5/2022 Week 24 | 8/12/2022 Week 25 | 8/19/2022 Week 26 | Total 13 wk exp | Total 26 wk exp |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash Balance** | | | | | | | | | | | | | | $ - | $ - |
| **Receipts:** | | | | | | | | | | | | | | | |
| DIP Funding | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Accounts Receivable Collections | | | | | | | | | | | | | | $ - | $ - |
| Other | | | | | | | | | | | | | | $ - | 341,386 |
| **Total Receipts** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | 341,386 |
| **Disbursements:** | | | | | | | | | | | | | | | |
| Payroll/Contract Labor-Administrative | $ 53,153 | 53,153 | 53,153 | 53,153 | 53,153 | 53,153 | 53,153 | 53,153 | 53,153 | 53,153 | 53,153 | 53,153 | 53,153 | 690,983 | 1,381,965 |
| IT services, monthly | $ 57,547 | $ - | $ - | $ - | 57,547 | $ - | $ - | $ - | 57,547 | $ - | $ - | $ - | $ - | 172,642 | 345,285 |
| Phone & Utilities- all locations | $ 224,000 | $ - | $ - | $ - | 224,000 | $ - | $ - | $ - | 224,000 | $ - | $ - | $ - | $ - | 672,000 | 1,778,000 |
| Fire Alarms/Monitoring Services | $ 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 65,000 | 130,000 |
| Security - Guards | $ 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 715,000 | 1,430,000 |
| Misc Maintenance services/costs | $ 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 65,000 | 120,000 |
| Waste Management Services | $ 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 31,200 | 54,400 |
| Building Lease payments | $ 425,168 | $ - | $ - | $ - | 333,065 | $ - | $ - | $ - | $ - | 333,065 | $ - | $ - | $ - | 1,091,298 | 2,730,301 |
| Equipment Rent/Lease payments | $ 56,250 | $ - | $ - | $ - | 37,500 | $ - | $ - | $ - | $ - | 37,500 | $ - | $ - | $ - | 131,250 | 356,250 |
| Trailer Lease payments | $ 56,250 | $ - | $ - | $ - | 37,500 | $ - | $ - | $ - | $ - | 37,500 | $ - | $ - | $ - | 131,250 | 356,250 |
| Misc office exp (reimburse 1099 filing fees) | $ 250 | 250 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | 500 | 4,500 |
| Unum payments past due | | | | | | | | | | | | | | $ - | 305,520 |
| UMR - Health Insurance | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | 2,866,484 |
| CARES ACT - Covid Payroll Tax deferred | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | 2,675,406 |
| Employee garnishments & child supports | | | | | | | | | | | | | | $ - | 162,266 |
| Insurance - Equipment | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | 298,493 |
| Insurance - Building | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | 1,447,818 |
| Miscellaneous | $ 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 195,000 | 390,000 |
| **Total Operating Expenses** | $ 955,018 | 135,803 | 135,553 | 135,553 | 825,165 | 135,553 | 135,553 | 135,553 | 135,553 | 825,165 | 135,553 | 135,553 | 135,553 | 3,961,123 | 16,832,938 |
| **Operating Cash Flow** | $ (955,018) | (135,803) | (135,553) | (135,553) | (825,165) | (135,553) | (135,553) | (135,553) | (135,553) | (825,165) | (135,553) | (135,553) | (135,553) | (3,961,123) | (16,491,552) |
| **Restructuring Fees:** | | | | | | | | | | | | | | | |
| Professionals: | | | | | | | | | | | | | | $ - | $ - |
| Debtor Counsel | $ - | $ - | $ - | $ - | 195,000 | $ - | $ - | $ - | 195,000 | $ - | $ - | $ - | 195,000 | 585,000 | 1,285,000 |
| FA | $ - | $ - | $ - | $ - | 50,000 | $ - | $ - | $ - | 50,000 | $ - | $ - | $ - | 50,000 | 150,000 | 265,000 |
| Committee Counsel | $ - | $ - | $ - | $ - | 27,500 | $ - | $ - | $ - | 27,500 | $ - | $ - | $ - | 27,500 | 82,500 | 110,000 |
| Claims Agent | $ - | $ - | $ - | $ - | 25,000 | $ - | $ - | $ - | 25,000 | $ - | $ - | $ - | 25,000 | 75,000 | 230,000 |
| Ordinary Course Professionals | $ - | $ - | $ - | $ - | 25,000 | $ - | $ - | $ - | 25,000 | $ - | $ - | $ - | 25,000 | 75,000 | 125,000 |
| Chapter 11 Trustee Fees | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Critical Vendors: | | | | | | | | | | | | | | $ - | $ - |
| | | | | | | | | | | | | | | $ - | $ - |
| | | | | | | | | | | | | | | $ - | $ - |
| DIP Lender Fees and Expenses | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| US Trustee Fee | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | 75,000 | $ - | $ - | 75,000 | 150,000 |
| **Total Restructuring Disbursements** | $ - | $ - | $ - | $ - | 322,500 | $ - | $ - | $ - | 322,500 | $ - | 75,000 | $ - | 322,500 | 1,042,500 | 2,165,000 |
| **Net Cash Flow** | $ (955,018) | (135,803) | (135,553) | (135,553) | (1,147,665) | (135,553) | (135,553) | (135,553) | (458,053) | (825,165) | (210,553) | (135,553) | (458,053) | (5,003,623) | (18,656,552) |
| **Ending Cash Balance** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **DIP:** | | | | | | | | | | | | | | | |
| Beginning Balance | $ 15,003,052 | $ 15,958,070 | $ 16,093,872 | $ 16,229,425 | $ 16,364,977 | $ 17,512,642 | $ 17,648,195 | $ 17,783,747 | $ 17,919,300 | $ 18,377,352 | $ 19,202,517 | $ 19,413,070 | $ 19,548,622 | $ 15,003,052 | $ - |
| GAP Period Advances | | | | | | | | | | | | | | | 1,226,282 |
| Post Commencement Advances | | | | | | | | | | | | | | | 123,841 |
| Draws | $ 955,018 | 135,803 | 135,553 | 135,553 | 1,147,665 | 135,553 | 135,553 | 135,553 | 458,053 | 825,165 | 210,553 | 135,553 | 458,053 | 5,003,623 | 18,656,552 |
| Interest | | | | | | | | | | | | | | $ - | $ - |
| DIP Fees | | | | | | | | | | | | | | $ - | $ - |
| Other | | | | | | | | | | | | | | $ - | $ - |
| **Ending DIP** | $ 15,958,070 | $ 16,093,872 | $ 16,229,425 | $ 16,364,977 | $ 17,512,642 | $ 17,648,195 | $ 17,783,747 | $ 17,919,300 | $ 18,377,352 | $ 19,202,517 | $ 19,413,070 | $ 19,548,622 | $ 20,006,675 | 20,006,675 | 20,006,675 |

# EXHIBIT B

**AMENDED AND REVISED CHAPTER 11 TRUSTEE LOAN
AND SECURITY AGREEMENT**


by and among


**UNITED FINANCE SERVICES, LLC,**

as Lender

and

**DEREK HENDERSON, ESQ.,
AS CHAPTER 11 TRUSTEE OF
UNITED FURNITURE INDUSTRIES, INC.,
UNITED FURNITURE INDUSTRIES, NC LLC,
UNITED FURNITURE INDUSTRIES, CA, INC.,
FURNITURE WOOD, INC.,
UNITED WOOD PRODUCTS, INC.,
ASSOCIATED BUNK BED COMPANY,
UFI ROYAL DEVELOPMENT, LLC,
UFI EXPORTER, INC,
UFI TRANSPORTATION LLC,
LS LOGISTICS, LLC,
AND FW ACQUISITION, LLC**

as Borrower

**Dated as of May 17, 2023**

**SECTION 1.**      **DEFINITIONS** ................................................................................ 5

**SECTION 2.**      **LOANS** ............................................................................................ 11

**SECTION 3.**      **INTEREST AND FEES** ................................................................. 15

**SECTION 4.**      **CONDITIONS PRECEDENT** ....................................................... 16

**SECTION 5.**      **SECURITY INTEREST** ................................................................ 17

**SECTION 6.**      **COLLECTION AND ADMINISTRATION** ................................. 20

**SECTION 7.**      **COLLATERAL REPORTING AND COVENANTS** ................. 21

**SECTION 8.**      **REPRESENTATIONS AND WARRANTIES** ............................ 23

**SECTION 9.**      **AFFIRMATIVE AND NEGATIVE COVENANTS** .................. 25

**SECTION 10.**     **EVENTS OF DEFAULT AND REMEDIES** ............................... 29

**SECTION 11.**     **JURY TRIAL WAIVER; OTHER WAIVERS AND CONSENTS; GOVERNING LAW** ....................................................................................... 32

**SECTION 12.**     **MISCELLANEOUS** ....................................................................... 35

EXHIBIT A – BUDGET
EXHIBIT B – INTERIM BORROWING ORDER
EXHIBIT C – FORM OF TERM LOAN REQUEST

**AMENDED AND REVISED CHAPTER 11 TRUSTEE**
**LOAN AND SECURITY AGREEMENT**

THIS AMENDED AND REVISED CHAPTER 11 TRUSTEE LOAN AND SECURITY AGREEMENT, dated as of May 17, 2023 (this "Agreement"), in entered into by and among **DEREK HENDERSON, ESQ., CHAPTER 11 TRUSTEE OF UNITED FURNITURE INDUSTRIES, INC., ET AL.[1]**, on his own behalf and on behalf of each of the Debtors and their Estates ("Borrower") and **UNITED FINANCE SERVICES, LLC**, an Ohio limited liability company, together with its successors and assigns ("Lender").[2]

**W I T N E S S E T H :**

WHEREAS, on December 30, 2022 (the "Involuntary Petition Date"), certain creditors of Parent filed an involuntary petition for relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Mississippi (together with any other court having jurisdiction over the Involuntary Case or the Chapter 11 Cases or any proceeding therein from time to time, the "Bankruptcy Court"), under Case No. 22-13422-SDM (the "Involuntary Case");

WHEREAS, on January 18, 2023 (the "Commencement Date"), (a) Parent converted the involuntary petition filed in the Involuntary Case to a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court;

WHEREAS, on January 25, 2023, the Bankruptcy Court appointed Borrower as Chapter 11 Trustee in Parent's bankruptcy case;

WHEREAS, on January 31, 2023, Borrower filed chapter 11 bankruptcy petitions in the Bankruptcy Court for each of the remaining Debtors;

WHEREAS, on February 14, 2023, Borrower was appointed chapter 11 trustee for the remaining Debtors;

WHEREAS, on March 2, 2023, Borrower and Lender entered into the original Chapter 11 Trustee Loan and Security Agreement (the "Original Agreement"). The Original Agreement

---

[1] The Debtors include United Furniture Industries, Inc.., an Ohio corporation ("Parent"), United Furniture Industries, NC LLC, a Mississippi limited liability company ("UFI NC"), United Furniture Industries, CA, Inc., a Mississippi corporation ("UFI CA"), Furniture Wood, Inc., a Mississippi corporation ("Furniture Wood"), United Wood Products, Inc., a Mississippi corporation ("UWP"), Associated Bunk Bed Company, an Ohio corporation ("ABBC"), UFI Royal Development, LLC, a North Carolina limited liability company ("UFI Royal Development"), UFI Exporter, Inc., a Delaware corporation ("UFI Exporter"), UFI Transportation LLC, a Mississippi limited liability company ("UFI Transportation"), LS Logistics, LLC, a Mississippi limited liability company ("LS Logistics") and FW Acquisition, LLC, a Mississippi limited liability company ("Holdco," and together with Parent, UFI NC, UFI CA, Furniture Wood, UWP, ABBC, UFI Royal Development, UFI Exporter, UFI Transportation and LS Logistics, the "Debtors," and each separately a "Debtor").

[2] To the extent that any provision of this Agreement conflicts with any provision of any of the Interim Borrowing Order or the Final Borrowing Order, the Financing Orders control and shall supersede the conflicting provision(s).

incorrectly named United Financial Services, Inc. as lender instead of United Finance Services, LLC. This Agreement revises the Original Agreement to correct Lender's name.

