**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**ABERDEEN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| UNITED FURNITURE INDUSTRIES, INC., *et al.*[1] | ) | Case No. 22-13422-SDM |
| | ) | Chapter 11 |
| Debtors. | ) | Jointly Administered |
| | ) | |

**DISCLOSURE STATEMENT TO ACCOMPANY PLAN OF LIQUIDATION**

Derek Henderson, duly appointed Chapter 11 trustee ("**Trustee**") for each of the above-captioned debtors (each generally a "**Debtor**" and, collectively, the "**Debtors**"), submits this *Disclosure Statement* for solicitation of acceptances and rejections of the *Plan of Liquidation* (the "**Plan**"). Capitalized terms used and not otherwise specifically defined herein shall have the meaning ascribed to them in the Plan.

## I. INTRODUCTION

The purpose of a Disclosure Statement is to set forth information (1) regarding the background of the Debtors and their businesses and the procedural history of these chapter 11 Cases; (2) concerning the Plan; (3) advising the holders of Claims and Interests of their rights under the Plan; (4) assisting the holders of Claims and Interests in making an informed judgment regarding whether they should vote to accept or reject the Plan; (5) providing rules and instructions for completing ballots and casting of votes on the Plan; and (6) assisting the Bankruptcy Court in determining whether the Plan complies with the provisions of Chapter 11 of the Bankruptcy Code and should be confirmed.

No representations concerning the Debtors or the Plan, other than as set forth in this Disclosure Statement, are authorized by the Trustee. Any representations or inducement made to secure your acceptance of the Plan that are other than as set forth in this Disclosure Statement should not be relied upon by you in arriving at your decision.

Accompanying this Disclosure Statement are the following (collectively, with the Disclosure Statement, the "Solicitation Package"):

- the Plan (with Exhibits), attached hereto as Exhibit 1;
- the Disclosure Order, attached hereto as Exhibit 2;

---

[1] The Debtors in these Chapter 11 cases, and the last four digits of each Debtor's federal tax identification number, are as follows: United Furniture Industries, Inc. (2576); United Furniture Industries NC, LLC.(9015); United Furniture Industries CA, Inc. (9966); FW Acquisition, LLC (2133); Furniture Wood, Inc. (9186);United Wood Products, Inc. (1061); Associated Bunk Bed Company (0569); UFI Royal Development, LLC (8143); UFI Exporter, Inc. (6518); UFI Transportation, LLC (9471); and LS Logistics, LLC (7004).

- the Committee Support Letter; and

- one or more Ballots for members of the voting classes.

Article 1 of the Plan contains definitions of certain terms. Where those capitalized terms are used in this Disclosure Statement, they have the meaning set forth in Article 1 of the Plan. Those defined terms are very important to fully understand this Disclosure Statement.

**THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN BY EACH HOLDER OF A CLAIM OR INTEREST. THE DISCLOSURE STATEMENT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW. THE DESCRIPTION OF THE PLAN IS A SUMMARY ONLY. HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE PLAN AND ANY RELATED ATTACHMENTS FOR A FULL UNDERSTANDING OF THE PLAN'S PROVISIONS. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN.**

### A. Disclosure Order

By order dated [____________], (the "Disclosure Order") a copy of which is attached hereto as Exhibit 2, the Bankruptcy Court approved this Disclosure Statement, in accordance with § 1125 of the Bankruptcy Code, as containing "adequate information" to enable a hypothetical, reasonable investor typical of holders of Claims against, or Interests in, the Debtors, to make an informed judgment as to whether to accept or reject the Plan, and authorized its use in connection with the solicitation of votes on the Plan. The Disclosure Order also establishes the following dates and deadlines:

- the deadline for filing objections to Confirmation of the Plan;

- the deadline for voting on the Plan; and

- the date on which a final hearing on Confirmation of the Plan will be held.

**APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.** No solicitation of votes may be made except pursuant to this Disclosure Statement and § 1125 of the Bankruptcy Code. In voting on the Plan, holders of Claims and Interests should not rely on any information relating to the Debtors other than that contained in this Disclosure Statement, the Plan and all exhibits to either.

### B. Voting on the Plan

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are (i) "impaired" by a plan, and (ii) entitled to receive a distribution under such a plan are entitled to vote on the plan. If you are entitled to vote to accept or reject the Plan (*see* Sections III.D and F of this Disclosure Statement), accompanying this Disclosure Statement should be the Ballot for casting your vote(s) on the Plan and instructions for return of the Ballot to the Voting Agent. BALLOTS FOR ACCEPTANCE OR REJECTION OF THE PLAN ARE BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN THE VOTING CLASSES BECAUSE THEY ARE THE ONLY HOLDERS OF CLAIMS THAT MAY VOTE TO ACCEPT OR REJECT THE PLAN.

THE TRUSTEE RECOMMENDS THAT THE HOLDERS OF CLAIMS IN ALL SOLICITED CLASSES VOTE TO ACCEPT THE PLAN. The Trustee believes that the prompt confirmation and implementation of the Plan is in the best interests of the estates, all holders of Claims and Interests and all persons who may be affected by the confirmation or denial of the confirmation of the Plan.

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE BY THE TRUSTEE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE SUCH DATE. THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE TRUSTEE. HOLDERS OF CLAIMS ENTITLED TO VOTE SHOULD READ IT CAREFULLY AND IN ITS ENTIRETY, AND WHERE POSSIBLE, CONSULT WITH COUNSEL OR OTHER ADVISORS PRIOR TO VOTING ON THE PLAN.**

**THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, WHICH SUMMARY IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE FULL TEXT OF THE PLAN. IF ANY INCONSISTENCY EXISTS BETWEEN THE TERMS AND PROVISIONS OF THE PLAN AND THIS DISCLOSURE STATEMENT, THEN THE TERMS AND PROVISIONS OF THE PLAN SHALL CONTROL. CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE FORWARD LOOKING PROJECTIONS AND FORECASTS AND ARE BASED UPON CERTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.[2] ALL HOLDERS OF CLAIMS ENTITLED TO VOTE SHOULD CAREFULLY READ AND CONSIDER FULLY THE ENTIRE DISCLOSURE STATEMENT AND PLAN BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

Most of the historic and current financial and other information contained in this Disclosure Statement has been derived from the Debtors, the Debtors' books and records, or other filings made or information obtained in these Cases. The Trustee believes the information to be correct; however, it has not been independently verified in every instance, nor has it been subjected to a certified audit.

## II. BACKGROUND AND SIGNIFICANT EVENTS IN THE CASES

### A. Pre-Bankruptcy Operations and Events Leading to Bankruptcy

UFI is an Ohio corporation owned by the David A. Belford Separate Property Trust ("Belford Property Trust") and David A. Belford Irrevocable Trust for the Benefit of his Lineal Descendants. UFI directly or indirectly owns all of the Affiliated Debtors and, collectively, operated a furniture manufacturing enterprise with operations headquartered in Mississippi, but also with significant presences in North Carolina and California. The Debtors owned 15 properties and leased additional properties, most of which at the time these Cases commenced were fully stocked with finished goods inventory, raw materials and component parts, work-in-process and other equipment. Additionally, the Debtors owned or leased over 1,800 trailers, the majority of which were also full of inventory, raw materials or other property.

[2] This Disclosure Statement may not be relied upon by any person for any purpose other than by holders of Claims or Interests entitled to vote for the purpose of determining whether to vote to accept or reject the Plan, and nothing contained herein shall constitute an admission of any fact or liability by any party, or be admissible in any proceeding involving the Trustee, the Debtors or any other party, or be deemed conclusive evidence of the tax or other legal effects of the Plan on the Trustee, the Debtors or the holders of Claims or Interests.

Prior to the Petition Date, Wells Fargo was the Debtors' senior secured lender pursuant to a comprehensive working capital credit facility secured by substantially all of the Debtors' personal property assets. Wells Fargo holds Allowed Claims as of the Petition date in the aggregate amount of $93,091,594.83. The Debtors also obtained secured financing from Renasant Bank, Bank of New Albany and the Belford Property Trust. Each held Allowed Secured Claims on the Petition Date secured primarily by the Debtors' owned real property in Mississippi and North Carolina.

During the pandemic, the Debtors began experiencing financial trouble and were struggling with timely and/or accurate financial reporting. The Debtors suffered from resulting supply-chain issues and rapidly fluctuating customer behaviors which exacerbated the Debtors financial struggles and began causing defaults under the Wells Fargo loan and security documents. In June 2022, all senior level management personnel were replaced. There were active and extensive negotiations with Wells Fargo and other third-parties about potential sources of new or additional financing, including David Belford who was one of UFI's directors and the trustee of the Trusts that own the Interests in UFI.

In November 2022, the Debtors were unable to find a solution to avoid a critical liquidity shortfall, and on November 21, 2022, the Debtors abruptly shut down all operations and terminated all employees. Two days later, all UFI management personnel tendered their resignations to the board of directors.

The UFI board moved to appoint new officers and engage restructuring professionals with the intention of preparing to file restructuring proceedings for the Debtors. Meanwhile, Wells Fargo also engaged financial and legal professionals to preserve its Collateral, secure the Debtors' properties and try to stabilize conditions. Wells Fargo engaged security, secured employment for necessary personnel, paid certain critical operating costs, and provided oversight and management of the Debtors' assets and properties after the shut-down. The Debtors were preparing to file voluntary bankruptcy petitions when Wells Fargo, Security Associates, Inc., and V&B International, Inc. field the Involuntary Petition against UFI on December 30, 2022. The petitioning creditors also sought appointment of an interim trustee pending adjudication of the Involuntary Petition.

**B. WARN Act and Related Employment Claims**

On November 21, 2022, the Debtors provided notice that it was immediately ceasing operations and terminating its workforce of approximately 2,700 employees. Within days of the shut-down, four (4) class-action complaints were filed against UFI by former employees alleging claims under the Worker Adjustment and Retraining Notification Act ("WARN Act"), 28 U.S.C. § 2101, et. seq.: *Neal v. UFI*, Cause No. 1:22-cv-171 (N.D. Miss., Nov. 22, 2022); *Poe v. UFI*, Cause No. 1:22-cv-172 (N.D. Miss. Nov. 23, 2022); and *Alomari v. UFI*, Cause No. 1:22-cv-176 (N.D. Miss., Nov. 23, 2022); *Alcantara v. UFI*, Cause No. 5:22-cv-2110 (C.D. Cal. Nov. 28, 2022). After UFI entered bankruptcy, substantially similar class-action complaints were filed as adversary proceedings in this Court: *Alcantara v. UFI*, Adv. Pro. No. 23-AP-01001 (Bankr. N.D. Miss. Jan. 3, 2023); *Alomari v. UFI*, Adv. Pro. 23-AP-01002 (Bankr. N.D. Miss. Jan. 6, 2023); *Neal v. UFI*, Adv. Pro. No. 23-AP-01005 (Bankr. N.D. Miss. Jan. 24, 2023); and *Hutchins v. UFI*, Adv. Pro. 23-AP-01007 (Bankr. N.D. Miss., Jan. 26, 2023). Some former employees also filed "Class Claims" in the bankruptcy case, asserting WARN Act Claims as well as other Related Employment Claims arising out of the shut-down.