WHEREAS, Borrower is continuing to operate Debtors' business and manage their properties as a chapter 11 trustee under Sections 1106 and 1108 of the Bankruptcy Code;

WHEREAS, Borrower is unable to obtain funds or credit on any other better or more favorable terms;

WHEREAS, Borrower acknowledges that Debtors' estates will receive substantial direct and indirect benefits by reason of the making of loans and other financial accommodations to Borrower as provided in this Agreement, by virtue of the Debtors' various inter-relationships as joint obligors and beneficiaries thereof;

WHEREAS, subject to the approval of the Bankruptcy Court, following the Involuntary Petition Date but prior to the Commencement Date, Debtors asked Lender to provide them with a multiple draw term loan facility in an aggregate principal amount of $20,000,000.00, inclusive of: (a) a term loan in the amount of up to $1,226,281.93 provided by Lender or a Related Party of Lender on an emergency basis after the Involuntary Petition Date, but prior to the Commencement Date (the "Total Gap Period Advance"),[3] (b) an advance of $141,314.77 to Borrower following the Commencement Date but prior to the entry of the Interim Borrowing Order (the "Post-Commencement Advance"); and (c) $18,632,403.23 in new money to be provided after the Commencement Date, of which Lender would make available to the Borrower not to exceed at any one time $10,382,388 (including the Allowed Gap Period Advance[4] and Post-Commencement Advances) prior to the entry of the Final Borrowing Order and up to the remaining amount of the Maximum Line Amount after the entry of the Final Borrowing Order (in each case, as such amount may be reduced pursuant to this Agreement);

WHEREAS, following the Commencement Date, Borrower asked Lender to recommit to lending to Borrower on terms substantially similar to those previously offered by Lender to Debtors;

WHEREAS, Lender is willing to provide such financing pursuant to Sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code, subject to the terms and conditions set forth herein and in the Financing Orders, including, without limitation, that all of the Obligations hereunder and under the other Loan Documents constitute allowed Superpriority Administrative Expense Claims pursuant to Section 364(c)(1) of the Bankruptcy Code in the Chapter 11 Cases as set forth herein and are secured by a Lien on substantially all of the Debtors' Collateral, whether now owned or hereafter acquired, pursuant to Sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code; and

---

[3] Reference is made to that certain Promissory Note dated November 22, 2022, in the principal amount of up to $10 million, by and between Parent, as borrower, and Stage Capital, LLC, an Ohio limited liability company ("**Stage**"), pursuant to which the GAP Period Advance was loaned to Parent by Stage. Stage assigned its rights and interests under such Promissory Note to Lender prior to the Commencement Date.

[4] The Interim Borrowing Order includes $617,612 of the Total Gap Period Advance (the "**Allowed Gap Period Advance**"). Inclusion of the remainder of the Total Gap Period Advance remains subject to the Final Borrowing Order.

WHEREAS, Borrower has agreed to provide such Collateral and Superpriority Administrative Expense Claims to Lender, subject to approval of the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## SECTION 1.  DEFINITIONS

All terms used herein which are defined in Article 1 or Article 9 of the UCC shall have the meanings given therein unless otherwise defined in this Agreement. All references to the plural herein shall also mean the singular and to the singular shall also mean the plural unless the context otherwise requires. All references to Borrower, Lender, and Debtors pursuant to the definitions set forth in the recitals hereto, or to any other Person herein, shall include their respective successors and assigns. The words "hereof," "herein," "hereunder," "this Agreement," and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not any particular provision of this Agreement and as this Agreement now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced. The word "including" when used in this Agreement shall mean "including, without limitation." Any accounting term used herein unless otherwise defined in this Agreement shall have the meanings customarily given to such term. All references to time of day shall mean local time in Columbus, Ohio unless otherwise stated. For purposes of this Agreement, the following terms shall have the respective meanings given to them below:

"Acceptable Plan" shall mean (a) a Bankruptcy Plan which provides for (i) Full Payment of all Obligations on the effective date of such Bankruptcy Plan, (ii) an effective date no later than 30 days after the date of entry of the Confirmation Order with respect to such Bankruptcy Plan, and (iii) a full and complete release of any and all claims and Causes of Action that any Borrower and any Estate might have or assert against Lender and Lender's Related Parties  (whether arising prior to or after the Commencement Date) arising under or with respect to the Loan Documents, the Obligations, or the Term Loans, or (b) a Bankruptcy Plan which is otherwise acceptable to Lender, in its sole and absolute discretion.

"Accounts" has the meaning ascribed to such term in the UCC, and in any event shall include all present and future rights of Borrower to payment for goods sold or leased or for services rendered, which are not evidenced by instruments or chattel paper, and whether or not earned by performance.

"Affiliate" has the meaning set forth in Section 101(2) of the Bankruptcy Code.

"Agreement Date" means the date as of which this Agreement is dated.

"Avoidance Claims" has the meaning set forth in the Financing Order.

"Avoidance Proceeds" has the meaning set forth in the Financing Order.

"Bankruptcy Code" means Title 11, United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

"Bankruptcy Court" has the meaning set forth in the recitals of this Agreement.

"Bankruptcy Plan" shall mean a plan of reorganization proposed by Borrower or any other Person (including Lender) in the Chapter 11 Cases.

"Belford Property Trust" shall mean the David A. Belford Separate Property Trust.

"Bidding Procedures Order" means a final non-appealable order approved by the Bankruptcy Court granting Borrower's motion to establish bidding procedures for a sale of all or substantially all of Borrower's real property assets, all in form and substance satisfactory to Lender in its sole discretion.

"Borrower" has the meanings set forth in the recitals to this Agreement.

"Budget" means any set of projections approved by Lender showing all projected cash receipts and all projected cash disbursements (with detail as to sources of cash receipts and identification of cash disbursements) for Borrower delivered to Lender pursuant to this Agreement. The initial Budget shall be substantially in the form of **Exhibit A** annexed hereto and made a part hereof, and all Budgets thereafter shall be in form and detail acceptable to Lender and shall show all facets of Borrower's operations. Any reference herein or in any other Loan Document to the "Budget", unless otherwise stated, shall be deemed to be a reference to the Budget, as of the date of determination, most recently submitted by Borrower to Lender and accepted in writing by Lender, it being understood that Lender shall have no obligation to accept any Budget which is not satisfactory to Lender in its discretion.

"Budget Period" means each weekly period following the Closing Date.

"Business Day" means any day excluding Saturday, Sunday, and any day which is a legal holiday under the laws of the State of Ohio, or which is a day on which Lender is otherwise closed for transacting business with the public.

"Carve-Out" has the meaning set forth in the Interim Borrowing Order, or, if the Final Borrowing Order has been entered by the Bankruptcy Court, the Final Borrowing Order.

"Causes of Action" means all claims, actions (including Avoidance Claims), causes of action, choses in action, suits, refunds, turnovers, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, third-party claims, counterclaims, and crossclaims of any Borrower and/or its bankruptcy Estate against any Person, based in law or equity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted, known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, foreseen or unforeseen, and any and all Commercial Tort Claims against any Person, arising from or relating to any act or omission or other event occurring at any time prior to or after the Commencement Date.

"Chapter 11 Cases" shall mean Debtors' bankruptcy cases.

"Closing Date" means the date upon which the Interim Borrowing Order has been entered and all then-applicable conditions precedent to the Term Loans under this Agreement have been satisfied or waived in writing by Lender.

"Collateral" shall have the meaning set forth in Section 5 hereof.

"Commercial Tort Claims" has the meaning ascribed to such term in the UCC.

"Confirmation Order" shall mean an order entered by the Bankruptcy Court confirming a Bankruptcy Plan.

"Debtors" has the meaning set forth in footnote 1 of the recitals of this Agreement.

"Default" means any event or circumstance which, with the giving of notice or passage of time or both, would constitute an Event of Default.

"Default Rate" has the meaning set forth in Section 3(b).

"Deposit Account" has the meaning ascribed to such term in the UCC.

"Estate" means each estate created in the Chapter 11 Cases pursuant to 11 U.S.C. § 541(a).

"Estates" means the Estates of all of the Debtors.

"Event of Default" means the occurrence or existence of any event or condition described in Section 10(a) hereof.

"Final Borrowing Order" means a final order of the Bankruptcy Court pursuant to Section 364 of the Bankruptcy Code approving this Agreement and the other Loan Documents, confirming the Interim Borrowing Order and authorizing the incurrence by Borrower of permanent Post-Petition secured and superpriority indebtedness in accordance with this Agreement, and as to which no stay has been entered and which has not been reversed, modified, vacated or overturned, in substantially the form of the Interim Borrowing Order and containing such additional terms and revisions as are customary to convert an interim borrowing order into a final borrowing order and is in form and substance satisfactory to Lender.

"Financing Order" means (a) before the Bankruptcy Court enters the Final Borrowing Order, the Interim Borrowing Order and (b) after the Bankruptcy Court enters the Final Borrowing Order, the Final Borrowing Order, and "Financing Orders" means the Interim Borrowing Order and the Final Borrowing Order, collectively.

"Fixtures" has the meaning ascribed to such term in the UCC.

"Full Payment" means, with respect to the Obligations full, final and indefeasible payment of all such Obligations in immediately available funds, together with the termination of all commitments of Lender to provide financing to Borrower and, in the case of any contingent

obligations (including any outstanding letters of credit issued pursuant to this Agreement), Lender's receipt of either cash or a direct pay letter of credit naming Lender as beneficiary and in form and substance, and from an issuing bank, acceptable to Lender, in each case in an amount not less than 105% of the aggregate amount of all such contingent obligations.

"Funding Account" means, with respect to any requested Term Loan, the Deposit Account identified in the applicable Term Loan Request as the Deposit Account into which the proceeds of the applicable Term Loan are to be deposited.

"Gap Period Advance" has the meaning set forth in the recitals to this Agreement.

"Governmental Authority" means any nation or government, any state, province or territory or other political subdivision thereof, any governmental agency, department, authority, instrumentality, regulatory body, court, central bank or other governmental entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization exercising such functions.

"IBNR" any health insurance claims related to Debtors' former employees that were incurred on or before November 21, 2022, but have not yet been reported.

"Interest Payment Date" means the first Business Day of each calendar month, commencing with May 1, 2023.

"Interest Rate" means an amount equal to eight percent (8.0%) per annum.

"Interim Borrowing Order" means an order entered by the Bankruptcy Court in substantially the form of **Exhibit B** hereto and otherwise in form and substance satisfactory to Lender.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended from time to time, and the rules and regulations issued thereunder and from time to time in effect.

"Involuntary Petition Date" has the meaning set forth in the recitals to this Agreement.

"Lender" has the meaning set forth in the recitals to this Agreement.

"Lien" means any security interest, security title, mortgage, deed to secure debt, deed of trust, lien, pledge, charge, conditional sale or other title retention agreement, or other encumbrance of any kind in respect of any property, including the interest of each lessor under any capitalized lease and the interest of any bondsman under any payment or performance bond, in, of or on any assets or properties of a Person, whether now owned or hereafter acquired and whether arising by agreement or operation of law.

"Loan Documents" means, collectively, this Agreement, each Security Instrument, each Budget, the Financing Orders, and all notes, guarantees, validity and/or support agreements, security agreements, mortgages, deeds of trust, intercreditor agreements, subordination agreements and other agreements, documents and instruments now or at any time hereafter executed and/or

delivered by Borrower in connection with this Agreement, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

"Mandatory Prepayment" means that term as defined in Section 2(c) hereof.

"Material Recovery Event" means (a) any casualty loss in respect of Debtors' assets covered by casualty insurances, and (b) any compulsory transfer or taking under threat of compulsory transfer of any asset of Debtors by any Governmental Authority.

"Maturity Date" means (a) the date that is 180 days after entry of the Final Borrowing Order or (b) such earlier date upon which the Obligations, including all accrued and unpaid interest, are either due and payable (unless the Lender forbears in writing from enforcing the obligation to pay such Obligations) or are otherwise paid in full in accordance with the terms hereof.

"Maximum Line Amount" means $20,000,000.00 (plus interests, fees, costs, and expenses as set forth below) unless otherwise increased by written agreement between the parties and approved by an order of the Bankruptcy Court.

"Obligations" means the Gap Period Advance, the Post-Commencement Advance and any and all Term Loans, all indebtedness and obligations under this Agreement and the other Loan Documents owing by Borrower to Lender and/or Lender's Related Parties, including all principal, interest, charges, indemnity obligations, fees, costs and expenses, Related Expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise, whether now existing or hereafter arising, whether arising during or after the initial or any renewal term of this Agreement, whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, secured or unsecured.

"Payment Account" means the Deposit Account identified by Lender to Borrower in writing as the Deposit Account where all payments in respect of the Obligations are to be made.

"Permitted Liens" means (a) Liens and security interests of Lender and (b) Liens that are valid and perfected as of the Involuntary Petition Date.

"Person" means any individual, sole proprietorship, partnership, corporation, limited liability company, limited liability partnership, business trust, unincorporated association, joint stock corporation, trust, joint venture or other entity or any government or any agency or instrumentality or political subdivision thereof.