On August 11, 2023, the Court entered an Order consolidating the adversary complaints, appointing interim class-counsel and designating *Neal v. UFI*, Adv. Pro. No. 23-AP-01005 ("Neal") as the lead case for all purposes, including discovery and trial. In its rulings, the Court indicated that the WARN Act litigation should proceed as a class-action under Fed.R.Civ.P. 23. On August 20, 2023, the

Court entered an Order Consolidating the Class Claims with the Neal case for all purposes, including discovery and trial.

On August 16, 2023, interim class-counsel filed an Amended Class Action Complaint alleging claims under the WARN Act as well as claims for unpaid wages and benefits (vacation pay) under the state laws of Mississippi, California and North Carolina. These claims are being pursued on behalf of a proposed WARN Act class as well as proposed sub-classes for the state law claims against UFI and non-debtor defendants: Stage Capital, LLC, David Belford, David Belford Separate Property Trust and David Belford Irrevocable Trust.

The WARN Act is a federal statute that generally requires employers to provide notification 60 calendar days in advance of plant closings and mass layoffs. An employer can be liable for up to sixty days' back pay and benefits to certain employees who lose their jobs as part of a plant closing or mass layoff without receiving sixty days' advanced notice. An employer may give less than sixty-days' notice if the plant closing or mass layoff was due to unforeseen business circumstances or if the employer was actively seeking capital or business, which if obtained, would have averted the shutdown.

The Claimants in the WARN Class Action allege that UFI violated the WARN Act, that no exception to the notification requirement applies, and that the non-debtor defendants are jointly and severally liable along with UFI under the "single-employer" doctrine. The Trustee disputes and denies that UFI is liable. The non-debtor defendants likewise dispute and deny liability.

It is anticipated that a trial of the WARN Act and Related Employment Claims will be scheduled in late 2024. If the Court rules in favor of the WARN Act class on the question of liability, then it will assess damages based on the amount of wages and benefits due to each class member for the 60-day notice period. The Trustee estimates that WARN Act damages could exceed $15 million dollars.

Some or all of the first $15,150 of each class member's portion of the WARN Act damages may be entitled to priority claim status under § 507(a)(4) and (5) of the Bankruptcy Code, with any excess amount treated as a general unsecured claim. The Trustee disputes this classification and contends that WARN Act damages should be treated as a general unsecured claim. If the Court finds that one or more of the non-debtor defendants are also liable, then UFI's potential exposure for WARN Act damages may be mitigated to some extent.

Some holders of the WARN Act Claims may Related Employment Claims under state law for unpaid wages and benefits (*e.g.*¸vacation pay) and/or claims under the California WARN Act, Cal. Labor Code Section 1400. These claims will likely be determined by the Court in conjunction with the WARN Class Action. If the Court finds in favor of one or more of the sub-classes on the applicable state law claims, damages could exceed $250,000 and some or all of the amounts awarded may be treated as a priority claim under § 507(a)(4) and (5) of the Bankruptcy Code.

### C. Procedural Case History

After the filing of the Involuntary Petition, UFI filed a motion to convert the Case to a voluntary case under chapter 11 which was opposed by the petitioning creditors who also requested, in the alternative, appointment of a chapter 11 trustee if the case was converted. The Bankruptcy Court held a hearing to consider the appointment of an interim trustee and conversion of the Case to chapter 11. The Court ruled that the Case should be converted to chapter 11 but that a trustee should be appointed under § 1104(a)(2) of the Bankruptcy Code as being in the best interest of creditors. The Court ordered in its ruling on January 18, 2023, that the U.S. Trustee appoint a chapter 11 trustee immediately.

The Trustee was appointed for UFI on January 23, 2023, and an order approving his appointment was entered in UFI on January 25, 2023 [Dkt #101]. By virtue of his appointment as Trustee for UFI, and given that UFI was the sole owner of all Affiliated Debtors, the Trustee became the only corporate representative for all Debtors. The Trustee, in such corporate capacity for each of the Affiliated Debtors, caused the Affiliated Debtors to file voluntary petitions on January 31, 2023. The Trustee was appointed on February 13, 2023, in the Affiliated Debtors' cases, and orders were entered approving his appointment on February 14, 2023. All of the Debtors' Cases were ordered to be jointly administered.

**D. Engagement of Professionals**

The Trustee requested and obtained Court approval to engage the following professionals to assist him with administration of these Cases:

- McCraney Montagnet Quin & Noble, PLLC – primary bankruptcy counsel, WARN Act counsel, litigation counsel
- Derek A. Henderson, Attorney at Law – bankruptcy counsel
- King & Spencer, PLLC – bankruptcy counsel primarily representing estates regarding accounts with utility providers other site-specific issues
- Mullin Hoard & Brown, LLP – special litigation counsel
- NC Eminent Domain Law Firm – special litigation counsel
- Harper Rains Knight & Company – financial and tax advisors
- B. Riley Real Estate, LLC – real estate advisors and broker
- SB 360 Capital Partners, LLC/Hilco Global – liquidators of personal property and collection of accounts receivable
- Epiq Corporate Restructuring, LLC – claims, noticing and voting agent

**E. Post-Petition Financing**

Immediately upon being appointed, the Trustee began seeking sources of post-petition financing to fund administration of the Cases, which need was critical and urgent since the Debtors had no Cash available to use on and after the shut-down of operations in November 2022. After extensive negotiations with both Wells Fargo and United Finance Services, LLC ("UFS," an affiliate of the Belford Property Trust), the Trustee sought and obtained interim and final approval from the Bankruptcy Court for a $20,000,000 post-petition credit facility from UFS (the "UFS Facility"). The UFS Facility was secured by second priority liens on the Debtors' real property. The Trustee received his first draw under the UFS Facility in mid-March and promptly paid several critical expenses many of which had been unpaid since the November shut-down, including reinstatement of the Debtors' comprehensive general liability Insurance Policy.

**F. Appointment Of Committee**

On April 4, 2023, the U.S. Trustee appointed the Committee and thereafter amended the composition of the Committee to be comprised of Norton Lilly Logistics LLC, Uwharrie Frames Mfg.,

LLC, DST Trading, LLC, American Nonwovens, Inc., and Seagrove Lumber, LLC. The Committee engaged the law firm of Stewart Robbins Brown & Altazan, LLC, as counsel, and the court approved its retention as Committee counsel.

### G. Liquidation Of Inventory/Collection of Accounts

The Trustee engaged SB 360 Capital Partners, LLC and Hilco Global as the joint liquidating agent (the "Liquidators") to manage and oversee the sale and liquidation of substantially all of the Debtors' personal property assets, including collection and enforcement of outstanding accounts receivable. Most of the assets and property to be liquidated was Collateral of Wells Fargo. The Liquidators commenced their engagement on or around April 1, 2023, and concluded their efforts near the end of August, 2023.

Upon cessation of operations, the Debtors had approximately $160,000,000 (recorded as landed cost) in finished goods inventory, raw materials and pre-fabricated kits. The Debtors' books reflected accounts receivable from customers in excess of $25,000,000. The Debtors owned equipment, including rolling stock, with a book value of $35,000,000. Through the efforts of the Liquidators, approximately $37,500,000 in gross proceeds were realized from liquidation and collection of these assets during the terms of their engagement. The total costs incurred and commissions earned aggregated almost $8,200,000, for a net recovery of approximately $29,400,000.

Certain small quantities of inventory and other assets remained after the Liquidators concluded their engagement, which the Trustee will continue efforts to sell. Negligible amounts are expected to be recovered as a result of these clean-up efforts. The Trustee has resolved and separately recovered certain accounts receivable and continues to attempt to collect amounts believed to be owed from customers.

### H. Sale of Real Property

B. Riley Real Estate, LLC ("B. Riley") was engaged by the Trustee to market and sell all of the Debtors' real property assets, which consisted of four (4) properties in North Carolina and eleven (11) properties in Mississippi. After a fulsome process in which B. Riley sought "stalking horse" bids on any and all of the properties, in any combination, it was determined that the "stalking horse bid" submitted by Phoenix Investors, LLC ("Phoenix") for $65,000,000 for all properties (excluding the "Wood Yard" described in Section III.A.2., below, due to the ongoing insurance claims relating to that property) was the best "stalking horse" bid submitted. The Trustee entered into a Purchase Agreement with Phoenix and subjected its bid to higher and better offers of all kinds, but after the period for submitting competing bids had closed, the Phoenix "stalking horse" bid remained the highest and best bid. The Court approved the Purchase Agreement and the sale to Phoenix under § 363 of the Bankruptcy Code, and the sale closed on August 30, 2023.

In connection with closing, the Trustee satisfied in full the Secured Claims of Renasant Bank, Bank of New Albany and the Belford Property Trust, each of which held first priority Liens on various of the properties sold. The Trustee also satisfied and retired the UFS Facility with the sale proceeds and all costs and expenses incurred in connection with preparing for and effecting the sale.

**I. Surcharge Settlement Agreement**

One of the fundamental assumptions critical to the liquidation of these Cases was the Trustee's expectation that he would recover significant costs associated with preserving and liquidating the property and assets of the estates by surcharging the Collateral under § 506(c) of the Bankruptcy Code. It was known that the administrative costs necessary to continue storing, recovering and disposing of all of the Debtors' assets – rent, utilities, security, labor, commissions, etc. – would be significant.

From the outset, the Trustee established and maintained separate records to identify all surchargeable expenses incurred and how he allocated those expenses between and among the various holders of Secured Claims with Liens on the Collateral to which the expense related, or whether such expense was a general expense borne by the estates and not surchargeable. These reports were prepared on a monthly and cumulative basis and provided to all parties throughout the Cases.

With respect to the administrative expenses attributable to preserving and selling the real property, the Trustee determined that recovery of such expenses through surcharges would be of no benefit to the estates. Each of the Secured Claims secured by Liens on the Debtors' real property were oversecured and entitled under § 506(b) of the Bankruptcy Code to apply all amounts that would be surcharged to their respective Secured Claims. Recovering these expenses as surcharges would have merely increased the amount of the Secured Claim owed by the estates in an amount equal to the surcharge, resulting in a net benefit to the estate of zero. Therefore, surchargeable costs attributed to the holders of Secured Claims with Liens on the Debtors' real property were not recovered from these Claimants. For purposes of determining a fair allocation of surcharge expenses among all holders of Secured Claims, however, the Trustee still allocated in his reports any surchargeable expense to the applicable holder of a Secured Claim even though such expenses were not actually recovered.