"Post-Commencement Advance" has the meaning set forth in the recitals to this Agreement.

"Commencement Date" has the meaning set forth in the recitals to this Agreement.

"Post-Petition" means after the Involuntary Petition Date.

"Proceeds" shall have the meaning ascribed to such term in the UCC.

"Property" means all of the real property interests owned by one or more Debtors, including, without limitation: (a) 100 United Furniture Drive, Lexington, North Carolina 27292; (b) 401 W. Hanes Mills Road, Winston-Salem, North Carolina 27105; (c) 3761 Old Glenola Road, Trinity, North Carolina 27370; (d) 315 Kettering Road, High Point, North Carolina 27263; (e) 325 Kettering Road, High Point, North Carolina 27263; (f) 431 Highway 41 East, Okolona, Mississippi 38860; (g) 60063 Puckett Drive, Amory, Mississippi 38821; (h) 60006 Industrial Drive, Amory, Mississippi 38821; (i) 61312 Highway 278 East, Amory, Mississippi 38821; (j) 389 Highway 6 East, Nettleton, Mississippi 38858; (k) 5380 Highway 145 South, Tupelo, Mississippi 38801; (l) 30440 Old Highway 41, Nettleton, Mississippi 38858; (m) 3301 Adams Farm Road, Belden, Mississippi 38826; (n) 311 Martin Luther King Drive, Amory, Mississippi 38821; (o) Parcel Number 2-046-23-020.01, PPIN 11497, located in Okolona, Mississippi, Tax District 8220[5]; (p) 210 East Sweet Potato Road, Vardaman, Mississippi 38878; and (q) 30016 Highway 278 West, Nettleton, Mississippi 38858.

"Records" means all of Debtors' present and future books of account of every kind or nature, purchase and sale agreements, invoices, ledger cards, bills of lading and other shipping evidence, statements, correspondence, memoranda, credit files and other data relating to the Collateral or any account debtor, together with the tapes, disks, diskettes and other data and software storage media and devices, file cabinets or containers in or on which the foregoing are stored (including any rights of Borrower and/or any Debtor with respect to the foregoing maintained with or by any other Person).

"Related Expenses" means any and all costs, liabilities and expenses (including, without limitation, losses, damages, penalties, claims, actions, attorneys' fees, legal expenses, judgments, suits and disbursements) (a) incurred by Lender, or imposed upon or asserted against Lender in connection with the Chapter 11 Cases, the negotiation or preparation of this Agreement or any attempt by Lender to (i) obtain, preserve, perfect or enforce any Loan Document or any security interest evidenced by any Loan Document; (ii) obtain payment, performance or observance of any and all of the Obligations; or (iii) maintain, insure, audit, collect, preserve, repossess or dispose of any of the Collateral securing the Obligations or any part thereof, including, without limitation, costs and expenses for appraisals, assessments and audits of any Debtor or any such Collateral; or (b) incidental or related to (a) above, including, without limitation, interest thereupon from the date incurred, imposed or asserted until paid in full.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, attorneys, advisors and representatives of such Person and of such Person's Affiliates.

"Sale Order" means a final non-appealable order approved by the Bankruptcy Court approving Borrower's execution and performance of an asset purchase agreement, pursuant to Section 363 of the Bankruptcy Code, providing for a sale of Collateral outside the ordinary course of business.

---

[5] The following is the legal description for the parcel of real property: 5.0 AC PT SE1/4 SE ¼, Okolona Records <9/18/92 DB629/771>, OP: 20423 12 0 02001, S/T/R 23-12-05, Block 0.

"Security Instruments" means, collectively, each mortgage or deed of trust executed by Borrower in favor of Lender encumbering Debtors' interest in the Property.

"Substantial Compliance" means, for any cumulative weekly Budget period, (x) the aggregate cumulative amount of disbursements may not exceed ten percent (10%) of the applicable line item for such Budget Period.

"Successor Trustee" shall mean any chapter 11 trustee appointed in these Bankruptcy Cases other than Derek Henderson, Esq., or any successor or replacement thereto.

"Superpriority Administrative Expense Claim" shall have the meaning set forth in Section 5 hereof.

"Taxes" shall have the meaning set forth in Section 2 hereof.

"Term Loan" means (a) the Gap Period Advance; (b) the Post-Commencement Advance; and (c) each term loan made by Lender to Borrower pursuant to Section 2, and "Term Loans" means all of the foregoing, collectively.

"Term Loan Request" means a written request for a Term Loan in substantially the form of **Exhibit C** attached to this Agreement.

"Termination Date" means the earliest of: (a) the Maturity Date; (b) the effective date of any Acceptable Plan; (c) the consummation of any Sale Order (and in the event of a series of transactions resulting in the sale of all or substantially all of the Collateral, the latest date of consummation of such sale under any applicable Sale Order); (d) without Lender's prior written consent, the date of filing or express written support of Borrower of a Bankruptcy Plan that does not provide for indefeasible payment in full in cash of all of the Obligations on the effective date of the Bankruptcy Plan, and a full and complete release of any and all claims and Causes of Action that Borrower and any Estate might have or assert against Lender and Lender's Related Parties (whether arising prior to or after the Commencement Date) arising under or with respect to the Loan Documents, the Obligations, or the Term Loans; or (e) unless otherwise agreed to in writing by Lender, the date of the occurrence of an Event of Default pursuant to Section 10.

"UCC" means the Uniform Commercial Code, as in effect from time to time, of the State of Ohio or of any other state the laws of which are required as a result thereof to be applied in connection with the issue of perfection of security interests; provided, however, that to the extent that the UCC is used to define any term herein or in any other documents and such term is defined differently in different Articles or Divisions of the UCC, the definition of such term contained in Article or Division 9 shall govern.

### SECTION 2.  LOANS

(a)      Term Loans.  Subject to the terms and conditions of this Agreement, including the satisfaction of the applicable conditions precedent set forth in Section 4, Lender agrees to make term loans available to Borrower.  Any amount borrowed under this Section 2 and subsequently repaid or prepaid may not be re-borrowed.  Full Payment of all amounts owed hereunder with respect to the Term Loans shall occur no later than the Termination Date. The commitment of

Lender to make Term Loans under this Agreement shall be (i) permanently reduced on a dollar-for-dollar basis by the aggregate principal amount of any Term Loans made by Lender in accordance with this Section 2, and (ii) terminated in full upon the Termination Date; provided, however, that that Lender shall not be obligated to make any Term Loan to the extent that (A) the amount of the requested Term Loan would cause the aggregate original principal amount of Term Loans to exceed the aggregate amount of Terms Loans set forth in the Budget through the requested funding date of any such Term Loan, or (B) the amount of the requested Term Loan would cause the aggregate original principal amount of all Term Loans to exceed the Maximum Line Amount. Notwithstanding the foregoing, to the extent that there exist any amounts in the Funding Account, the Borrower shall utilize such amounts in full before requesting a Term Loan hereunder.

(b)    Borrowing Mechanics for Term Loans.

(i)    Borrower may request a Term Loan by delivering to Lender a fully executed and delivered Term Loan Request. Any Term Loan request delivered to Lender on a day that is not a Business Day will be deemed delivered on the next following Business Day. Term Loan Requests received after 10:00 a.m. on any Business Day shall not be honored or funded by Lender until the earlier of (A) the next Business Day or (B) the requested funding date set forth in the applicable Term Loan Request. Each Term Loan Request shall provide the amount of the requested Term Loan, the requested funding date of the requested Term Loan, wire instructions for the Funding Account into which the proceeds of the applicable Term Loan are to be deposited, and a certification that the making of such Term Loan would not cause the aggregate original principal amount of Term Loans to exceed the aggregate amount of Terms Loans set forth in the Budget through the requested funding date of any such Term Loan.

(ii)    Upon confirmation by Lender of the satisfaction or waiver of the conditions precedent specified in this Agreement in respect of any requested Term Loan, Lender shall make the proceeds of the requested Term Loan available to Borrower on the requested funding date as set forth in the applicable Term Loan Request (or the next Business Day if applicable pursuant to Section 2(b)(i)) by causing an amount of same day funds equal to the proceeds of such requested Term Loan to be deposited into the Funding Account.

(c)    Repayment of Term Loans. In addition to the other repayment requirements set forth herein, the Term Loans, together with all accrued interest thereon and all other Obligations, shall be due and payable in full on the Termination Date. The Obligations shall also be due and payable as and when provided in the Financing Orders. Borrower shall make mandatory prepayments on the Obligations (each a "Mandatory Prepayment") in accordance with the following provisions:

(i)    Sale of Assets. On the first Business Day after receipt by Borrower of proceeds from any sale or other disposition of any Collateral secured by a Lien under Section 364(c)(2) of the Bankruptcy Code, or Section 364(c)(3) of the Bankruptcy Code after the payment in full of any senior priority Liens on such assets, by Borrower to any Person other than in the ordinary course of business, Borrower shall make a Mandatory Prepayment in an amount equal to one hundred percent (100%) of the net cash proceeds of such sale or other disposition or such other amount as may be agreed to by Lender.

(ii)    <u>Material Recovery Event</u>.  On the first Business Day after receipt by Borrower of any proceeds from a Material Recovery Event related to any Collateral secured by a Lien under Section 364(c)(2) of the Bankruptcy Code, or Section 364(c)(3) of the Bankruptcy Code after the payment in full of any senior priority Liens on such assets, Borrower shall make a Mandatory Prepayment in an amount equal to one hundred percent (100%) of such proceeds (net of reasonable costs and taxes incurred in connection with such Material Recovery Event) or such other amount as may be agreed to by Lender.

(iii)    <u>Option to Delay Repayment</u>. Notwithstanding the foregoing, Lender, in its sole discretion, may agree in writing to delay payment of any Mandatory Prepayments set forth in <u>Section 2</u> of this Agreement.

(d)    <u>Taxes</u>.  All payments made by Borrower under this Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any governmental authority, excluding, in the case of Lender, net income taxes and franchise or gross receipts taxes imposed on Lender as a result of a present or former connection between the jurisdiction of the government or taxing authority imposing such tax and Lender (excluding a connection arising solely from Lender having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement) or any political subdivision or taxing authority thereof or therein (all such non-excluded taxes, levies, imposts, duties, charges, fees, deductions and withholdings being hereinafter called "<u>Taxes</u>").  If any Taxes are required to be withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after payment of all Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement.  Whenever any Taxes are payable by Borrower, as promptly as possible thereafter Borrower shall send to Lender for its own account a certified copy of an original official receipt received by Borrower showing payment thereof.  If Borrower fails to pay any Taxes when due to the appropriate taxing authority or fails to remit to Lender the required receipts or other required documentary evidence, Borrower shall indemnify Lender and Lender Related Parties for any incremental taxes, interest or penalties that may become payable by Lender as a result of any such failure.  The agreements in this subsection shall survive the termination of this Agreement and the payment of the Obligations and all other amounts payable hereunder.

(e)    <u>Termination of Agreement</u>.

(i)    This Agreement and the other Loan Documents, as each of same has been or may hereafter be modified, shall continue in full force and effect until Full Payment has occurred.  The making of any Term Loans by Lender following the Termination Date shall be at Lender's sole and absolute discretion.  The occurrence of the Termination Date shall not affect the continued perfection of Lender's Liens in the Collateral, the effectiveness of any UCC financing statement filed in connection with this transaction, or the effectiveness of any security filing with any federal agency, and such financing statements and security filings shall remain in effect until terminated as required under Article 9 of the UCC or other applicable law.  In the event that Borrower desires to terminate this Agreement prior to the Maturity Date, Borrower must provide Lender a written termination notice at least ten (10)

days prior to the desired termination date which specifies the desired termination date, all outstanding Term Loans, other Obligations shall be due and payable in full on such specified termination date (without limiting any obligation of Borrower to pay any such Term Loans or other Obligations on one or more earlier dates), and Borrower may not terminate this Agreement before the expiration of such ten-day period. Upon the effective date of termination of the Loan Documents, Borrower shall effectuate Full Payment. Lender shall have no obligation to release its security interest in or any other Lien on any Collateral until Full Payment has occurred and Lender shall have received a general release of all claims and Causes of Action by Borrower against Lender.

(ii)    The occurrence of the Termination Date shall not relieve or discharge Borrower of its duties, obligations and covenants under this Agreement or the other Loan Documents until Full Payment has occurred, and Lender's continuing security interest in the Collateral and the rights and remedies of Lender hereunder, under the other Loan Documents, and applicable law, shall remain in effect until Full Payment has occurred.