Because Wells Fargo stood as the only holder of a Secured Claim with a Lien on substantially all of the Debtors personal property, it stood to bear significant surcharge expenses related to preserving and disposing of its Collateral. A substantial portion of the Trustee's administrative effort and expense in the Cases was devoted to this task given the tremendous volume of personal property assets on hand. Throughout the case, from engagement and negotiations of terms with the Liquidators to collecting accounts receivable, the Trustee and Wells Fargo have worked cooperatively to effect liquidation of its Collateral as quickly and efficiently as possible.

After the Liquidators had concluded selling all of the personal property assets they could (which effort concluded at roughly the same time as the closing of the real estate sale to Phoenix), the Trustee and Wells Fargo began discussions to try and resolve by agreement the expenses recoverable from its Collateral. The result of these negotiations was the Surcharge Settlement Agreement, which fixed the amount to be recovered, an amount of interim distribution to be paid to Wells Fargo on account of its Secured Claim from collected Cash held by the Trustee, and agreement on the protocols for surcharges and compensation for the Trustee's continued efforts to liquidate and collect on Wells Fargo's Collateral. The Surcharge Settlement Agreement was approved by the Bankruptcy Court, and the Trustee collected $6,290,976.62 in surcharges and made an interim distribution to Wells Fargo of $29,955,665.49 as set forth therein.

# III. SUMMARY OF THE PLAN

The following summary and the other descriptions in the Disclosure Statement are qualified in their entirety by reference to the provisions of the Plan and its exhibits, a copy of which is attached hereto as Exhibit 1. It is urged that each holder of a Claim or Interest carefully review the terms of the Plan. In the event of any inconsistency between the provisions of the Plan and the summary contained in this Disclosure Statement, the terms of the Plan shall control.

In general, a Chapter 11 plan (i) divides claims and equity interests into separate classes, (ii) specifies the property that each class is to receive under the plan, and (iii) contains other provisions necessary to confirm the plan. Under the Bankruptcy Code, "claims" and "equity interests" are classified, rather than classification as "creditors" and "shareholders," because such entities may hold claims or equity interests in more than one class. For purposes of this Disclosure Statement, the term "holder" refers to the holder of a Claim or Interest, respectively, in a particular class under the Plan.

A Chapter 11 plan may specify that certain classes of claims or equity interests are either to be paid in full when the plan becomes effective or are to remain unchanged by the treatment prescribed in the plan. Such classes are referred to as "unimpaired," and because of such favorable treatment, the holders in such classes are deemed to accept the plan and are not entitled to vote. Accordingly, it is not necessary to solicit votes from the holders of claims or equity interests in such classes. A Chapter 11 plan may also specify that certain classes will not receive any distribution of property or retain any claim against a debtor. Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan.

## A. Debtors' Assets

### 1. *Cash*

The Trustee presently holds approximately $8,000,000 in Cash which has been collected from the liquidation of the assets and properties as described above, the collection and recovery of other amounts due and owing to the Debtors and recoupment of amounts from Wells Fargo through the Surcharge Settlement Agreement. These amounts will be used to satisfy Allowed Claims prior to or on the Effective Date and thereafter in accordance with the distribution structure found in Section 6.4 of the Plan to fund Trust Expenses and the Trust Expense Reserve.

Amounts realized from the sale or collection of property that is Collateral of Wells Fargo have been maintained throughout these Cases in segregated bank accounts, and the Trustee currently holds approximately $500,000 of such funds. After the Effective Date, the Liquidating Trustee will continue this practice in connection with the continued collection and liquidation of property that is Collateral of Wells Fargo.

### 2. *Other Assets*

Substantially all of the Debtors' assets and properties have been liquidated by the Trustee during the pendency of these Cases, and all Secured Creditors with Liens against those assets and properties have been paid and satisfied. The following generally describes the assets and properties that remain and that the Trustee expects to be liquidated and/or collected by the Liquidating Trustee after the Effective Date of the Plan.

There remain personal property assets and equipment not yet liquidated. Accounts receivable remain uncollected and subject to the Trustee's efforts to enforce and collect. Most of the remaining

personal property assets and the accounts receivable are Collateral of Wells Fargo. The Trustee has entered into a Litigation Management Agreement with Wells Fargo that sets forth the litigation plan and how costs and recoveries are to be handled. The Litigation Management Agreement will become a Trust Asset on the Effective Date, and the Liquidating Trustee will continue account collection efforts thereunder.

UFI owns a parcel of real property located in Amory, Mississippi, known as the "Wood Yard" and which was subjected to casualty loss in March 2023 from damage caused by a tornado. The Wood Yard is a single tract of land in Amory which was used to store the Debtors' unfinished lumber inventory, and all of the lumber and most of the structures located on this tract were rendered a total loss due to a tornado that struck Amory on March 28, 2023. The Debtors have asserted and are in process of adjustment and settlement of the casualty claims for the losses incurred at the Wood Yard. Any amounts shall become Trust Assets and distributed pursuant to Section 6.4 of the Plan. Likewise, the Liquidating Trustee will sell the Wood Yard after all damaged debris and property is removed and all insurance claims have been resolved.

Confirmation of the Plan will transfer to the Liquidating Trust other intangible assets of the Debtors' and the estates, including all Causes of Action listed and identified in Section 6.3.3 of the Plan. These include Adversary Proceeding No. 23-01012-SDM against Rent-A-Box, Inc., pending in the Cases, as well as the pending eminent domain proceeding in North Carolina. Such assets also include claims and rights under any Insurance Policies, contractual and other rights of recovery, and the authority to object to Claims. Unless specifically abandoned by the Trustee prior to the Effective Date, all Causes of Action and other rights of recovery shall be preserved and transferred under the Plan to the Liquidating Trust as Trust Assets.

All of these assets not liquidated prior to the Effective Date shall vest in the Liquidating Trust as Trust Assets on the Effective Date for liquidation and distribution in accordance with the Plan.

**B. Debtors' Liabilities and Claims Asserted**

Estimated Claim amounts are provided below based on the knowledge and best information available to the Trustee at this time.

**C. Pending WARN Class Action/Priority Claims**

Other than Administrative Claims or Secured Claims payable from Net Cash Proceeds realized from liquidation or collection of Collateral securing such Secured Claim, no Claims will be paid until the WARN Class Action is resolved. Final determination of the WARN Class Action is required in order to determine both (i) liability of the Debtors under the claims asserted by holders of WARN Act and Related Employment Claims and (ii) the priority afforded WARN Act Claims if they are determined to be Allowed Claims. If the Bankruptcy Court rules in favor of the WARN Act Claimants on all claims asserted in the WARN Class Action, such Claims could exceed $15,000,000 and would be Allowed Priority Claims entitled to payment as Class 1A Claims. The Trustee disputes both liability and classification, but if the Trustee does not prevail on these defenses, the holders of WARN Act and Related Employment Claims would be expected to receive their *pro rata* share of all available Cash as distributions to the Class 1A Claims. In such instance, no Cash or other assets or properties are expected to result in Net Cash Available to make distributions to Classes holding Allowed Claims junior in priority to the WARN Act and Related Employment Claims in Class 1A.

Some former employees may also separately hold Related Employment Claims that are Priority Claims under § 507(a)(4) for earned but unpaid vacation in an amount estimated to be $250,000. Final

determination of Allowance of these additional Priority Claims will be resolved in the WARN Class Action.

**D. Classification of Claims and Interests**

The Plan divides the Claims against and the Interests in the Debtors, on a substantively consolidated basis, into the following classes:

| Class | Consolidated Debtors Claims/Interests | Status | Voting Rights |
|---|---|---|---|
| Unclassified | Administrative Claims | | Not entitled to vote |
| 1A | Priority Claims | Impaired | Entitled to vote |
| 1B | Priority Tax Claims | Impaired | Entitled to vote |
| 2 | Wells Fargo Secured Claim | Impaired | Entitled to vote |
| 3 | Other Secured Claims | Unimpaired | Not entitled to vote |
| 4 | WARN Act and Related Employment Claims | Impaired | Not entitled to vote |
| 5 | Tort Claims | Impaired | Not entitled to vote |
| 6 | Unsecured Claims | Impaired | Entitled to vote |
| 7 | Interests | Impaired | Entitled to vote |

**E. Treatment of Unclassified Claims and Interests**

1. *Administrative Claims*

a. Administrative Bar Date.

The Court established November 30, 2023, as the Administrative Bar Date. Administrative Claims other than Administrative Claims for Professional Fees or that may relate to WARN Act and Related Employment Claims (the Trustee does not believe that any WARN Act and Related Employment Claims are asserted as or will be determined to be Allowed Administrative Claims, but such Claims were nevertheless excluded from the Administrative Bar Date) must be filed by this date or will be barred. The Trustee will not be able to estimate the number or amount of Administrative Claims until passage of the Administrative Bar Date.

b. United States Trustee Fees.

Quarterly fees owed to the United States Trustee will be paid when due. The Trustee shall continue to file monthly operating reports and pay post-confirmation quarterly fee payments to the United States Trustee, based upon disbursements made through the Effective Date, and by the Liquidating Trustee thereafter, until entry of a final decree pursuant to § 350 of the Bankruptcy Code.

c. Professional Fees and Trustee Compensation.

There are Allowed Administrative Claims of Professionals, which Claim amounts will increase for fees and expenses incurred through the Effective Date, as well as an Administrative Claim for the Trustee's compensation under § 326 of the Bankruptcy Code. All Final Compensation Applications for such compensation will be filed after the Effective Date. The Trustee estimates that as of the Effective Date, Allowed and unpaid Claims of Professionals will exceed $2,000,000, inclusive of the Trustee's Claim for unpaid compensation.

## F. Treatment of Classified Claims and Interests

### 1. *Priority Claims*

Based on a review of the Debtors' Schedules and timely filed proofs of Claim, the Trustee believes that Priority Claims asserted against the Debtors total the approximate amount of $985,000. The Trustee has not undertaken any efforts to review or analyze any of the asserted Priority Claims to determine whether and to what extent these Claims are Disputed or subject to reclassification, either in part or in whole.

The WARN Act and Related Employment Claims are asserted in the WARN Class Action to be Priority Claims, but the Trustee disputes that such Claims are entitled to Allowance as Priority Claims. *See* Section III.C., above. The Trustee believes that former employees may hold Related Employment Claims that are Priority Claims under § 507(a)(4) in the approximate estimated amount of $250,000.

Class 1A Claims will be paid on a *pro rata* basis from Net Trust Assets in accordance with Section 6.4 of the Plan. Class 1A is Impaired and entitled to vote to accept or reject the Plan.

### 2. *Tax Claims*

Based on a review of the Debtors' Schedules and timely filed proofs of Claim, the Trustee believes that Tax Claims asserted against the Debtors total the approximate amount of $14,665,000. The Trustee has not undertaken any efforts to review or analyze any of the asserted Tax Claims to determine whether and to what extent these Claims are Disputed or subject to reclassification, either in part or in whole.