(f)    <u>Single Loan</u>. All Term Loans to Borrower and all of the other Obligations arising under this Agreement and the other Loan Documents shall constitute one general obligation of Borrower secured by all of the Collateral.

(g)    <u>Grants, Rights and Remedies</u>. The Liens, security interests and the administrative priority granted pursuant to <u>Section 5</u> of this Agreement may be independently granted by the Loan Documents and by other Loan Documents hereafter entered into. This Agreement, the Interim Borrowing Order, the Final Borrowing Order and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of Lender hereunder and thereunder are cumulative.

(h)    <u>Perfection</u>. The Liens and security interests securing the Obligations, as granted in <u>Section 5</u> of this Agreement, shall be deemed valid and perfected by entry of the Interim Borrowing Order, and entry of the Interim Borrowing Order shall have occurred on or before the date of any Term Loan. Lender shall not be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to this Agreement, the Interim Borrowing Order or Final Borrowing Order or any other Loan Document, which Liens shall be deemed perfected without Lender taking any action whatsoever. Notwithstanding the foregoing, Borrower agrees, promptly upon request by Lender, to take all actions reasonably requested by Lender to perfect its Lien in all or any portion of the Collateral.

(i)    <u>Waiver of any Priming Rights and Violative Use of Cash Collateral</u>. Upon the Closing Date, and on behalf of itself and the Estates, and for so long as any Obligations shall be outstanding, Borrower hereby irrevocably waives any right pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise to grant any Lien of equal or greater priority than the Lien securing the Obligations, or to approve a claim of equal or greater priority than the Obligations except as expressly set forth in this Agreement or otherwise agreed to in writing by Lender. Notwithstanding the foregoing, Borrower may seek financing for the sole purpose of satisfying all of the Obligations in full in cash.

(j)      <u>Waiver of Claims to Surcharge</u>.  In accordance with the Financing Orders, Borrower, the Debtors, and the Estates hereby waive, and shall cause each of their respective Affiliates to waive, any claims to surcharge the Collateral of Lender under Section 506(c) of the Bankruptcy Code.

(k)      <u>Joint and Several Liability</u>.

(i)      All Term Loans and all of the other Obligations, including all interest, fees and expenses with respect thereto, shall constitute one joint and several direct and general obligation of Borrower and the Estates.  Notwithstanding anything to the contrary contained herein, Borrower and the Estates shall be jointly and severally, directly and unconditionally liable to Lender for all Obligations, it being understood that the Term Loans inures to the benefit of Borrower and the Estates, and that Lender is relying on the joint and several liability of Borrower and the Estates as co-makers in extending the Term Loans hereunder. Borrower and the Estates hereby unconditionally and irrevocably agree that upon default in the payment when due (whether at stated maturity, by acceleration or otherwise) of any principal of, or interest on, any Obligation payable to Lender, they will forthwith pay the same, without notice or demand, unless such payment is then prohibited by application of law (provided such Obligation shall not be extinguished by any such prohibition).

(ii)      No payment or payments made by Borrower or any other Person or received or collected by Lender from Borrower or any other Person by virtue of any action or proceeding or any setoff or appropriation or application at any time or from time to time in reduction of or in payment of the Obligations shall be deemed to modify, reduce, release or otherwise affect the liability of Borrower and the Estates under this Agreement, and Borrower and the Estates shall remain liable for all of the remaining Obligations until the Obligations are paid in full.

**SECTION 3.  INTEREST AND FEES**

(a)      <u>Interest</u>.  Except as otherwise set forth in this Agreement, the Term Loans shall bear interest on the unpaid principal amount thereof from the date such Term Loan is made at a rate equal to the Interest Rate until Full Payment thereof.

(b)      <u>Default Interest</u>.  To the extent permitted by law and without limiting any other right or remedy of Lender hereunder, whenever an uncured Event of Default exists and until such time as no uncured Event of Default exists, interest on the unpaid principal balance of the Term Loans shall accrue at the interest rate set forth in <u>Section 3(a)</u> of this Agreement plus an additional 4.00% per annum (the "<u>Default Rate</u>").  Lender may charge the Default Rate retroactively beginning on the date the applicable Event of Default first occurred or existed.  In the event of termination of this Agreement by either party hereto, Lender's entitlement to the Default Rate will continue until all Obligations are paid in full.

(c)      <u>Interest Payments</u>.  Interest shall be payable: (i) in kind in arrears on each Interest Payment Date, and such interest shall be capitalized and added to the principal amount of such Term Loan on such date; (ii) in cash upon any prepayment of the Term Loans, whether by a voluntary prepayment or a Mandatory Prepayment; and (iii) in cash on the Termination Date. Any

and all interest paid in kind in accordance with the preceding sentence shall constitute and increase the outstanding principal amount of the Term Loans for all purposes under this Agreement as of the applicable Interest Payment Date, and shall bear interest from and after such Interest Payment Date in accordance with the provisions of this Agreement applicable to the Term Loans.  If Lender so elects, all interest accruing hereunder while an Event of Default exists or after the Termination Date shall be payable on demand.

(d)      No Usury. Borrower acknowledges that Lender does not intend to reserve, charge or collect interest on money borrowed under this Agreement at any rate in excess of the rates permitted by applicable law and that, should any interest rate provided for in this Agreement exceed the legally permissible rate(s), the rate will automatically be reduced to the maximum rate permitted under applicable law ("Maximum Rate"). If Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Term Loans or, if it exceeds such unpaid principal, refunded to Borrower. In determining whether the interest contracted for, charged, or received by Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable law (i) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (ii) exclude voluntary prepayments and the effects thereof, and (iii) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

### SECTION 4.  CONDITIONS PRECEDENT

(a)      Conditions Precedent to Initial Loans.  Each of the following is a condition precedent to Lender making the initial Loans hereunder:

(i)      Lender shall have received the initial Budget in the form attached hereto as **Exhibit A**, with only such modifications as are agreed to in writing by Lender.

(ii)      Upon Lender's request, Lender shall receive fully executed, originals of each Security Instrument, and the same shall have been recorded in the applicable county.

(iii)      The Interim Borrowing Order shall have been entered by the Bankruptcy Court, and such order shall be in full force and effect and shall not have been reversed, modified, amended, subject to a pending appeal, stayed or vacated (other than by the Final Borrowing Order) absent the prior written consent of Lender.

(iv)      Lender shall have receive a fully executed original of this Agreement.

(v)      Lender shall have received all documentation and information regarding applicable "know-your-customer" or similar laws and regulations.

(b)      Conditions Precedent to All Loans. Each of the following is an additional condition precedent to Lender making Term Loans, including the initial Term Loans and any future Term Loans:

(i)      All representations and warranties contained herein and in the other Loan Documents shall be true and correct in all material respects with the same effect as though

such representations and warranties had been made on and as of the date of the making of each such Term Loan and after giving effect thereto.

(ii)      No Default or Event of Default shall exist on and as of the date of the making of such Term Loan and after giving effect thereto.

(iii)     The Bankruptcy Court shall have entered such other orders (e.g., a cash management order) as Lender may require, each of which shall be in form and substance acceptable to Lender in its discretion.

(iv)     There shall not be pending any motion which, if granted by the Bankruptcy Court, would result in a Default or an Event of Default.

(v)      With respect to Term Loans to be made subsequent to the conclusion of the final hearing on Borrower's motion for approval of the financing contemplated by this Agreement, the Final Borrowing Order shall have been entered by the Bankruptcy Court in a form acceptable to Lender in its sole discretion and such order shall be in full force and effect and shall not have been reversed, stayed, modified or amended absent prior written consent of Lender.

(vi)     Lender shall have received such other agreements, instruments, approvals, and other documents, each in form and substance satisfactory to Lender, as Lender may reasonably request from time to time.

## SECTION 5.  SECURITY INTEREST

(a)      <u>Grant of Security Interest</u>.  To secure payment and performance of all Term Loans and all other Obligations, Borrower hereby grants to Lender a continuing security interest in, a Lien upon, and a right of set off against, and hereby assigns to Lender as security, the following property and interests in property of the Estates, whether now owned or existing or hereafter acquired or arising, and wherever located (collectively, the "<u>Collateral</u>"):

(i)      The Property;

(ii)      All Fixtures located on the Property;

(iii)     All Commercial Tort Claims, provided, however, that any such claim against Lender or Lender Related Parties, not otherwise precluded or waived hereunder or in the Financing Orders shall be excluded;

(iv)     Any and all assets and/or property that are not subject to an existing perfected lien as of the Involuntary Petition Date, excluding Avoidance Claims and Avoidance Proceeds;

(v)      The Funding Account;

(vi)     Any transfer avoided or liens that are avoided under Section 551 of the Bankruptcy Code (other than any transfer avoided as part of an Avoidance Claim); and

(vii)    Junior priority liens of the Lender under Section 364(c)(3) on other assets and/or property of the Debtors, including, without limitation, all Accounts; all Inventory; all Equipment and Fixtures; all General Intangibles, Payment Intangibles, and Intellectual Property; all Investment Property and Subsidiary Interests; all Deposit Accounts and any and all monies credited by or due from any financial institution or any other depository; all Goods and other personal property owned by the Debtors, including all merchandise returned or rejected by Account Debtors, relating to or securing any of the Accounts; all rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lienor, including stoppage in transit, setoff, replevin, reclamation and repurchase; all additional amounts due to Borrower or the Estates from any Account Debtors relating to the Accounts; other property, including warranty claims, relating to any Goods; all contract rights, rights of payment earned under a contract right, Instruments (including promissory notes), Chattel Paper (including electronic chattel paper), Documents, warehouse receipts, letters of credit, and money; all Letter-of-Credit Rights (whether or not such Letter of Credit is evidenced by a writing); all Supporting Obligations; all real and personal property of third parties in which Borrower has been granted a lien or security interest as security for the payment or enforcement of Accounts; and any other goods or personal property, if any, in which Borrower may hereafter in writing grant a security interest to the Lender hereunder, or in any amendment or supplement hereto or thereto, or under any other agreement between the Lender and the Borrower (capitalized terms appearing herein in this Section 5 that are not otherwise defined shall have the meanings ascribed to such terms in the UCC), excluding Avoidance Claims and Avoidance Proceeds.

(viii)   Borrower's and the Estates' Post-Petition ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computers, computer software (owned by Borrower and/or the Estates or in which it has an interest), computer programs, electronic media, tapes, disks and documents relating to subsection (a) of this definition of Collateral; and

(ix)     all Post-Petition proceeds and products of the foregoing in whatever form, including: cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard, flood and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents, eminent domain proceeds, condemnation proceeds and tort claim proceeds.

(b)      All Collateral Secures all Obligations.  All of the Collateral constitutes continuing collateral security for all of the Obligations, whether now existing or hereafter acquired. This Agreement shall constitute a "security agreement" for purposes of the UCC.

(c)      Lien Perfection; Further Assurances.  The Liens granted to Lender pursuant to the provisions of this Agreement and the other Loan Documents shall be in addition to all Liens conferred upon Lender pursuant to the terms of the Financing Orders.  The Interim Borrowing Order, and, if and when it becomes effective, the Final Borrowing Order, shall be sufficient and conclusive evidence of the validity, perfection and priorities of Lender's Liens upon the Collateral, without the necessity of filing or recording any financing statement, assignment, mortgage, deed of trust, preferred mortgages (formerly known as preferred ship mortgages) or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Liens of Lender in and to the Collateral or to entitle Lender to the priorities granted herein; provided, however, that each Borrower shall promptly following the request of Lender, execute such instruments, assignments, mortgages, deeds of trust, ship mortgages, or documents as are necessary to perfect Lender's Liens upon any of the Collateral and shall take such other action as may be required to perfect or to continue the perfection of Lender's Liens upon the Collateral.  Borrower hereby irrevocably authorizes Lender at any time and from time to time to file in any UCC jurisdiction any initial financing statements and amendments thereto that (a) describe the Collateral, and (b) contain any other information required by part 5 of Article 9 of the UCC of the State of any Debtors' respective location for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether such Debtor is an organization, the type of organization and any organization identification number issued to such Debtor, and, (ii) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates.  Borrower agrees to furnish any such information to Lender promptly upon request.  Borrower also ratifies its authorization for Lender to have filed in any UCC jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof.  No such filing or recordation shall be necessary or required in order to create or perfect any such Lien. The parties agree that a carbon, photographic or other reproduction of this Agreement shall be sufficient as a financing statement and may be filed in any appropriate office in lieu thereof.  At Lender's request, Borrower shall also promptly execute or cause to be executed and shall deliver to Lender any and all documents, instruments and agreements deemed necessary by Lender to give effect to or carry out the terms or intent of the Loan Documents.