Allowed Tax Claims will be paid on a *pro rata* basis from Net Trust Assets in accordance with the distribution structure found in Section 6.4 of the Plan. Class 1B is Impaired and entitled to vote to accept or reject the Plan.

### 3. *Class 2: Wells Fargo Secured Claim*

The Wells Fargo Secured Claims are Allowed to the extent of the value of any property or assets of the Debtors that serves as its Collateral subject to Wells Fargo's validly perfected Lien thereon. Wells Fargo has received interim distributions from the Trustee in partial satisfaction of its Secured Claim pursuant to and following the Surcharge Settlement Agreement. The remaining amount of the Wells Fargo Secured Claim will be satisfied after the Effective Date from the ongoing liquidation and collection of its remaining Collateral and in accordance with the distribution structure found in Section 6.4 of the Plan. Class 2 is Impaired and entitled to vote to accept or reject the Plan.

### 4. *Class 3: Other Secured Claims*

Class 3 consists of any Claimant holding a Secured Claim that is Allowed to the extent of the value of any assets or property of the Debtors that serves as its Collateral pursuant to a valid Lien thereon. All holders of Class 3 Claims shall receive either payment in full of the Allowed amount of their Claim upon the sale or other disposition of its Collateral, with its Lien to attach to the Net Cash Proceeds, or the Trustee will abandon and relinquish possession of its Collateral to such Class 3 Claimant. Either action shall satisfy in full an Allowed Class 3 Claim.

The Trustee is currently unaware of the existence of any remaining holders of Class 3 Claims but includes treatment for such holders in the event that it is determined that the Trustee is still in possession

of Collateral of an Allowed Class 3 Secured Claimant. Class 3 is Unimpaired, deemed to accept the Plan and therefore not entitled to vote to accept or reject the Plan.

5. *Class 4: WARN Act and Related Employment Claims*

Class 4 consists of all WARN Act and Related Employment Claims. WARN Act and Related Employment Claims in Class 4 will, upon liquidation and final resolution of the WARN Class Action, either become Allowed Class 1A Claims or Allowed Class 6 Claims, but until such time as the liability, classification and extent of Allowance is determined, all Class 4 Claims are Disputed.

Class 4 is Impaired. All Class 4 Claims are Disputed and are not entitled to vote to accept or reject the Plan.

6. *Class 5: Tort Claims*

Class 5 consists of Tort Claims asserted against any of the Debtors. Any Tort Claim that was (i) scheduled by the Trustee and listed as contingent, unliquidated and/or Disputed but (ii) as to which the holder failed to file a proof of Claim as required by Bankruptcy Rule 3003(b)(1) by the Claim Bar Date, shall be barred and be entitled to no recovery under the Plan. As to all Tort Claims requesting relief from the automatic stay during the Cases, the Trustee granted partial relief from the automatic stay to permit such holders to seek recovery on account of their Tort Claims only to the extent of Insurance Coverage and waive and relinquish any right to recovery from the estates. Remaining Class 5 Tort Claims are treated in like manner under the Plan.

Under the Plan, the holders of Class 5 Tort Claims not otherwise barred or waived will be granted immediate relief from the automatic stay by operation of the Confirmation Order to permit such holders to look solely to the Insurance Coverage for payment of its Claim. Holders of Class 5 Tort Claims shall be deemed to waive and relinquish any other Claim against the Debtors or their estates unless prior to the date of the Confirmation Hearing such holder files with the Court a notice of its intent to opt out of such treatment and affirmatively elects to participate as the holder of a Class 6 Unsecured Claim for all amounts in excess of those paid to such Claimant under any applicable Insurance Coverage.

Class 5 is Impaired. All Class 5 Claims are Disputed and are not entitled to vote to accept or reject the Plan.

7. *Class 6: Unsecured Claims*

Class 6 consists of Allowed Unsecured Claims. Each holder of an Allowed Class 6 Claim shall receive its *pro rata* share of Cash realized from the collection and liquidation of Trust Assets by the Liquidating Trustee after the Effective Date in accordance with the distribution structure found in Section 6.4 of the Plan.

Class 6 is Impaired and entitled to vote to accept or reject the Plan.

8. *Class 7: Interests*

Class 7 consists of all Interests in the Debtors. These Interests shall be cancelled on the Effective Date, with control over all remaining assets and property of the Debtors to be vested in the Liquidating Trustee. The holders of the Interests in Class 7 are not expected to receive any distributions on account of their Class 7 Interests, but in the event that there exists Net Cash Available after payment in full of all

Allowed Claims in Classes 1A through Class 6 and in accordance with the distribution structure in Section 6.4 of the Plan, such holders will receive a *pro rata* distribution of all remaining Net Trust Assets.

Class 7 is Impaired and entitled to vote to accept or reject the Plan.

## IV. DESCRIPTION OF PLAN

### A. Substantive Consolidation

The Trustee believes that the substantive consolidation of the Debtors is in the best interest of the estates and all holders of Claims to provide the most efficient and economical process for confirming the Plan and administering and paying Claims. The law generally provides that substantive consolidation is appropriate when there is a substantial identity among the estates to be consolidated and consolidation is necessary to realize some benefit. On the Effective Date, the estates of UFI and all Affiliated Debtors are proposed to be substantively consolidated for all purposes, including, without limitation, with respect to solicitation, voting, confirmation, implementation and execution of the Plan. All assets and liabilities will be treated as merged, and all Claims filed or otherwise asserted shall be deemed filed against and receive distributions from the single consolidated estate created under the Plan.

The Trustee believes a substantial identity existed prior to and after the Petition Date among the Debtors and in these Cases and that substantive consolidation of the Debtors is in the best interest of the estates. UFI and all Affiliated Debtors were obligors under the Wells Fargo senior secured credit facility. All amounts advanced by Wells Fargo were made to UFI on a daily basis, which then disbursed money to any Affiliated Debtor that needed it, and all revenues generated by the Debtors were swept into a master account controlled by Wells Fargo to repay its revolving loan. Pooled revenues were used to pay other loan and operating obligations owed by one Debtor. Internal accounting for all intercompany transactions was maintained, but the practical result was that all funds used in the operations of the Debtors business were accessible for and repaid by all Debtors. The Debtors' cash management system and compliance with the working requirements of the Wells Fargo credit facility resulted in daily debits and credits between and among the Debtors, resulting in some instances in significant intercompany obligations. None of these intercompany claims were ever repaid. For the same reasons, all Debtors were joint obligors on the UFS Facility. Advances and repayments were made to the Debtors on a unified basis without regard for separation between or among Debtor entities.

UFI is the sole owner, directly or indirectly, of all Affiliated Debtors, and the entire enterprise was managed by the same management team from company headquarters in Mississippi. All entities shared the same corporate officers, and employees at the various UFI facilities reported to the same executives. All Debtors were insured under a common insurance policy containing an aggregate limit applicable to claims made at all of the Debtors. The Debtors always filed consolidated corporate tax returns. Having always been effectively treated as a substantially unified enterprise, the Trustee believes that consolidation merely formalizes for purposes of the Plan the actual custom and practice of the company.

Segregating and reconciling each of the Debtors for purposes of voting, administration of Claims and making distributions would be extremely difficult, burdensome and unlikely to result in any material benefit to any Claimant. The ability to consolidate the collective Claims of creditors for the purposes of voting and distribution maximizes the return to creditors holding the most significant (in dollar amount) and eases the administrative burden of the Liquidating Trustee. The Trustee believes substantive consolidation is appropriate and an important aspect of the Plan.

## B. Liquidating Trust

### 1. *Creation of Liquidating Trust*

On the Effective Date, the Liquidating Trust will be formed to receive all Trust Assets and will exist solely to administer and liquidate the Trust Assets for the benefit of the Trust Beneficiaries, who are the holders of Allowed Claims. Allowed Claims that are not paid in full on the Effective Date shall receive any distributions on account of such Claims from the Liquidating Trust from and after the Effective Date. The Liquidating Trust shall be formed and exist pursuant to the Trust Agreement attached to the Plan as Exhibit "A". The Liquidating Trust will be initially funded and Trust Expenses paid from Cash transferred to the Liquidating Trust on the Effective Date.

### 2. *Appointment of Liquidating Trustee*

Confirmation of the Plan will effect appointment of the Liquidating Trustee under the Truste Agreement. Derek Henderson will be appointed as the Liquidating Trustee and continue management and oversight of the Debtors' liquidation and administration of these estates without interruption of loss of institutional knowledge. The Liquidating Trustee will have full authority under the Liquidating Trust as the sole representative of the estates with the same powers and rights he held as Trustee in these Cases to carry out the duties and obligations under the Trust Agreement. The Liquidating Trustee under the Trust Agreement shall have no liability to any holder of a Claim or other third party except for acts or omissions that are grossly negligent or intentional.

The Liquidating Trustee will have the power and authority to retain and employ such professional persons as he deems necessary or expedient to assist with carrying out his duties under the Trust Agreement or the purposes of the Liquidating Trust. The Liquidating Trustee will receive compensation for his services of three percent (3%) of amounts distributed by the Liquidating Trustee, plus reimbursement of expenses incurred in connection with administration of the Liquidating Trust. This compensation is consistent with that provided to the Trustee under § 326 of the Bankruptcy Code.

The Liquidating Trustee will ensure that all applicable tax returns are filed on behalf of the estates and the Liquidating Trust. As the sole corporate representative of the Liquidating Trust, the Liquidating Trustee will also complete and file all other corporate or regulatory documents necessary or incidental to the Plan or administration of the Liquidating Trust, including dissolution and termination of the Liquidating Trust.

### 3. *Administration of Trust Assets*

The Liquidating Trustee will have the complete authority to make take all actions and make all decisions regarding disposition of Trust Assets. As provided in Section 6.3 of the Plan and in the Trust Agreement, these duties will largely relate to liquidation of Trust Assets that remain, collection of accounts receivable and analysis and pursuit of Causes of Action. The Liquidating Trustee may sell, lease, abandon or otherwise dispose of Trust Assets after the Effective Date.

The Liquidating Trustee will be granted the power and authority to sell and transfer Trust Assets and to vest the purchaser with all right, title and interest of the Debtors, the estates and the Liquidating Trust free and clear of all Liens or other encumbrances of any type, subject only to those Liens or other encumbrances preserved under the Plan. If a Trust Asset is Collateral securing an Allowed Secured Claim, the Liquidating Trustee shall not be permitted to sell or transfer the Truste Asset without the consent of the holder of the Secured Claim or a Final Order from the Bankruptcy Court.

The Liquidating Trustee will investigate and pursue all Causes of Action and other rights of recovery, including those identified above in Section III.A. The Liquidating Trustee will be the real party in interest in any such Cause of Action which arose in favor of the Debtors and which is transferred to the Liquidating Trust on the Effective Date. As described above, the Liquidating Trustee will continue to collect accounts receivable which are Collateral securing the Wells Fargo Secured Claims. The Liquidating Trust will also recover and collect deposits, refunds, setoffs and any other contractual rights to recover Trust Assets, and he may file adversary proceedings or institute litigation in any appropriate forum to do so.