(d)      Superpriority Administrative Expense Claim.  The Obligations shall constitute, in accordance with Section 364(c)(1) of the Bankruptcy Code, a superpriority administrative expense claim ("Superpriority Administrative Expense Claim") having priority (to the extent permitted by the Bankruptcy Code and other applicable law) over any and all administrative expense claims and unsecured claims against any Debtor now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 and any fees not allowed under Section 326 and/or 330 of the Bankruptcy Code,  Lender shall have a Superpriority Administrative Expense Claim against each Debtor's Estate pursuant to Section 364(c)(1) of the Bankruptcy Code for the Obligations and all related costs and expenses, which shall be prior, senior and superior to any other claim, including any other superpriority administrative expense claim of any kind or nature, except as provided herein and/or in the

Financing Orders. The Obligations are a claim to be afforded priority pursuant to Section 364(c)(1) of the Bankruptcy Code, as provided herein and/or in the Financing Orders and secured by Liens pursuant to Section 364 of the Bankruptcy Code as provided herein. The Superpriority Administrative Expense Claim shall include (or be payable from or have recourse to) the Avoidance Claims and the Avoidance Proceeds, however, that any such claim against Lender and/or Lender's Related Parties, not otherwise precluded or waived hereunder or in the Financing Orders shall be excluded and the Avoidance Proceeds resulting from a successful final, non-appealable, Avoidance Claim against Lender and/or Lender's Related Parties. The Superpriority Claims granted in this paragraph shall be subject and subordinate in priority of payment only to prior payment of the Carve-Out.

(e)    Survival.  The Liens, lien priority, administrative priorities and other rights and remedies granted to Lender pursuant to this Agreement, the Financing Orders and the other Loan Documents (specifically including, but not limited to, the existence, perfection and priority of the security interests and other Liens provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Chapter 11 Cases, or by any other act or omission whatsoever. Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(i)    no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of Lender against Borrower, Debtors, and/or the Estates in respect of any Obligations; and

(ii)    the Liens in favor of Lender set forth herein and in the other Loan Documents shall continue to be valid and perfected without the necessity that Lender file or record financing statements, mortgages or otherwise perfect its Lien under applicable non-bankruptcy law.

**SECTION 6.  COLLECTION AND ADMINISTRATION**

(a)    Payments.  All Obligations shall be payable to the Payment Account or such other place as Lender may designate from time to time.  Subject to the terms of the Financing Orders, Lender may apply payments received or collected from Borrower or for the account of Borrower (including the monetary proceeds of collections or of realization upon any Collateral) to such of the Obligations, whether or not then due, in such order and manner as Lender determines, and Lender shall have the continuing exclusive right to reverse and reapply any and all such payments and collections in such manner and in such order as Lender may deem advisable.  Borrower shall make all payments to Lender on the Obligations free and clear of, and without deduction or withholding for or on account of, any setoff, counterclaim, defense, duties, taxes, levies, imposts, fees, deductions, withholding, restrictions or conditions of any kind.  If after receipt of any payment of, or proceeds of Collateral applied to the payment of, any of the Obligations, Lender is required to surrender or return such payment or proceeds to any Person for any reason, then the Obligations intended to be satisfied by such payment or proceeds shall be reinstated and continue and this Agreement shall continue in full force and effect as if such payment or proceeds had not been

received by Lender.  Borrower shall be liable to pay to Lender, and does hereby indemnify and hold Lender harmless for the amount of any payments or proceeds surrendered or returned.  This Section 6(a) shall remain effective notwithstanding any contrary action which may be taken by Lender in reliance upon such payment or proceeds and shall survive the payment of the Obligations and the termination or non-renewal of this Agreement.

(b)      Authorization to Make Term Loans.  Lender is authorized to make the Term Loans based upon electronic mail, facsimile or other instructions received from anyone purporting to be a representative of Borrower or other authorized Person or, at the discretion of Lender, if such Term Loans are necessary to satisfy any Obligations.  All requests for Term Loans hereunder shall specify the date on which the requested advance is to be made and the amount of the requested Term Loan.  All Term Loans under this Agreement shall be conclusively presumed to have been made to, and at the request of and for the benefit of, Borrower when deposited to the credit of Borrower or otherwise disbursed or established in accordance with the instructions of Borrower or in accordance with the terms and conditions of this Agreement.

(c)      Use of Proceeds.  Borrower shall use the proceeds of the Term Loans for the purpose of funding Post-Petition operations in accordance with the Budget.  Except as provided in the Financing Orders, no proceeds of any Term Loan may be utilized by Borrower to finance in any way any professional fees, disbursements, costs or expenses incurred in connection with asserting, investigating, or preparing for any claims or Causes of Action against Lender, Lender's counsel or advisors (including advisors to their counsel), Lender's Related Parties, and the Belford Property Trust and/or investigating, challenging or raising any defenses to the Obligations or any Liens under or in connection with this Agreement.

## SECTION 7.  COLLATERAL REPORTING AND COVENANTS

(a)      Perfection; Further Assurances.  Borrower will, at Borrower's expense, promptly execute and deliver from time to time at Lender's request and pay the costs of filing such additional financing statements, mortgages, or other evidences of Liens as may be necessary or desirable to perfect or continue perfection of Lender's security interest in Debtors' property and assets. Borrower shall at any time and from time to time take such steps as Lender may request for Lender (i) to obtain an acknowledgment, in form and substance satisfactory to Lender, of any bailee having possession of any of the Collateral that such bailee holds such Collateral for Lender, (ii) to obtain "control" of the Collateral, with any agreements establishing control to be in form and substance satisfactory to Lender, and (iii) otherwise to insure the continued perfection and priority of Lender's security interest in any of the Collateral and of the preservation of its rights therein.

(b)      Power of Attorney.  Upon a Default or Event of Default, Borrower hereby irrevocably designates and appoints Lender (and all Persons designated by Lender) as such Borrower's true and lawful attorney in fact, and authorizes Lender, in Borrower's or Lender's name, to (i) subject to the terms of the Financing Orders, at any time a Default or an Event of Default exists: (A) sell or assign any Account upon such terms, for such amount and at such time or times as Lender deems advisable, (B) settle, adjust, compromise, extend or renew an Account, (C) discharge and release any Account, (D) prepare, file and sign Borrower's name on any proof of claim in bankruptcy or other similar document against an account debtor, (E) notify the post office authorities to change the address for delivery of Borrower's mail to an address designated

by Lender, and open and dispose of all mail addressed to Borrower, (F) sign on behalf of Borrower any document or instrument necessary or desirable to perfect Lender's security interest in any Collateral, (G) sign Borrower's name on any agreement or certificate in connection with any insurance policy of Borrower (including any documentation to receive benefit payments due thereunder or to cancel such insurance policy and receive a refund of the unearned premium with respect thereto), and (K) do all acts and things which are necessary, in Lender's determination, to fulfill Borrower's obligations under this Agreement and the other Loan Documents; and (ii) subject to the terms of the Financing Orders, at any time to (A) take control in any manner of any item of payment or proceeds thereof, (B) endorse Borrower's name upon any items of payment or proceeds thereof and deposit the same in Lender's account for application to the Obligations, (C) endorse Borrower's name upon any chattel paper, document, instrument, invoice, or similar document or agreement relating to any Account or any goods pertaining thereto or any other Collateral, and (D) sign Borrower's name on any verification of Accounts and notices thereof to account debtors. Borrower hereby releases Lender and its Related Parties and their respective officers, employees, attorneys and designees from any liabilities arising from any act or acts under this power of attorney and in furtherance thereof, whether of omission or commission, except as a result of Lender's own gross negligence or willful misconduct as determined pursuant to a final non-appealable order of a court of competent jurisdiction.

(c)     <u>Right to Cure; Protective Advances</u>.  Lender may, at its option and following consultation with Borrower, (i) cure any default by Borrower under any agreement with a third party or pay or bond on appeal any judgment entered against Borrower, (ii) discharge taxes and Liens at any time levied on or existing with respect to the Collateral, and (iii) pay any amount, incur any expense or perform any act which, in Lender's judgment, is necessary or appropriate to preserve, protect, insure or maintain the Collateral and the rights of Lender with respect thereto or enhance the likelihood of repayment of the Obligations.  Lender may add any amounts so expended to the Obligations and charge Borrower's account therefor as a Term Loan (regardless of whether an overadvance exists or would be caused thereby and regardless of whether the conditions precedent for such Term Loan would be satisfied), such amounts to be repayable by Borrower on demand.  Lender shall be under no obligation to effect such cure, payment or bonding and shall not, by doing so, be deemed to have assumed any obligation or liability of Borrower or Debtors. Any payment made or other action taken by Lender under this Section shall be without prejudice to any right to assert an Event of Default hereunder and to proceed accordingly.

(d)     <u>Access to Premises</u>.  From time to time as requested by Lender, at the cost and expense of Borrower, (i) Lender and its designees shall have complete access to all of Debtors' premises during normal business hours (and at any time if an Event of Default exists) for the purposes of inspecting, verifying and auditing the Collateral and all of Borrower's books and records, including the Records; (ii) Borrower shall promptly furnish to Lender such copies of such Records or extracts therefrom as Lender may request from time to time; and (iii) Lender shall be able to use such of Borrower's personnel, equipment, supplies and premises as may be reasonably necessary for the foregoing and, if an Event of Default exists, for the collection of Accounts and realization upon other Collateral.

(e)     <u>Appraisals</u>.  Lender may, from time to time, at Borrower's expense, obtain one or more appraisals in form, scope and methodology acceptable to Lender and by an appraiser selected by Lender on some or all of the Collateral, and Borrower shall cooperate with such appraiser in

connection therewith. Notwithstanding the foregoing, Borrower shall not be required to reimburse Lender for more than two appraisals per calendar year (it being agreed that any such appraisal conducted while an Event of Default exists shall not count against such two-per-year limitation).

(f)    Financing Statements. Borrower authorizes Lender at any time and from time to time to file, transmit, or communicate, as applicable, financing statements and amendments (i) describing the Collateral of Borrower, (ii) describing the Collateral as being of equal or lesser scope or with greater detail, or (iii) that contain any information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance. Borrower also hereby ratifies and re-authorizes any and all financing statements or amendments previously filed by Lender in any jurisdiction. Borrower acknowledges and agrees that it is not authorized to file any financing statement or amendment or termination statement with respect to any financing statement filed in connection with this Agreement without the prior written consent of Lender.

(g)    Cash Management System. At all times after the Commencement Date, Borrower shall maintain a cash management system that is (i) approved the Bankruptcy Court, and (ii) is approved in all respects by Lender. Borrower shall cooperate with Lender in obtaining a deposit account control agreement signed by the Borrower, Lender and the depository institution, over Borrower's accounts holding proceeds of any Term Loan and any Collateral therefor and any successor account thereof (collectively, the "Controlled Accounts") reasonably promptly after the Commencement Date and the opening of any such successor accounts, which establishes "control" (as defined in the UCC) in favor of Lender, in form and substance satisfactory to the Lender. The Borrower shall maintain all proceeds of any Term Loan in the Controlled Accounts, except as permitted to be used in accordance with the Budget and this Agreement. The Term Loan Proceeds must be segregated in the Funding Account and/or any related disbursement account under section 363(c)(4) of the Bankruptcy Code from any other cash of the Estates or cash collateral of any other party.

## SECTION 8.    REPRESENTATIONS AND WARRANTIES

Borrower hereby represents and warrants to Lender the following (which shall survive the execution and delivery of this Agreement):

(a)    Financial Statements. All financial statements relating to Borrower and the Estates which have been or may hereafter be delivered by Borrower to Lender fairly present the financial condition and the results of operation of such Borrower as at the dates and for the periods set forth therein.

(b)    Title to Properties. To Borrower's knowledge upon reasonable due diligence, Borrower has good and marketable title to all of its properties and assets subject to no Liens other than Permitted Liens.

(c)    Accuracy and Completeness of Information. All information furnished by or on behalf of Borrower or the Estates in writing to Lender in connection with this Agreement or any of the other Loan Documents or any transaction contemplated hereby or thereby, including all information on any financial statement, information certificate, due diligence checklist or similar document is true and correct in all material respects on the date as of which such information is

dated or certified and does not omit any material fact necessary in order to make such information not misleading.

(d)      Budget.  Borrower has furnished the Budget to Lender.  The Budget is reasonable and was prepared on a reasonable basis and in good faith by Borrower and is based on reasonable assumptions based on the best information reasonably available to Borrower, and Borrower is not aware of any facts or information that would lead it to believe that the Budget is incorrect or misleading in any material respect.

(e)      Administrative Priority; Lien Priority.