The Liquidating Trustee shall retain a right to collect as a surcharge any expenses incurred in preservation or disposition of a Trust Asset that is Collateral securing an Allowed Secured Claim. The Surcharge Settlement Agreement governs the Trustee and Liquidating Trustee's surcharge rights relating to any Trust Assets that are Wells Fargo's Collateral.

4. *Distributions*

The Liquidating Trustee will be authorized to make distributions from Trust Assets as and when deemed appropriate and prudent. Distributions to holders of Allowed Claims will be made as described in and subject to the provisions of the distribution structure Section 6.4 of the Plan, which provides a waterfall of priority for payment of Allowed Claims. Distributions will be made only to the holders of Allowed Claims unless the Trustee or Liquidating Trustee determines it to be appropriate to estimate an amount which a contingent or Disputed Claim should be Allowed.

Allowed Secured Claims will receive distributions upon disposition or collection of Collateral less any applicable surcharged expenses. As to remaining Net Cash Available, the Liquidating Trustee will first use Cash to pay Trust Expenses and to establish a Trust Expense Reserve to ensure the viability of the Liquidating Trust and his ability to carry out his duties under the Trust Agreement.

Thereafter, the distribution structure for distributions to holders of Claims is as follows:

a. First, in payment in full of Allowed Administrative Claims.

b. Second, in payment in full of Allowed Class 1A Claims.

c. Third, in payment in full of all Allowed Class 1B Claims.

d. Fourth, in payment in full of all Allowed Class 6 Claims.

e. Fifth, if, after all Allowed Claims are paid in full, plus all interest (if any), then any remaining Net Trust Proceeds shall be distributed to the Holders of the Class 7 Interests.

Claimants may be required to provide certain information to the Liquidating Trustee (Social Security number, Federal Tax I.D. number, etc.) and to complete a Form W-4, Form W-9 or other form or document in order to receive a distribution from the Liquidating Trust as provided in Section 8.10 of the Plan. The Liquidating Trustee shall be entitled to make written demand on a Claimant to provide such information as is necessary to complete such forms or to meet other requirements prior to making a distribution. If a Claimant fails to provide the requested information within ninety (90) days, such Claim shall be barred and all right to payment thereunder shall be deemed waived.

**C. Claims Administration**

1. *Allowance of Claims*

The Trustee and Liquidating Trustee shall determine whether and to what extent a Claim is Allowed subject to the provisions for resolution of objections to Claims as described below and in Section 8.3 of the Plan.

2. *Objections to Claims*

The Trustee and/or the Liquidating Trustee shall have exclusive authority to file with the Bankruptcy Court an objection to any Claim. The Bankruptcy Court shall determine the amount of any Disputed Claim, unless the Trustee and/or the Liquidating Trustee stipulate as to its amount, or withdraw, compromise, settle or dismiss the objection to the Disputed Claim prior to the determination of the Bankruptcy Court. If a Claimant desires for the Liquidating Trustee to pursue a Claim objection, it shall have the right to serve a written request to the Liquidating Trustee to assert the objection. The Liquidating Trustee shall have thirty (30) days within which to respond affirmatively of his intent to pursue the objection. If the Liquidating Trustee fails to respond or refuses to pursue the objection, the Claimant shall have standing to file and pursue the objection on behalf of the Liquidating Trust but shall be responsible for all costs of doing so. The Claimant's sole recourse for recovery of such costs shall be from proceeds recovered upon prevailing on the Claim objection and not from the Liquidating Trust or any other Trust Assets.

The Trustee and Liquidating Trustee shall retain as Trust Assets all right of setoff under § 553 of the Bankruptcy Code or otherwise and shall be entitled to assert such right in connection with any Claim objection or to the amount of Allowance of any Claim. The Trustee and Liquidating Trustee shall be real parties in interest in any pending litigation filed against the Debtors, including any Tort Claims and the WARN Act Claims, and shall have the power and authority to defend against, settle, compromise or otherwise effect disposition of all such Causes of Action.

3. *Tort Claims*

As provided in the Plan, all Tort Claims are Disputed Claims, unless and until they are Allowed, and no objection thereto shall be required to have been filed by the Trustee or the Liquidating Trustee. Tort Claims reflected in a timely filed proof of Claim that were not liquidated prior to the Effective Date (*i.e.*, filed or scheduled as contingent, unliquidated and/or disputed), or that are the subject of a Claim objection, shall be subject to the treatment applicable to Tort Claims in the Plan. The holder of a Tort Claim will be granted relief from the automatic stay to pursue its Claim in the appropriate forum or jurisdiction to the extent of Insurance Coverage. Any residual Claim shall be deemed waived. Upon liquidation to final judgment or settlement, such Tort Claim shall become an Allowed Unsecured Claim in the liquidated amount.

4. *WARN Act and Related Employment Claims*

All WARN Act and Related Employment Claims are Disputed Claims to be resolved in the WARN Class Action. If the WARN Act and Related Employment Claimants prevail in the WARN Class Action, the WARN Act Claims will be Allowed Claims to the extent determined by the Bankruptcy Court. Resolution of the WARN Class Action will also determine whether and to what extent holders of Class 4 Claims are entitled to Allowed Priority Claims for WARN Act Claims and Related Employment Claims to be under Class 1A Claims and/or holders of Allowed Class 6 Unsecured Claims.

5. *Disallowed Claims*

In the event the Trustee holds or has asserted a Cause of Action under Chapter 5 of the Bankruptcy Code against the holder of a Claim, then such Claim shall be deemed disallowed pursuant to § 502(d) of the Bankruptcy Code. Consequently, the holders of such Claims may not vote to accept or reject the Plan until the Cause of Action against such Claimant has been settled or adjudicated by the Bankruptcy Court and any amounts payable to the Trustee or Liquidating Trustee have been received.

6. *Estimated Claims*

The Trustee or Liquidating Trustee may estimate the Allowed amount of any contingent or Disputed Claim under § 502(d) of the Bankruptcy Code for any purposes other than for voting (*see* Section VI.B, below).

7. *No Interest*

Except as expressly stated in the Plan or otherwise allowed by Final Order of the Bankruptcy Court, no holder of an Allowed Claim will be entitled to recover interest from and after the Petition Date or any other penalties, assessments or late charges on account of such Claim for any purpose.

8. *Modification of Payment Terms*

The Liquidating Trustee shall have the right to modify the treatment of any Allowed Claim, as provided in Bankruptcy Code § 1123(a)(4), at any time after the Effective Date, upon the consent of the holder of such Allowed Claim.

**D. Executory Contracts and Unexpired Leases**

Pursuant to the Plan, any Executory Contract or Unexpired Lease not previously assumed or rejected by an Order of the Bankruptcy Court during the pendency of these Cases, or otherwise expressly assumed in the Plan, shall be deemed rejected upon entry of the Confirmation Order.

Any Rejection Claim arising as a result of rejection of an Executory Contract or Unexpired Lease effected by the Confirmation Order shall be filed on or before thirty (30) days after the Effective Date. If an Executory Contract or Unexpired Lease was rejected by the Trustee during the pendency of the Cases, then the Rejection Claim arising from such rejection should have been filed by the date established in the Notice of Rejection or other order approving such rejection. Any Rejection Claim not timely filed shall be deemed waived without further action by the Trustee or Liquidating Trustee. If any Rejection Claim becomes an Allowed Claim, it shall be treated as an Unsecured Claim under Class 6.

**E. Post-Effective Date Actions**

1. *Corporate Existence; Corporate Action*

From and after the Effective Date, each Debtor entity shall continue in existence solely for the purposes consistent with the terms of this Plan, which include, *inter alia*: (1) transferring property to the Liquidating Trust; (2) liquidating Trust Assets; (3) enforcing and prosecuting Claims, rights, interests and privileges of the Liquidating Trust, including Causes of Action; (4) filing appropriate tax returns; (5) assisting in the administration of the Plan and taking such actions as are necessary to effectuate the Plan; and (6) an exculpation of the Liquidating Trustee for all acts other than gross negligence and willful misconduct.

The Liquidating Trustee shall serve as the sole officer, director or other official corporate representative of the Debtors for all purposes and in whatever capacities necessary. All matters provided for under the Plan involving the corporate structure of the Debtors, or any corporate action to be taken by or required of the Debtors, will be deemed to have occurred and be effective as provided in the Plan and Confirmation Order, and will be authorized and approved in all respects without any requirement for further action by the shareholders, directors, members or managers of the Debtors.

2. *Retention of Jurisdiction*

The Bankruptcy Court will maintain jurisdiction to the fullest extent allowed under applicable law over all matters set forth in the Plan to hear and determine any matters necessary to implementation of the Plan.

3. *Final Accounting and Case Closing*

The Liquidating Trustee shall be responsible for preparing and filing any required motion and the final accounting necessary to close the Cases. These Cases may be closed notwithstanding the continued existence of the Liquidating Trust, the pendency of any objections to Claims, contested motions or Causes of Action, over which the Court shall retain jurisdiction.

## V. FINANCIAL MATTERS UNDER THE PLAN

### A. Liquidation Analysis

If the Plan is not confirmed or the Bankruptcy Court determines other cause exists for conversion, these chapter 11 cases may be converted to cases under chapter 7 of the Bankruptcy Code. In chapter 7, one or more new trustees would be elected or appointed to liquidate the assets of the Debtors for distribution to creditors in accordance with priorities established by the Bankruptcy Code.

The Trustee has already liquidated substantially all assets of the Debtors other than those described herein. During the pendency of these Cases, the Trustee has recovered $112,637,992.80 in total gross receipts from liquidation and collection of the Debtors' assets and properties. The Trustee has satisfied Secured Claims and Administrative Expenses totaling $114,914,267.92. After satisfying these Claims, the Trustee currently holds in excess of $8,000,000 in Cash substantially all of which is unencumbered.

The Trustee believes that liquidation under chapter 7 would not result in a greater distribution to general unsecured creditors than that proposed under the Plan. If converted, the Trustee estimates that the additional delays and administrative cost of installing one or more new trustees and professionals would be material, unnecessary and detrimental to the liquidation process already successfully and substantially implemented by the Trustee. The Debtors' remaining assets are not extensive or exceedingly complex, but the remaining tasks of liquidating and collecting them requires institutional knowledge that would have to be relearned and applied by a chapter 7 trustee to effectively administer the estates. Further, the intangible assets remaining to be administered and monetized (*e.g.,* Causes of Action, collection of accounts and other amounts) are illiquid. Present management and counsel have already invested heavily in investigating and analyzing them, including the viability of certain of the Causes of Action identified herein.