(i)      To the extent set forth in the Interim Borrowing Order or Final Borrowing Order (whichever is applicable at any given time), the Obligations constitute an allowed Superpriority Administrative Expense Claim in the Chapter 11 Cases, having priority in payment over all other administrative expenses and claims against any Debtor now existing or hereafter arising, of any kind or nature whatsoever, including without limitation all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 and any fees not allowed under Section 326 and/or 330 of the Bankruptcy Code.

(ii)      To the extent set forth in the Interim Borrowing Order or Final Borrowing Order (whichever is applicable at any given time), pursuant to Section 364(c)(2) and 364(c)(3) of the Bankruptcy Code and the Financing Orders, all Obligations are secured by either a perfected Lien on the Collateral that is not otherwise subject to a Permitted Lien, or a junior lien on Collateral that is subject to a Permitted Lien.

(iii)      To the extent set forth in the Interim Borrowing Order or Final Borrowing Order (whichever is applicable at any given time), all Obligations are secured by (A) a perfected Lien on the Collateral which came into existence or was acquired by Borrower and/or any Debtor on or after the Involuntary Petition Date, subject to no other Lien other than Permitted Liens, and (B) a perfected Lien on the Collateral which came into existence or was acquired by Borrower or any Debtor prior to the Involuntary Petition Date, subject to no other Lien other than Liens consisting of (1) valid, perfected, non-avoidable and enforceable Liens in existence as of the Involuntary Petition Date, and (2) valid Liens in existence at the time of the Involuntary Petition Date that are perfected subsequent to the Involuntary Petition Date as permitted by Section 546(b) or 362(b) of the Bankruptcy Code.

(iv)      On the Closing Date, the Interim Borrowing Order is, and from and after the entry of the Final Borrowing Order, the Final Borrowing Order will be, in full force and effect, and neither Financing Order has been reversed, vacated, modified, amended or stayed, except for modifications and amendments that are reasonably acceptable to Lender and are not stayed in any respect.

(f)      The Chapter 11 Cases.  The Chapter 11 Cases were commenced in accordance with applicable law, proper notice has been given to all Persons entitled thereto, and no Chapter 11 Cases have been dismissed.  The motion for approval of this Agreement was proper and sufficient pursuant to the Bankruptcy Code and the rules and procedures of the Bankruptcy Court.

(g)    <u>Survival of Warranties; Cumulative</u>.  All representations and warranties contained in this Agreement or any of the other Loan Documents shall survive the execution and delivery of this Agreement and shall be deemed to have been made again by Borrower to Lender on the date of each additional borrowing or other credit accommodation hereunder and shall be conclusively presumed to have been relied on by Lender regardless of any investigation made or information possessed by Lender. The representations and warranties set forth herein shall be cumulative and in addition to any other representations or warranties which Borrower shall now or hereafter give, or cause to be given, to Lender.

## SECTION 9.  AFFIRMATIVE AND NEGATIVE COVENANTS

(a)    <u>Maintenance of Existence</u>.  Borrower shall at all times preserve, renew and keep in full force and effect their corporate existence and rights and franchises with respect thereto and maintain in full force and effect all permits, licenses, Intellectual Property, trade names, approvals, authorizations, leases and contracts necessary to carry on the business as presently or proposed to be conducted.

(b)    <u>Compliance with Laws, Regulations, Etc</u>.  Borrower shall, at all times, comply in all material respects with all laws, rules, regulations, licenses, permits, approvals and orders of any federal, state or local governmental authority applicable to it.

(c)    <u>Payment of Taxes and Claims</u>.  Borrower shall duly pay and discharge all taxes, assessments, contributions and governmental charges upon or against them or their properties or assets, except for taxes the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to Borrower and with respect to which cash reserves have been established in such amounts and in such manner as may be reasonably acceptable to Lender and with respect to which no Lien exists which could reasonably be expected to have priority over Lender's Liens in the Collateral.  Borrower and the Estates shall be liable for any tax or penalties imposed on Lender as a result of the financing arrangements provided for herein, and Borrower, on his own behalf and on behalf of the Estates, agrees to indemnify and hold Lender harmless with respect to the foregoing, and to repay to Lender on demand the amount thereof, and until paid by Borrower or the Estates such amount shall be added and deemed part of the Term Loans, <u>provided</u>, <u>however</u>, that nothing contained herein shall be construed to require Borrower to pay any income or franchise taxes attributable to the income of Lender from any amounts charged or paid hereunder to Lender.  The foregoing indemnity shall survive the payment of the Obligations and the termination or non-renewal of this Agreement.

(d)    <u>Insurance</u>.  Borrower shall, at all times, maintain with financially sound and reputable insurers insurance with respect to the Collateral against loss or damage and all other insurance of the kinds and in the amounts customarily insured against or carried by corporations of established reputation engaged in the same or similar businesses and similarly situated.  Said policies of insurance shall be satisfactory to Lender as to form, amount and insurer.  Borrower shall furnish certificates, policies or endorsements to Lender as Lender shall require as proof of such insurance, and, if Borrower fails to do so, Lender is authorized, but not required, to obtain such insurance at the expense of Borrower. All policies shall provide for at least thirty (30) days prior written notice to Lender of any cancellation or reduction of coverage, and Lender may act as attorney for Borrower in obtaining, and at any time an Event of Default exists, adjusting, settling,

amending and canceling such insurance. Borrower shall cause Lender to be named as a loss payee under policies of casualty insurance and an additional insured under policies of liability insurance (but in either case, without any liability for any premiums) under such insurance policies and Borrower shall obtain non-contributory lender's loss payable endorsements to all insurance policies in form and substance satisfactory to Lender. Such lender's loss payable endorsements shall specify that the proceeds of such insurance shall be payable to Lender as its interests may appear and further specify that Lender shall be paid regardless of any act or omission by any Borrower or any of its Affiliates. At its option, Lender may apply any insurance proceeds received by Lender at any time to the cost of repairs or replacement of Collateral and/or to payment of the Obligations, whether or not then due, in any order and in such manner as Lender may determine or hold such proceeds as cash collateral for the Obligations.

(e)     Financial and Other Information.

(i)     Borrower shall keep proper books and records in which true and complete entries shall be made of all dealings or transactions of or in relation to the Collateral and the business of Borrower and the Estates and Borrower shall furnish or cause to be furnished to Lender, within fifteen (15) days after the end of each calendar month, monthly unaudited consolidated financial statements (including, in each case, balance sheets, statements of income and loss, statements of cash flow, and statements of shareholders' equity), all prepared in reasonable detail, fairly presenting the financial position and the results of the operations of Borrower as of the end of and through such fiscal month.

(ii)     Borrower shall provide, on or before the third (3rd) Business Day of each calendar week, a rolling thirteen (13) week cash flow projection, in form and substance reasonably acceptable to Lender.

(iii)     Borrower shall provide, within fifteen (15) days of the end of each fiscal quarter, quarterly unaudited financial statements (including, in each case, balance sheets, statements of income and loss, statements of cash flow, and statements of shareholders' equity), in reasonable detail, fairly presenting the financial position and results of the operations of the Borrower as of the end of and through such fiscal quarter.

(iv)     Borrower shall promptly notify Lender in writing of the details of (A) any loss, damage, investigation, action, suit, proceeding or claim relating to the Collateral or any other property which is security for the Obligations, and (B) the occurrence of any Default or Event of Default.

(v)     Borrower shall promptly (and in any event within two days) after filing thereof, furnish to Lender copies of any pleadings, motions, applications, financial information and other papers and documents filed by Borrower in the Chapter 11 Cases, which papers and documents would not otherwise be served on Lender and Lender's counsel pursuant to the Bankruptcy Court's appropriate procedures.

(vi)     Borrower also shall promptly furnish or cause to be furnished to Lender such additional budgets, forecasts, projections and other information respecting the

Collateral and the business of Borrower as Lender may reasonably request from time to time.

(f)    <u>Sale of Assets, Consolidation, Merger, Dissolution, New Subsidiaries, Etc</u>. Borrower shall not, directly or indirectly, (i) merge into or with or consolidate with any other Person or permit any other Person to merge into or with or consolidate with it; or (ii) sell, assign, lease, transfer, abandon or otherwise dispose of any stock or indebtedness to any other Person or any of its assets to any other Person, without the prior written consent of Lender.

(g)    <u>Encumbrances</u>.  Borrower shall not create, incur, assume or suffer to exist any Lien on any Collateral or any other asset or property of any Debtor other than Permitted Liens, without the prior written consent of Lender.

(h)    <u>Indebtedness and Guarantees</u>.  Borrower shall not incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any obligations or indebtedness, or guarantee any indebtedness or other obligations, except:  (i) the Obligations; (ii) trade obligations and normal accruals in the ordinary course of business not yet due and payable, or with respect to which Borrower is contesting in its good faith the amount or validity thereof by appropriate proceedings diligently pursued and available to Borrower, and with respect to which cash reserves have been established in such amounts and in such manner as may be reasonably acceptable to Lender; (iii) purchase money indebtedness (including capital leases) to the extent not secured by Liens (including capital leases) in violation of any other provision of this Agreement; and (iv) indebtedness owed to Lender other than the Obligations existing as of the Commencement Date.

(i)    <u>Loans, Investments, Etc</u>.  Borrower shall not, directly or indirectly, make any loans or advance money or property to any Person, or invest in (by capital contribution, dividend or otherwise) or purchase or repurchase the stock or indebtedness of all or a substantial part of the assets or property of any Person, or agree to do any of the foregoing.

(j)    <u>Compliance with Budget; Variance Reports; Updated Budgets</u>.

(i)    Borrower shall be in Substantial Compliance with the Budget at all times. The Budget will be tested on an aggregate cumulative basis each week.

(ii)    On the third Business Day of each week (no later than 5:00 p.m., Eastern time), Borrower shall provide to Lender a variance report in form and detail satisfactory to Lender showing (A) sales, actual cash collections and disbursements, in each case on a weekly and cumulative basis through the previous Friday and (B) a comparison to the same periods in the Budget.

(iii)    On or before the Closing Date, and on the third Business Day of each week thereafter, Borrower shall submit to Lender an updated Budget for the shorter of: 1) the immediately succeeding 13-week period or 2) the projected period remaining in the Chapter 11 Cases.  Such Budget must be satisfactory to Lender, in its sole discretion, in form, substance and detail and shall not be effective until accepted in writing by Lender, with email transmission to Lender and/or its counsel acceptable for this purpose.

(k)     Costs and Expenses.  Subject to the terms of the Financing Orders, Borrower shall pay to Lender on demand all costs, expenses, filing fees and taxes paid or payable in connection with the preparation, negotiation, execution, delivery, recording, administration, collection, liquidation, enforcement and defense of the Obligations, Lender's rights in the Collateral, this Agreement, the other Loan Documents and all other documents executed in connection herewith or therewith and the consummation of the transactions contemplate hereby and thereby and any amendments, supplements or consents which may hereafter be contemplated (whether or not executed) or entered into in respect hereof and thereof, including:  (i) all costs and expenses of filing or recording (including Uniform Commercial Code financing statement filing taxes and fees, documentary taxes, intangibles taxes and mortgage recording taxes and fees, if applicable); (ii) all insurance premiums, appraisal fees and search fees; (iii) costs and expenses of remitting loan proceeds, collecting checks and other items of payment, and establishing and maintaining the lockbox contemplated hereby, together with Lender's customary charges and fees with respect thereto (including wire transfer fees); (iv) costs and expenses of preserving and protecting the Collateral; (v) costs and expenses paid or incurred in connection with obtaining payment of the Obligations, enforcing the security interests and Liens of Lender, selling or otherwise realizing upon the Collateral, and otherwise enforcing the provisions of this Agreement and the other Loan Documents or defending any claims made or threatened against Lender arising out of the transactions contemplated hereby and thereby (including preparations for and consultations concerning any such matters); (vi) all out of pocket expenses and costs heretofore and from time to time hereafter incurred by Lender; and (vii) all costs, expenses, filing fees and taxes (other than income and franchise taxes) paid or payable by Lender in connection with the collection, the liquidation, the enforcement and defense of the Obligations, Lender's rights in the Collateral, this Agreement, the other Loan Documents and all other documents related herewith or therewith.

(l)     Further Assurances.  At the request of Lender at any time and from time to time, Borrower shall, at his expense, duly execute and deliver, or cause to be duly executed and delivered, such further agreements, documents and instruments, and do or cause to be done such further acts as may be necessary or proper to evidence, perfect, maintain and enforce the security interests and the priority thereof in the Collateral and to otherwise effectuate the provisions or purposes of this Agreement and each of the other Loan Documents.  Lender may at any time and from time to time request a certificate from an officer of Borrower representing that all conditions precedent to the making of Term Loans contained herein are satisfied.  In the event of such request by Lender, Lender may, at its option, cease to make any further Term Loans until Lender has received such certificate and, in addition, Lender has determined that such conditions are satisfied.