Liquidating the Debtors under chapter 7 would impose on the estates both delay and added expense that directly results from having to redo work already done by the Trustee. These expenses do cannot reasonably be expected to enhance recoveries; in fact, the opposite is true. Similarly, the Trustee's

knowledge relating to Claims and the Debtors' operations will permit administration of the Claims process to be more efficient and effective than that conducted by a new trustee. Defending against the estates' largest remaining uncertainty – the WARN Class Action – could entail a delay in resolution of that litigation. The Liquidating Trustee's compensation has been fixed at 3% of distributions which is commensurate with compensation for a chapter 7 trustee under § 326 of the Bankruptcy Code. Thus, under the Plan, all creditors are benefitting from a lower administrative cost to liquidate under the most efficient and administratively convenient manner.

The Plan itself tracks the distribution scheme set forth in a Chapter 7, but without the additional costs or delays that are certain to be incurred in a Chapter 7 liquidation identified above. As a result of the foregoing, the Trustee believes that holders of Allowed Claims would not receive greater distributions under chapter 7 liquidation of the Debtors than they will receive under the Plan.

**B. Risks Related to Recoveries to Claimants**

Generally, the material uncertainties and risk factors regarding the Plan are the amounts and timing of distributions to the holders of Allowed Claims in the Plan Classes. Inherent in the nature of uncertainty associated with liquidation of property and assets is both timing and value. The Liquidating Trust will move as expeditiously as possible, within reason and subject to market determinations, to liquidate property and monetize Trust Assets. Projecting an ultimate sale price or value recoverable is not feasible. Nevertheless, these are the same material uncertainties that exist within a chapter 7 liquidation.

1. *WARN Class Action*

Resolution of the WARN Class Action will determine the Classification, extent of Allowance of the WARN Act and Related Employment Claims, including those arising under state law and entitled to priority under § 507(a)(4) of the Bankruptcy Code for accrued but unpaid vacation or similar benefits. Absent a settlement, the WARN Class Action will be litigated before the Bankruptcy Court, so the date and outcome of any resolution remain unknown. Non-debtor parties may also be liable in the WARN Class Action which may mitigate the Debtors' liability, if any, to the WARN Act and Related Employment Claimants. Until such time as this litigation is fully and finally resolved, the Trustee will be unable to determine when or whether distributions can be made to holders of Allowed Class 6 Unsecured Claims.

2. *Causes of Action*

Also, after the Effective Date, the Liquidating Trustee will continue evaluation of the Causes of Action identified herein that exist on behalf of the Debtors' estates. No determinations have been made regarding pursuit of any Cause of Action at this time. The Liquidating Trustee will make determinations and cost/benefit analyses as to the viability, costs and expenses of prosecution, likelihood of success and other considerations with respect to assertion, settlement, abandonment or election not to prosecute any Causes of Action in his sole discretion. The projected amounts of recovery to Claimants based on these Causes of Action are, like any type of litigation, uncertain and inherently unable to be determined.

3. *Claim Objections*

Material uncertainties exist regarding whether and to what extent objections to Claims will be meritorious and reduce the body of Claims against the estate. Evaluation and determination as to whether pursuit of such objections, or the extent to which such objections result in a net benefit to the estates or the Liquidating Trust, will be a determination made by the Trustee or Liquidating Trustee on a case-by-case basis.

### C. Tax Consequences

THE FOLLOWING DISCUSSION IS A SUMMARY OF CERTAIN OF THE SIGNIFICANT FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO THE DEBTORS, AND TO HOLDERS OF CLAIMS AND EQUITY INTERESTS AND IS BASED ON THE INTERNAL REVENUE CODE, TREASURY REGULATIONS PROMULGATED AND PROPOSED THEREUNDER, JUDICIAL DECISIONS AND PUBLISHED ADMINISTRATIVE RULES AND PRONOUNCEMENTS OF THE IRS AS IN EFFECT ON THE DATE HEREOF. CHANGES IN SUCH RULES OR NEW INTERPRETATIONS THEREOF COULD SIGNIFICANTLY AFFECT THE TAX CONSEQUENCES DESCRIBED BELOW. NO RULINGS HAVE BEEN REQUESTED FROM THE IRS. MOREOVER, NO LEGAL OPINIONS HAVE BEEN REQUESTED FROM COUNSEL WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN.

THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN TO THE HOLDERS OF CLAIMS AND INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. IN ADDITION, THIS DISCUSSION DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE DEBTOR OR THE HOLDERS OF ALLOWED CLAIMS OR INTERESTS (SUCH AS HOLDERS WHO DO NOT ACQUIRE THEIR CLAIM ON ORIGINAL ISSUE), NOR DOES THE DISCUSSION DEAL WITH TAX ISSUES PECULIAR TO CERTAIN TYPES OF TAXPAYERS (SUCH AS DEALERS IN SECURITIES, S-CORPORATIONS, LIFE INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, TAX-EXEMPT ORGANIZATIONS AND FOREIGN TAXPAYERS). NO ASPECT OF FOREIGN, STATE, LOCAL OR ESTATE AND GIFT TAXATION IS ADDRESSED.

THE FOLLOWING SUMMARY IS, THEREFORE, NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES PECULIAR TO THEM UNDER THE PLAN. THE TRUSTEE ASSUMES NO RESPONSIBILITY FOR THE TAX EFFECT THAT CONFIRMATION AND RECEIPT OF ANY DISTRIBUTION UNDER THE PLAN MAY HAVE ON ANY GIVEN CREDITOR OR OTHER PARTY IN INTEREST.

THE TRUSTEE IS NOT AWARE OF ANY ADVERSE TAX CONSEQUENCES TO THE DEBTORS' ESTATES.

1. *IRS Circular 230 Disclosure.*

THIS DISCLOSURE STATEMENT IS WRITTEN TO SUPPORT THE PROMOTION OR THE MARKETING OF TRANSACTIONS DISCUSSED HEREIN. TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, THE TRUSTEE IS INFORMING YOU THAT THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES THAT MAY BE IMPOSED ON SUCH TAXPAYER UNDER THE TAX CODE. TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

2. *Consequences to Holders of Claims*

The federal income tax consequences of the implementation of the Plan to a holder of a Claim will depend, among other things, upon the origin of the holder's Claim, when the holder's Claim becomes an Allowed Claim, when the holder receives payment in respect of such Claim, whether the holder reports income using the accrual or cash method of accounting, whether the holder has taken a bad debt deduction or worthless security deduction with respect to such Claim, and whether the holder's Claim constitutes a "security" for federal income tax purposes.

Generally, a holder of an Allowed Claim will realize gain or loss on the exchange under the Plan of its Allowed Claim for stock and other property (such as Cash and new debt instruments), in an amount equal to the difference between (i) the sum of the amount of any Cash and the issue price of any debt instrument, (other than any consideration attributable to a Claim for accrued but unpaid interest), and (ii) the adjusted basis of the Allowed Claim exchanged therefor (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income). The treatment of accrued, but unpaid interest and amounts allocable thereto varies depending on the nature of the holder's Claim and is discussed below.

Whether or not such realized gain or loss will be recognized, *i.e.*, taken into account, for federal income tax purposes will depend in part upon whether such exchange qualifies as a recapitalization or other "reorganization" as defined in the Tax Code, which may in turn depend upon whether the Claim exchanged is classified as a "security" for federal income tax purposes. The term "security" is not defined in the Tax Code or in the Treasury Regulations. One of the most significant factors considered in determining whether a particular debt instrument is a security is the original term thereof. In general, the longer the term of an instrument, the greater the likelihood that it will be considered a security. As a general rule, a debt instrument having an original term of ten (10) years or more will be classified as a security, and a debt instrument having an original term of fewer than five years will not. Debt instruments having a term of at least five (5) years but less than ten (10) years are likely to be treated as securities, but may not be, depending upon their resemblance to ordinary promissory notes, whether they are publicly traded, whether the instruments are secured, the financial condition of the debtor at the time the debt instruments are issued, and other factors. Each holder of an Allowed Claim should consult his or her own tax advisor to determine whether his or her Allowed Claim constitutes a security for federal income tax purposes.

***Each holder of an Allowed Claim is urged to consult its tax advisor regarding the allocation of consideration and deductibility of unpaid interest for tax purposes.***

All distributions to holders of Claims under the Plan are subject to any applicable withholding. Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding." Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

3. *Consequences to the Debtors*

In general, the discharge of a debt obligation by a debtor for an amount less than the adjusted issue price (generally, the amount received upon incurring the obligation plus the amount of any previously amortized original issue discount and less the amount of any previously amortized bond issue premium) gives rise to cancellation of indebtedness ("COD") income which must be included in a debtor's income for federal income tax purposes, unless, in accordance with Internal Revenue Code § 108(e)(2), payment of the liability would have given rise to a deduction. As UFI is taxed as a partnership, tax consequences may be experienced at the owner level. There may be discharge of debt under the Plan that could flow through to the Interests, personally. To the extent the holders of Interests have "suspended" losses that have not been utilized through offset against income, the discharge of debt "income" will apply to reduce such suspended losses in conformity with the tax code. The Plan does not transfer to the Liquidating Trust any suspended losses or other losses ever owned or held by the holder of an Interest. It is thought that compromise of disputed Claims, where there is a good faith basis upon which to dispute the existence or amount of the Claims would not generate debt forgiveness. Holders of Interests are cautioned that they should contact their tax advisers to obtain advice concerning the possibility of adverse tax consequences of Confirmation.

## VI. VOTING PROCEDURES

The Plan cannot be consummated unless it is confirmed by the Bankruptcy Court. Confirmation of the Plan requires that, among other things, either (i) each class of Claims or Interests that is Impaired by the Plan has voted to accept the Plan by the requisite majority, or (ii) the Plan is determined by the Bankruptcy Court to be fair and equitable, as defined by the Bankruptcy Code, with respect to classes of Claims or Interests that have rejected the Plan. The Bankruptcy Code also requires that the Confirmation of the Plan be in the "best interests" of all holders of Claims and Interests. The Trustee believes that the Plan meets the Confirmation requirements of the Bankruptcy Code.

### A. Manner of Voting

IT IS IMPORTANT THAT HOLDERS OF CLAIMS AND INTERESTS EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN. All known holders of Claims and Interests entitled to vote on the Plan will receive a Ballot contained in the Solicitation Package. Holders should read the Ballot carefully and follow the Voting Instructions and other information contained therein. In voting for or against the Plan, please use only the Ballot (or Ballots) sent to you with this Disclosure Statement. A holder may hold an Allowed Claim or Interest in more than one Class and may therefore receive and cast multiple Ballots.