(m)     Financing Orders; Administrative Priority; Lien Priority; Payment of Claims.

(i)     Borrower will not, at any time, seek, consent to or suffer to exist any reversal, modification, amendment, stay or vacation of any of the Financing Orders, except for modifications and amendments agreed to in writing by Lender.

(ii)     Except as set forth in the Interim Borrowing Order or Final Borrowing Order (whichever is applicable at any given time), Borrower will not, at any time, suffer to exist a priority for any administrative expense or unsecured claim against any Debtor or their Estate (now existing or hereafter arising of any kind or nature whatsoever, including

without limitation any administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 328, 503(b), 506(c), 507(a), 507(b), 546(c) 726 and 1114 and any fees not allowed under Section 326 and/or 330 of the Bankruptcy Code) equal or superior to the priority of Lender in respect of the Obligations.

(iii)    With the exception of any preexisting liens on the Collateral as of the Involuntary Petition Date, Borrower will not, at any time, suffer to exist any Lien on the Collateral having a priority equal or superior to the Lien in favor of Lender in respect of the Collateral.

(iv)    To the extent having applicability to Borrower, Borrower shall comply with the Interim Borrowing Order, the Final Borrowing Order and all other orders entered by the Bankruptcy Court in the Chapter 11 Cases.

**SECTION 10.**          **EVENTS OF DEFAULT AND REMEDIES**

(a)    Events of Default.  The occurrence or existence of any one or more of the following events are referred to herein individually as an "Event of Default," and collectively as "Events of Default":

(i)    Borrower fails to pay when due any of the Obligations, including but not limited to any payment of principal or interest on the Term Loans;

(ii)    Borrower fails to perform any of the terms, covenants, conditions or provisions contained in this Agreement, any Financing Order or any of the other Loan Documents;

(iii)    any representation, warranty or statement of fact made by any Borrower to Lender in this Agreement, any Budget, any other Loan Document or any other agreement, schedule, confirmatory assignment or otherwise shall when made or deemed made be false or misleading in any material respect;

(iv)    Borrower shall fail to comply or shall default in the performance of any term of any Financing Orders or any other "Event of Default" under and as defined in either of the Financing Orders shall occur subject to any cure rights set forth in the applicable Financing Order;

(v)    An order is entered, modifying, reversing, revoking, staying, rescinding, vacating, or amending the Financing Orders or any of the other Loan Documents, without the consent and approval of the  Lender;

(vi)    an order is entered by the Bankruptcy Court approving or allowing any claim, security interest or other Lien ranking junior, equal or senior in priority to the Liens, and the Superpriority Administrative Expense Claim granted to the Lender under this Agreement, the other Loan Documents or the Financing Orders, or any such equal or prior claim, security interest or other Lien shall be established in any manner, except, in any case, as expressly permitted under this Agreement and the Financing Orders;

(vii)    the entry of an order dismissing any Chapter 11 Cases or converting any Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code;

(viii)    the entry of an order which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code, which order permits any creditor, other than Lender, to realize upon, or to exercise any right or remedy with respect to, any real Property Collateral, which would result in triggering an Event of Default under any Financing Order, or any of the Loan Documents, without Lender's prior written consent;

(ix)    any deadline contained in the Interim Borrowing Order or the Final Borrowing Order is not met subject to any cure rights set forth in this Agreement;

(x)    Borrower fails to pay employee benefit liabilities at the time such liabilities come due related to Debtors' unpaid payroll taxes and/or IBNR;

(xi)    Borrower shall file with the Bankruptcy Court or enter into any asset purchase agreement with any third party which would result in triggering an Event of Default under this Order, the Final Order, or any of the Loan Documents unless such asset purchase agreement has been approved in writing by Lender in Lender's sole discretion; and

(xii)    Bankruptcy Case Milestones. If any of the following shall fail to occur in the Bankruptcy Case:

(a)    the failure of Borrower on behalf of each of the Debtors and their Estates to file an application to retain a real estate broker or investment banker acceptable to the Lender in its sole reasonable discretion to market and sell the Property on or before ten (10) days after the entry of the Interim Borrowing Order;

(b)    the failure of Borrower on behalf of each of the Debtors and their Estates to obtain an order approving bidding procedures for one or more sales of the Property in form and substance acceptable to the Lender in its sole reasonable discretion to be entered by the Court on or before April 14, 2023; or

(c)    the failure of Borrower on behalf of each of the Debtors and their Estates to obtain any Sale Order in form and substance satisfactory to the Lender in its sole discretion to be entered by the Court on or before July 8, 2023.

(b)    Remedies. Subject to the Carve-Out, if any Event of Default occurs and is continuing, Lender may deliver written notice to the Borrower and Bankruptcy Court that the automatic stay provisions of Section 362 of the Bankruptcy Code have been vacated and modified to the extent necessary to permit the Lender to exercise all rights and remedies provided for in the Loan Documents, and to take any or all of the following actions without further order of or application to the Bankruptcy Court (as applicable):

(i)      declare (with notice to the Borrower and the United States Trustee) the commitment of the Lender to make any Term Loan to be terminated, whereupon such commitments and obligation shall be terminated;

(ii)     declare (with notice to the Borrower and the United States Trustee) the unpaid principal amount of the Term Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document, including, without limitation, the Obligations, to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by Borrower;

(iii)    exercise any and all remedies available under the Loan Documents and otherwise available under applicable Law, including without limitation the remedies available under Article 9 of the UCC;

(iv)     immediately terminate the Borrower's use of any and all cash collateral provided under the Loan Documents;

(v)      freeze monies or balances in the Borrower's Funding Account, *provided, however,* Lender shall be prohibited from sweeping and transferring funds in the Controlled Accounts for a period of 14 days from and after freezing the account to allow any party to seek emergency relief from the Court, to include injunctive relief;; ; and/or

(vii)    take any other actions or exercise any other rights or remedies permitted under the Financing Orders, the Loan Documents or applicable Law to effectuate the repayment of the Obligations;

provided, however, subject to the Financing Orders, that prior to the exercise of any rights in the above clauses of section 10 of this Agreement, the Lender, the Borrower on behalf of the Debtors and the bankruptcy estates, and any other party in interest with standing in these Chapter 11 cases shall provide (5) days written notice of the right to cure the Event of Default. In the event that the Default is not cured, the parties shall request, in accordance with the Local Rules, an expedited hearing before this Court (the "**Remedies Hearing**"). Upon the effectiveness of any relief from the automatic stay granted or deemed to have been granted pursuant to this Order, the Lender  may, in its discretion, enforce the Liens, and, as applicable, take all other actions and exercise all other rights and remedies under the Loan Documents, this Order and applicable law that may be necessary or deemed appropriate to collect any of its Obligations, proceed against or realize upon all or any portion of the Collateral as if these Chapter 11 Cases or any Successor Cases were not pending, and otherwise enforce any of the provisions of this Order. The Lender's delay or failure to exercise rights and remedies under any Loan Documents, this Order or applicable law shall not constitute a waiver of any of its rights and remedies hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed by the Lender.  If at the Remedies Hearing, the Court declines to stay the enforcement thereof, the Termination Date shall be deemed to have occurred for all purposes and the Lender will have automatic and immediate relief from the automatic stay with respect to the Lender Collateral. Subject to entry of a Final Order, at any Remedies Hearing, the Borrower on behalf of each of the Debtors and their bankruptcy estates, and each Debtor, hereby waive, and shall not be entitled to assert (including, without limitation,

under section 105 of the Bankruptcy Code), the right to challenge or dispute the effectiveness of any provision of the Financing Orders, to the extent such relief would impair or restrict the rights and remedies of the Lender as set forth in the Financing Orders or in any of the Loan Documents.

(c)    <u>Waiver of Marshaling</u>.  Borrower hereby waives any right of marshaling such Borrower or the Estates may have.

(d)    <u>Application of Funds</u>. Subject to the Carve-Out, after the exercise of remedies provided for in Section 10(b) of this Agreement, any amounts received on account of the Obligations shall be applied by the Lender in the following order:

(i)    First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts payable to the Lender (including reasonable fees, charges and disbursements of counsel to the Lender);

(ii)    Second, to payment of that portion of the Obligations constituting any interest on the Term Loans and other Obligations;

(iii)    Third, to payment of that portion of the Obligations constituting unpaid principal of the Term Loans; and

(iv)    Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to Borrower, or as otherwise required by order of the Bankruptcy Court or applicable law.

**SECTION 11.      JURY TRIAL WAIVER; OTHER WAIVERS AND CONSENTS; GOVERNING LAW**

(a)    <u>Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver</u>.

(i)    The validity, interpretation and enforcement of this Agreement and the other Loan Documents and any dispute arising out of the relationship between the parties hereto, whether in contract, tort, equity or otherwise, shall be governed by the internal laws of the State of Ohio (without giving effect to principles of conflicts of law).

(ii)    Borrower and Lender irrevocably consent and submit to the exclusive jurisdiction of the Bankruptcy Court and waive any objection based on venue or forum non conveniens with respect to any action instituted therein arising under this Agreement or any of the other Loan Documents or in any way connected with or related or incidental to the dealings of the parties hereto in respect of this Agreement or any of the other Loan Documents or the transactions related hereto or thereto, in each case whether now existing or hereafter arising, and whether in contract, tort, equity or otherwise, and agree that any dispute with respect to any such matters shall be heard only in the Bankruptcy Court (except that Lender shall have the right to bring any action or proceeding against any Borrower or its property in the courts of any other jurisdiction which Lender deems necessary or appropriate in order to realize on the Collateral or to otherwise enforce its rights against Borrower or any Debtor's property).

(iii)    Borrower hereby waives personal service of any and all process upon it and consents that all such service of process may be made by certified mail (return receipt requested) directed to its address in accordance with the notice provisions hereof, and service so made shall be deemed to be completed three (3) days after the same shall have been so deposited in the U.S. mail, or, at Lender's option, by service upon the applicable Borrower in any other manner provided under the rules of any such courts. Within thirty (30) days after such service, Borrower shall appear in answer to such process, failing which Borrower shall be deemed in default and judgment may be entered by Lender against Borrower for the amount of the claim and other relief requested.

(iv)    BORROWER AND LENDER HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (i) ARISING UNDER THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, OR (ii) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE.  BORROWER AND LENDER HEREBY AGREE AND CONSENT THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT BORROWER OR LENDER MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

(v)    Lender shall not have any liability to Borrower or the Estates (whether in tort, contract, equity or otherwise) for losses suffered by Borrower in connection with, arising out of, or in any way related to the transactions or relationships contemplated by this Agreement, or any act, omission or event occurring in connection herewith, unless it is determined by a final and non-appealable judgment or court order binding on Lender, that the losses were the result of acts or omissions constituting gross negligence or willful misconduct.  In any such litigation, Lender shall be entitled to the benefit of the rebuttable presumption that it acted in its sole discretion and with the exercise of ordinary care in the performance by it of the terms of this Agreement.  In no event shall Lender or any of its Related Parties or any of their respective officers, directors, employees or agents be liable on any theory of liability for any special, indirect, consequential, exemplary or punitive damages (including any loss of profits, business or anticipated savings).  Borrower hereby waives, releases and agrees not to sue upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(b)    Waiver of Notices.  Borrower hereby expressly waives demand, presentment, acceptance, notice of acceptance, protest and notice of protest and notice of dishonor with respect to any and all instruments and commercial paper, included in or evidencing any of the Obligations or the Collateral, and any and all other demands and notices of any kind or nature whatsoever with respect to the Obligations, the Collateral and this Agreement, except such as are expressly provided

for herein.  No notice to or demand on Borrower which Lender may elect to give shall entitle Borrower to any other or further notice or demand in the same, similar or other circumstances.

(c)    <u>Amendments and Waivers</u>.  Neither this Agreement nor any provision hereof shall be amended, modified, waived or discharged orally or by course of conduct, but only by a written agreement signed by an authorized officer of Lender, and as to amendments, as also signed by Borrower or Borrower's counsel.  Lender shall not, by any act, delay, omission or otherwise be deemed to have expressly or impliedly waived any of its rights, powers and/or remedies unless such waiver shall be in writing and signed by an authorized officer of Lender.  Any such waiver shall be enforceable only to the extent specifically set forth therein.  A waiver by Lender of any right, power and/or remedy on any one occasion shall not be construed as a bar to or waiver of any such right, power and/or remedy which Lender would otherwise have on any future occasion, whether similar in kind or otherwise.