**Your ballot must be actually received by Epiq Corporate Restructuring, LLC (the "Voting Agent") before 5:00 p.m., prevailing central time, on [______________] (the "Voting Deadline").**

1. *Electronic Voting – E-Ballot*

You will receive a unique E-Ballot ID# with which you may submit your Ballot and vote on the Plan electronically. Your E-Ballot ID# is provided to you and found in your Solicitation Package. Instructions for voting electronically are as follows:

| |
|---|
| To submit your Ballot via the Epic Corporate Restructuring online portal, you should visit https://dm.epiq11.com/UnitedFurniture. Click on the "E-Ballot" section of the website and follow the instructions to submit your Ballot.<br><br>**IMPORTANT NOTE:**<br><br>**You will need the following information to retrieve and submit your customized electronic Ballot:**<br><br>**Unique E-Ballot ID#:____________________**<br><br>The E-Ballot Portal is the sole manner in which Ballots will be accepted *via* electronic or online transmission. Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted.<br><br>Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable. **Holders who cast a Ballot using the Voting Agent's online portal SHOULD NOT also submit a paper Ballot.** |

2. *Standard Voting – Paper Ballot*

You may also complete your paper Ballot and return it in the enclosed envelope provided via First Class U.S. Mail, overnight courier, or hand delivery as follows:

| **If by First Class Mail:** | **If by Hand Delivery or Overnight Mail:** |
|---|---|
| United Furniture Industries, Inc.<br>c/o Epiq Ballot Processing<br>P.O. Box 4422<br>Beaverton, OR 97076-4422 | United Furniture Industries, Inc.<br>c/o Epiq Ballot Processing<br>10300 SW Allen Blvd.<br>Beaverton, OR 97005 |

ANY BALLOT WHICH IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN WILL BE DEEMED AN ACCEPTANCE OF THE PLAN.

If you have any questions concerning voting procedures or if a Ballot is damaged or lost, you may seek assistance from the Voting Agent as follows:

- UFI website and portal:

  https://dm.epiq11.com/UnitedFurniture

- Contact Voting Agent *via* e-mail:

  UnitedFurnitureInfo@epiqglobal.com

Additional copies of the Plan, the Disclosure Statement, Disclosure Order, or any documents or exhibits relating to solicitation and voting on the Plan may be obtained without charge from either of the means identified above.

**B. Creditors Eligible to Vote**

Subject to the provisions of the Disclosure Order, any holder of a Claim against or Interest in any Debtor as of the Petition Date, which Claim or Interest has not been disallowed by order of the Bankruptcy Court and is not otherwise a Disputed Claim or Disputed Interest, is entitled to vote to accept or reject the Plan if (i) such Claim or Interest is Impaired under the Plan and is not of a Class that is deemed to have accepted or rejected the Plan pursuant to §§ 1126(f) and 1126(g) of the Bankruptcy Code and (ii) either (a) such holder's Claim or Interest has been scheduled by the Debtors (and such Claim or Interest is not scheduled as disputed, contingent or unliquidated), or (b) such holder has filed a Proof of Claim on or before the applicable Bar Dates.

Unless otherwise permitted in the Plan, the holder of any Disputed Claim is not entitled to vote with respect to such Disputed Claim, unless the Bankruptcy Court, upon timely application by such holder in accordance with Bankruptcy Rule 3018(a), temporarily allows such Disputed Claim for the limited purpose of voting to accept or reject the Plan. Any such application must be heard and determined by the Bankruptcy Court on or before fourteen (14) days prior to the Voting Deadline. A vote on the Plan may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

**C. General Procedures for Solicitation and Voting**

Pursuant to Bankruptcy Rule 3017(d) and as directed in the Disclosure Order, on or before [________________] (the "Solicitation Mailing Date"), the Trustee will transmit the Solicitation Packages to all parties entitled to receive it.

1. *Procedures for Non-Voting Classes*

Under the Plan, certain holders of Claims in Classes 3, 4 and 5 are either Unimpaired or Disputed (the "Non-Voting Parties"). Under Bankruptcy Code § 1126(f) and (g), the Non-Voting Parities are deemed to have accepted or rejected the Plan, and solicitation of votes from such Classes is not required. Under the Plan, Class 3 is deemed to accept the Plan and Classes 4 and 5 are deemed to reject the Plan. Classes 3, 4 and 5 are deemed Non-Voting Parties. Accordingly, solicitation of votes with respect to these Classes of Claims is not required and holders of Claims in these Classes need not receive Ballots. The Trustee will still provide Solicitation Packages to Non-Voting Parties but will not provide a Ballot.

Pursuant to Bankruptcy Rule 3003(c)(2), the Trustee will not mail or distribute any documents or notices to any holders of Claims or Interests (a) whose Claim or Interest is not scheduled or is scheduled at zero, in an unknown amount, or as disputed, contingent, or unliquidated; and (b) who failed to timely file a Proof of Claim. Moreover, such holders shall not be treated as a holder of a Claim or Interest with respect thereto for the purposes of voting and distribution.

2. *Procedures for Vote Tabulation*

a. Voting Deadline

Pursuant to Bankruptcy Rule 3017(c), and as set forth above, ballots for accepting or rejecting the Plan must be received by the Trustee by the Voting Deadline in order to be counted.

b. Tabulation Procedures

The following general voting procedures and standard assumptions shall be used in tabulating Ballots:

- If a Claim is deemed allowed under the Plan, an order of the Court or a stipulated agreement between the parties, such claim will be temporarily allowed for voting purposes in the deemed allowed amount set forth therein;

- if a Claim for which a Proof of Claim has been timely filed for unknown or undetermined amounts, or is wholly unliquidated, or contingent (as determined on the face of the claim or after a reasonable review of the supporting documentation by the Trustee or the Voting Agent) and such Claim has not been allowed, such Claim shall be temporarily allowed for voting purposes only, and not for purposes of allowance or distribution, at $1.00;

- if a Claim, for which a Proof of Claim was timely filed, is listed as contingent, unliquidated, or disputed in part, such Claim is temporarily allowed in the amount that is liquidated, non-contingent, and undisputed for voting purposes only, and not for purposes of allowance or distribution;

- if a Claim was listed in the filed Schedules in an amount that is liquidated, non-contingent, and undisputed, and a Proof of Claim was not filed by the applicable Claims Bar Date, such Claim is allowed for voting in the liquidated, non-contingent, undisputed, amount set forth in the filed Schedules;

- if a Claim has been estimated or otherwise allowed for voting purposes by order of the Court, such Claim is temporarily allowed in the amount so estimated or allowed by the Court for voting purposes only, and not for purposes of allowance or distribution;

- Proofs of Claim filed for $0.00 are not entitled to vote;

- if the Trustee has served an objection or request for estimation as to a Claim at least ten (10) days before the Voting Deadline, such Claim is temporarily disallowed for voting purposes only and not for purposes of allowance or distribution, except to the extent and in the manner as may be set forth in such objection, or as ordered by the Court before the Voting Deadline;

- for purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code separate Claims held by a single creditor in a particular Class shall be aggregated as if such creditor held one Claim in such Class, and the votes related to such Claims shall be treated as a single vote to accept or reject the Plan;

- notwithstanding anything to the contrary contained herein, any Claimant who has filed duplicate Claims within the same Class shall be provided with only one Solicitation Package and one Ballot for voting a single Claim in such Class, regardless of whether the Trustee has

objected to such duplicate Claims; and

- If a Proof of Claim has been amended by a later Proof of Claim, the later filed amending Claim shall be entitled to vote in a manner consistent with these tabulation rules, and the earlier filed Claim shall be disallowed for voting purposes, regardless of whether the Trustee has objected to such amended claim. Except as otherwise ordered by the Court, any amendments to proofs of claim after the Voting Deadline shall not be considered for purposes of these tabulation rules.

c. Rules for Evaluating Ballots Received.

The following rules shall apply to the Trustee's and Voting Agent's actions with regard to any Ballots received under the following circumstances:

- if a holder casts more than one Ballot voting the same Claim(s) before the Voting Deadline, the last properly completed Ballot actually received before the Voting Deadline shall be deemed to reflect the voter's intent and, thus, to supersede any prior Ballots;
- if a holder simultaneously casts inconsistent Ballots, neither Ballot shall be counted;
- any holder of a Claim entitled to vote that has delivered a valid Ballot may withdraw such Ballot solely in accordance with Bankruptcy Rule 3018(a);
- if a holder casts a Ballot that is properly completed, executed, and timely returned to the Voting gent, but does not indicate either an acceptance or rejection of the Plan, the Ballot shall not be counted;
- a holder may not split its vote(s), so if a Ballot is cast that partially rejects and partially accepts that Plan, the Ballot shall not be counted; and
- if a holder casts a Ballot that is properly completed, executed, and timely returned to the Voting Agent but indicates both an acceptance and rejection of the Plan, the Ballot shall not be counted.

d. Disregarded and Uncounted Ballots.

The following rules shall apply to the Trustee's and Voting Agent's determinations as to any Ballots received but which shall be disregarded and will not be counted:

- any Ballot received after the Voting Deadline unless the Trustee has granted an extension with respect to such Ballot;
- any Ballot that is illegible or contains insufficient information to permit the identification of the claimant;
- any Ballot cast by a person or entity that does not hold a Claim in a Class entitled to vote to accept or reject the Plan;
- any unsigned Ballot;
- any Ballot without an original signature; and

- any Ballot transmitted to the Voting Agent by facsimile, electronic mail, or other means not specifically approved by this Court.

Neither the Trustee, the Voting Agent nor any other person or entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots, nor will any of them incur any liability for failure to provide such notification. The Trustee may, except as otherwise set forth herein, waive any defects or irregularities as to any particular Ballot at any time, either before or after the Voting Deadline, and any such waivers shall be documented in the vote tabulation certification prepared by the Voting Agent.

### D. Acceptance Necessary to Confirm the Plan

For the Plan to be accepted and thereafter confirmed, it must be accepted by at least one (1) class of Claims that is Impaired by the Plan. Under § 1126 of the Bankruptcy Code, the Impaired class is deemed to have accepted the Plan if: (i) with respect to a class of Claims, votes representing at least two-thirds (2/3) in amount and more than one-half (1/2) in number of Allowed Claims that have voted in that class have accepted the Plan, and (ii) with respect to a class of Interests, votes representing at least two-thirds (2/3) in amount of those Allowed Interests that have voted have accepted the Plan; provided, however, that the vote of any holder of an Allowed Claim or Allowed Interest whose acceptance or rejection of the Plan was not made in good faith, as determined by the Court, will not be counted.

If a class of Claims has been Impaired by the Plan, the Impaired class must accept the Plan. Otherwise, the Bankruptcy Court, in order to confirm the Plan, must independently determine that the Plan provides to each holder of a Claim or Interest, as the case may be, of such class a recovery which has a value, as of the Effective Date, at least equal to the value of the distribution which such holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

CREDITORS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE ALL CONTENTS OF THE SOLICITATION PACKAGE FOR A FULL UNDERSTANDING OF VOTING REQUIREMENTS, INCLUDING, WITHOUT LIMITATION, USE OF OFFICIAL BALLOT FORMS.