(d)    <u>Waiver of Counterclaims</u>.  Borrower waives all rights to interpose any claims, deductions, setoffs or counterclaims of any nature (other then compulsory counterclaims) in any action or proceeding with respect to this Agreement, the Obligations, the Collateral or any matter arising therefrom or relating hereto or thereto.

(e)    <u>Indemnification</u>.

(i)    Borrower and the Estates shall indemnify Lender, the Belford Property Trust in connection with its ownership of the Lender, and the Lender's Related Parties solely in connection with the Loans, the Loan Documents, this Order and any Final Order (each such Person being called an "<u>Indemnitee</u>") against, and hold Lender Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the reasonable fees, charges and disbursements of any counsel for any Indemnitee), and shall indemnify and hold harmless each Indemnitee from all reasonable fees and time charges and disbursements for attorneys who may be employees of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrower arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) the Term Loans or the use or proposed use of the proceeds therefrom, (iii) any liability arising out of any matter contemplated by this Agreement, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by Borrower, and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (y) are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the fraud, gross negligence or willful misconduct of such Indemnitee or (z) result from a claim brought by Borrower against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if Borrower has obtained a final and non-appealable judgment in their favor on such claim as determined by a court of competent jurisdiction.  The foregoing indemnity shall survive the payment of the

Obligations and the termination or non-renewal of this Agreement. For the avoidance of doubt, the Trustee and the Debtors' bankruptcy estates shall not use Avoidance Proceeds obtained from a timely and successful, final and non-appealable order authorizing an Avoidance Claim against the Lender and/or the Lender's Related Parties to indemnify such Indemnitee.

(ii)     Waiver of Consequential Damages, Etc.  To the fullest extent permitted by applicable law, Borrower shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, the Term Loans or the use of the proceeds thereof.  No Indemnitee referred to in subsection (i) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and non-appealable judgment of a court of competent jurisdiction.

(iii)     Payments.  All amounts due under this Section 11 shall be payable not later than ten (10) Business Days after demand therefor.

## SECTION 12.          MISCELLANEOUS

(a)     Notices.  All notices, requests and demands hereunder shall be (i) in writing, (ii) made to Lender or Borrower at their respective addresses set forth below, or to such other address as either party may designate by written notice to the other in accordance with this provision, and (iii) deemed to have been given or made: if delivered in person, immediately upon delivery; if by facsimile transmission, immediately upon sending and upon confirmation of receipt; if by nationally recognized overnight courier service with instructions to deliver the next Business Day, one (1) Business Day after sending; and if by certified mail, return receipt requested, five (5) days after mailing; provided, however, that Lender shall not be deemed to have received any request for a Term Loan unless and until Lender actually receives such request.

If to Borrower:          Derek Henderson, Chapter 11 Trustee
                         1765 Lelia Drive • Suite 103
                         Jackson, Mississippi 39216-4820
                         derek@derekhendersonlaw.com

With a copy to:          Douglas C. Noble
                         McCraney | Montagnet | Quin | Noble PLLC
                         602 Steed Road • Suite 200
                         Ridgeland, Mississippi 39157
                         dnoble@MMQNLaw.com

If to Lender:                           United Finance Services, LLC
                                        Attn: Jason Gabauer
                                        633 9th St. N., Ste. 301
                                        Naples, FL 34102

With a copy to:                         McDonald Hopkins LLC
                                        600 Superior Avenue, East
                                        Suite 2100
                                        Cleveland, Ohio 44114
                                        Attn.:  Nicholas Miller
                                                Scott Opincar
                                        nmiller@mcdonaldhopkins.com
                                        sopincar@mcdonaldhopkins.com

                                        and

                                        Husch Blackwell LLP
                                        120 S. Riverside Plaza, Suite 2200
                                        Chicago, Illinois 60606
                                        Attn:   Michael A. Brandess
                                        michael.brandess@huschblackwell.com

        (b)     Partial Invalidity.  If any provision of this Agreement is held to be invalid or unenforceable, such invalidity or unenforceability shall not invalidate this Agreement as a whole, but this Agreement shall be construed as though it did not contain the particular provision held to be invalid or unenforceable and the rights and obligations of the parties shall be construed and enforced only to such extent as shall be permitted by applicable law.

        (c)     Successors.  This Agreement, the other Loan Documents and any other document referred to herein or therein shall be binding upon and inure to the benefit of and be enforceable by Lender, Borrower, the Estates and their respective successors and assigns (including any trustee or examiner for Borrower or the Estates), except that Borrower may not assign his rights or obligations under this Agreement, any other Loan Documents or any other document referred to herein or therein without the prior written consent of Lender.  Lender may assign its rights and delegate its obligations under this Agreement and the other Loan Documents and further may assign, or sell participations in, all or any part of the Term Loans or any other interest herein to another financial institution or other Person, in which event, the assignee or participant shall have, to the extent of such assignment or participation, the same rights and benefits as it would have if it were Lender hereunder, except as otherwise provided by the terms of such assignment or participation.

        (d)     Execution in Counterparts; Execution by Fax or E-Mail.  This Agreement and each other Loan Document may be executed in separate counterparts, all of which shall constitute one and the same agreement.  Delivery of an executed counterpart of this Agreement or any other Loan Document by facsimile or e-mail shall be equally as effective as delivery of an original executed counterpart of this Agreement or such other Loan Document.  Any party delivering an executed counterpart of this Agreement or any other Loan Document by facsimile or e-mail also shall deliver

an original executed counterpart of this Agreement or such other Loan Document, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement or such other Loan Document.

(e)   No Third-Party Beneficiaries.  Neither (i) any of Borrower's employees or creditors (other than Lender and Lender's Related Parties), (ii) any of Debtors' employees or creditors, nor (iii) any other Person claiming by or through Borrower shall be entitled to rely on this Agreement or have any rights, remedies or claims against Lender or any Affiliate of Lender under or in connection with this Agreement.

(f)   Entire Agreement.  This Agreement, the Financing Orders, the other Loan Documents, any supplements hereto or thereto, and any instruments or documents delivered or to be delivered in connection herewith or therewith represents the entire agreement and understanding concerning the subject matter hereof and thereof between the parties hereto, and supersede all other prior agreements, understandings, negotiations and discussions, representations, warranties, commitments, proposals, term sheets, offers and contracts concerning the subject matter hereof, whether oral or written.  In the event of any inconsistency between the terms of this Agreement and any schedule or exhibit hereto, the terms of this Agreement shall govern.  To the extent that this Agreement contradicts any provision of the Financing Orders, the Financing Orders shall control.

(g)   Oral Agreements Ineffective.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND THE SAME MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

(h)   Lender as Party-in-Interest.  Borrower hereby stipulates and agrees that Lender is and shall remain a party in interest in the Chapter 11 Cases and shall have the right to participate, object and be heard in any motion or proceeding in connection therewith.  Nothing in this Agreement or any other Loan Document shall be deemed to be a waiver of any of Lender's rights or remedies under applicable law or documentation.  Without limitation of the foregoing, Lender shall have the right to make any motion or raise any objection it deems to be in its interest (specifically including but not limited to objections to use of proceeds of the Term Loans, to payment of professional fees and expenses or the amount thereof, to sales or other transactions outside the ordinary course of business or to assumption or rejection of any executory contract or lease).

(i)   Waiver of Right to Obtain Alternative Financing.  In consideration of the Term Loans to be made to Borrower by Lender, Borrower hereby waives any right it may have to obtain an order by the Bankruptcy Court authorizing Borrower to obtain financing pursuant to Section 364 of the Bankruptcy Code from any Person other than Lender, unless such financing would result in Full Payment.

(j)   Credit Bids.  In connection with any sale of all or any portion of the Collateral, including pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or as part of a

Bankruptcy Plan subject to confirmation under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code, or at any sale or foreclosure conducted by the Lender, in accordance with applicable law, Borrower hereby gives the Lender and the Belford Property Trust the power and right, without assent by the Borrower, to "credit bid" the full amount of all of their respective Obligations in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral. In connection with the foregoing,  Lender shall have the right to assign its right to purchase all or any portion of the Debtors' assets in connection with any such "credit bid" to one or more newly-formed acquisition vehicles or Affiliates.

(k)     <u>No Advisory for Fiduciary Responsibilities</u>.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), Borrower acknowledges and agree that:  (i) (A) Borrower has consulted his own legal, accounting, regulatory and tax advisors to the extent they have deemed appropriate, and (B) Borrower is capable of evaluating, and understand and accept, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Debtors, Borrower or any of their Related Parties, or any other Person and (B) Lender has no obligation to Borrower or any of his Related Parties with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) Lender and its respective Related Parties may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and his  Related Parties, and Lender has no obligation to disclose any of such interests to Borrower or his Related Parties.

**[SIGNATURE PAGES FOLLOW]**

IN WITNESS WHEREOF, Borrower and Lender have caused this Loan and Security Agreement to be duly executed as of the day and year first above written.

**<u>BORROWER</u>:**

_____

Derek Henderson, Esq., Chapter 11 Trustee of United Furniture Industries, Inc., *et al*., on his own behalf and on behalf of each of the Debtors and their Estates

**<u>LENDER</u>:**

**UNITED FINANCE SERVICES, LLC,**
an Ohio limited liability company

By:    _____
Name:  _____
Title: _____

**EXHIBIT A**

BUDGET

[See Attached]

# **EXHIBIT B**

<u>INTERIM BORROWING ORDER</u>

[See Attached]

## EXHIBIT C

### FORM OF TERM LOAN REQUEST

To:    UNITED FINANCE SERVICES, LLC

Date: [_____], 2023

Ladies and Gentlemen:

Reference is made to the Loan and Security Agreement, dated as of March 2, 2023 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "Agreement;" the terms defined therein being used herein as therein defined), by and among **DEREK HENDERSON, ESQ., CHAPTER 11 TRUSTEE OF UNITED FURNITURE INDUSTRIES, INC., ET AL.**[6], ("Borrower") and **UNITED FINANCE SERVICES, LLC**, an Ohio limited liability company, together with its successors and assigns ("Lender").

The undersigned hereby requests pursuant to Section 2 of the Agreement a Term Loan in the amount of $[_____] to be disbursed on [_____], 2023 (the "Borrowing Date"). The undersigned requests that the proceeds of the Term Loan be deposited on the Borrowing Date (which is a Business Day) into the Deposit Account and in accordance with the wire instructions identified on Schedule 1 attached hereto.

The undersigned hereby certifies that the following statements are true on the date hereof and will be true on the Borrowing Date:

(A)    the conditions set forth in Section 4 of the Agreement have been satisfied or will be satisfied as of the Borrowing Date;

(B)    the representations and warranties contained in the Agreement are correct, before and after giving effect to the borrowing of the Term Loan and to the application of the proceeds thereof, as though made on and as of each such date;

(C)    no Default or Event of Default has occurred and is continuing, or would result from the Term Loan or from the application of the proceeds thereof; and

(D)    this Term Loan Request has been executed and delivered by an authorized officer of the Borrower.

---

[6] The Debtors include United Furniture Industries, Inc.., an Ohio corporation ("Parent"), United Furniture Industries, NC LLC, a Mississippi limited liability company ("UFI NC"), United Furniture Industries, CA, INC., a Mississippi corporation ("UFI CA"), Furniture Wood, Inc., a Mississippi corporation ("Furniture Wood"), United Wood Products, Inc., a Mississippi corporation ("UWP"), Associated Bunk Bed Company, an Ohio corporation ("ABBC"), UFI Royal Development, LLC, a North Carolina limited liability company ("UFI Royal Development"), UFI Exporter, Inc., a Delaware corporation ("UFI Exporter"), UFI Transportation LLC, a Mississippi limited liability company ("UFI Transportation"), LS Logistics, LLC, a Mississippi limited liability company ("LS Logistics") and FW Acquisition, LLC, a Mississippi limited liability company ("Holdco," and together with Parent, UFI NC, UFI CA, Furniture Wood, UWP, ABBC, UFI Royal Development, UFI Exporter, UFI Transportation and LS Logistics, the "Debtors," and each separately a "Debtor").

{11040912:2 }

Very truly yours,

**<u>BORROWER</u>:**

_____
Derek Henderson, Esq., Chapter 11 Trustee
of United Furniture Industries, Inc., *et al*., on
his own behalf and on behalf of each of the
Debtors and their Estates

## Schedule 1

Funding Account Wire Instructions

Bank:  [_____]
Bank Address: [_____]
ABA No.: [_____]
Account No.: [_____]
Beneficiary: [_____]
Beneficiary Address: [_____]
Reference: [_____]