## VII. CONFIRMATION

### A. Hearing on Confirmation of the Plan

Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing on confirmation of a plan. Pursuant to the Disclosure Order entered by the Bankruptcy Court, a hearing on confirmation of the Plan will be held on **[_______________], 2024, at 10:00 a.m., Central Time**, before the Honorable Selene Dunn Maddox in the Thad Cochran U.S. Courthouse for the United States Bankruptcy Court for the Northern District of Mississippi, 745 Highway 145 North, Aberdeen, Mississippi 39730 (the "Confirmation Hearing"). The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjournment thereof.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan must be made in writing, conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, set forth the name of the objector, the nature and amount of the Claim or Interest held or asserted by the objector against the Debtors' estates or property, the basis for the objection and the specific grounds therefor. **The**

**objection, together with proof of service thereof, must be filed with the Clerk of Court by 12:00 p.m. Central Time on [_______, ________________], 2024, ("Plan Objection Deadline") and served on the following persons by the Plan Objection Deadline**: (a) Trustee, Derek Henderson, derek@derekhendersonlaw.com; (b) Counsel for the Trustee, Douglas C. Noble, dnoble@mmqnlaw.com; (c) Counsel for the Committee, Paul Douglas Stewart, dstewart@stewartrobbins.com; and (d) Office of the United States Trustee, Sammye S. Tharp, Trial Attorney, sammye.s.tharp@usdoj.gov.

Objections to confirmation of the Plan are governed by Federal Rule of Bankruptcy Procedure 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY AND PROPERLY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

### B. Requirements for Confirmation of the Plan

1. *Acceptance*

Holders of Claims in Classes 1A, 1B, 2, 6 and 7 are Impaired and entitled to vote on the Plan. Each class must accept the Plan in order for it to be confirmed without application of the "fair and equitable test" described below to such Class. As stated above, a Class of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds (⅔) in dollar amount and a majority in number of the Claims of such Class (other than any Claims of creditors designated under § 1126(e) of the Bankruptcy Code) that cast votes on the Plan.

2. *Confirmation without Unanimous Acceptance; Cram Down*

Section 1129(b) of the Bankruptcy Code provides that the Plan may be confirmed by the Court despite not being accepted by every Impaired class if (i) at least one Impaired class of Claims, excluding the claims of insiders, has accepted the Plan; and (ii) the Court finds that the Plan does not discriminate unfairly and is fair and equitable to the rejected classes. Among other things, such a finding would require a determination by the Court that the Plan provides that no holder of an Allowed Claim or Interest junior to the rejecting class will receive or retain property or payment under the Plan until or unless such rejecting class is paid in full.

The Trustee reserves the right pursuant to Bankruptcy Code § 1129(b) to request the Court to confirm the Plan if all of the applicable requirements of Bankruptcy Code § 1129(a) have been met. In addition, the Trustee reserves the right pursuant to Bankruptcy Code § 1126(e) to request the Court to strike any Ballot rejecting the Plan cast by any holder of a Claim or interest which was not cast in good faith.

3. *Absolute Priority Rule*

The absolute priority rule provides that the Plan is fair and equitable with respect to a rejecting class if the rejecting class receives (i) payment in full over time with interest or (ii) as long as no class junior to it receives a distribution under the Plan. The Trustee believes that the Plan represents the best option available to maximize the return to all creditors. Furthermore, under the Plan, no inferior class of creditors or Interest holders will receive or retain anything unless the Allowed Claims of all superior classes are paid in full.

4. *"Best Interests" Test/Liquidation Analysis*

The "best interests of creditors" test embodied in § 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find either (a) that all members of each Impaired Class have accepted the Plan

or (b) that each holder of an Allowed Claim or Interest of each Impaired Class will receive or retain under the Plan on account of such Claim or Interest in property a value, as of the Effective Date, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on such date.

For the reasons explained in the Liquidation Analysis in Section V.A., above, the Trustee believes that the Plan satisfies the "best interest of creditors" test.

### C. Effect of Confirmation

Confirmation of the Plan will bind the Debtors and all holders of Claims or Interests, whether or not they accept the Plan. The distributions provided for in the Plan will be in exchange for and in complete settlement, satisfaction and discharge of all Claims and Interests, including any claim for interest after the Petition Date. All holders of Claims shall be precluded from asserting any claim against the Trustee, the Debtors or their property based upon any transaction or other activity of any kind that occurred prior to the Effective Date.

1. *Title to Assets*

Except as otherwise provided by the Plan, on the Effective Date, title to all assets and properties encompassed by the Plan shall vest in the Liquidating Trust, in accordance with § 1141 of the Bankruptcy Code.

2. *Discharge and Dissolution of Unsecured Creditors Committee*

Upon the Effective Date, the Committee shall be dissolved and its members shall be deemed relieved of all of their prior duties and responsibilities and shall be without any further duties, responsibilities and authority in connection with the Cases or the Plan and its implementation.

3. *General Injunction*

The Plan provides in Section 13.3 for a permanent injunction resulting from confirmation of the Plan against parties holding Claims against any of the Debtors, which will take effect from and after the Effective Date and states as follows:

**INJUNCTION. THERE SHALL BE AN INJUNCTION TO THE FULL EXTENT ALLOWED UNDER BANKRUPTCY CODE §§ 1141, AND ALL HOLDERS OF CLAIMS AND INTERESTS OR OTHER PERSONS BOUND BY THE PROVISIONS OF THE PLAN SHALL BE ENJOINED FROM PURSUING ANY ACTION ON ACCOUNT OF OR RELATED TO ANY CLAIM OR INTEREST THROUGH ANY CONDUCT OR PROCEEDING WHATSOEVER, WITH RESPECT TO SUCH HOLDER'S CLAIMS OR WITH RESPECT TO ANY EXCULPATED CLAIMS. ALL CLAIMS AGAINST, INTERESTS IN, AND ANY OTHER RIGHT OF RECOVERY FROM THE DEBTORS ARE HEREBY CHANNELED TO THE LIQUIDATING TRUST, WHICH IS AND SHALL BE THE SOLE SOURCE OF RECOVERY IN ACCORDANCE WITH THE PLAN.**

**FURTHERMORE, NO CREDITOR POSSESSING A LIEN IN, TO, OR UPON PROPERTY OF THE ESTATES OR TRUST ASSETS MAY CONTINUE OR COMMENCE ANY ACTION TO SIEZE, SELL, DISTRAIN, RETAIN, RESTRAIN, REPLEVIN, SEQUESTER, ATTACH, OR OTHERWISE OBTAIN POSSESSION, CUSTODY, CONTROL, OWNERSHIP OR EFFECTUATE A TRANSFER OF OWNERSHIP OF PROPERTY OF THE ESTATES OR TRUST ASSETS THROUGH NON-BANKRUPTCY LAW PROCEDURES WITHOUT FURTHER ORDER OF THE BANKRUPTCY COURT.**

4. *Exculpation*

The Plan provides in Section 13.4 for a limited release of claims and causes of action against and exculpation of liability in favor only of the Trustee for his action while serving in such capacity in these Cases and the Professionals he engaged to fulfill his duties and effect administration of these Cases:

**This Plan does not affect an exculpation or release of any person or entity, save and except the officers and employees employed by the Trustee during the pendency of these Cases or serving in such capacity as of the Effective Date, the Trustee, and Professionals authorized to be employed by the Trustee under Order[s] of the Bankruptcy Court. Upon the Effective Date, such protected persons shall be released by the Debtor pursuant to §1123(b)(3) of the Bankruptcy Code and shall not have or incur any liability to the Debtors or the estates under any theory of liability for any act or omission occurring on or after the Petition Date in connection with or related to any Debtor, the Cases, or the estates, including, but not limited to, (i) formulating, preparing, disseminating, implementing, confirming, consummating or administering this Plan (including soliciting acceptances or rejections thereof); or (ii) the Disclosure Statement or any contract, instrument, release or other agreement or document entered into or any action taken or omitted to be taken in connection with this Plan, except for acts constituting willful misconduct, gross negligence, or ultra vires activity and in all respects such protected persons shall be entitled to rely in good faith upon the advice of counsel.**

5. *No Discharge*

PURSUANT TO BANKRUPTCY CODE § 1141(d)(3), THE DEBTORS ARE NOT ENTITLED TO A DISCHARGE. Otherwise, all other terms and provisions of § 1141 of the Bankruptcy Code shall apply in full.

**D. Confirmation Order and Plan Control**

To the extent the Confirmation Order and/or the Plan is inconsistent with the Disclosure Statement, or any other agreement entered into between or among the Debtors and any third party, the Plan controls the Disclosure Statement and the Confirmation Order shall control the Plan.

**E. Immediate Binding Effect and Modification of Plan.**

(a) Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Trustee and any and all holders of Claims against or Interests in the Debtors (regardless of whether such Claims or Equity Interests are deemed to have accepted or rejected the Plan), all entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts or Unexpired

Leases with any Debtor. All Claims and debts shall be fixed, adjusted or compromised, as applicable, pursuant to the Plan regardless of whether any holder of a Claim or debt has voted on the Plan.

(b) Subject to the limitations contained in the Plan, the Trustee reserves the right to modify the Plan as to immaterial terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in Bankruptcy Code § 1127 and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Trustee expressly reserves the right to immaterially alter, amend or modify immaterially the Plan one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, this Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

(c) Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof and prior to the Confirmation Date are approved pursuant to Bankruptcy Code § 1127(a) and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

### F. Revocation or Withdrawal

The Trustee reserves the right to revoke or withdraw the Plan prior to the Confirmation Date or substantial consummation of the Plan and to file subsequent plans. If the Trustee revokes or withdraws the Plan, or if Confirmation or consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption and assignment or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Trustee, Debtors or any other entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Trustee, Debtors or any other entity.

### G. Governing Law

Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Mississippi, without giving effect to the principles of conflict of laws thereof.

## VIII. CONCLUSION AND RECOMMENDATION

The Trustee believes that the Plan is in the best interests of all holders of Claims and Interests and of all other persons who will be affected by the confirmation of the Plan. The Plan is supported by the Committee. The Trustee urges the holders of Impaired Claims in the Voting Classes to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be actually received by the Voting Deadline.

THIS the 22nd day of November, 2023.

Respectfully submitted,

**DEREK HENDERSON, CHAPTER 11 TRUSTEE of UNITED FURNITURE INDUSTRIES, INC., *et al.***

By: /s/ *Derek Henderson*

Douglas C. Noble, MS Bar No. 10526
**McCraney | Montagnet | Quin | Noble PLLC**
602 Steed Road • Suite 200
Ridgeland, Mississippi 39157
Telephone: (601) 707-5725
Facsimile: (601) 510-2939
Email: dnoble@MMQNLaw.com

and

Derek A. Henderson, MS Bar No. 2260
Anna Claire Henderson, MS Bar No. 106230
1765-1 Lelia Drive, Suite 103
Jackson, Mississippi 39216
Telephone: (601) 948-3167
Email: derek@derekhendersonlaw.com

***Counsel to Chapter 11 Trustee***

**Exhibit 1**

Plan of Liquidation

**Exhibit 2**

Disclosure Order